Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FRACTUS, S.A.,                    (   CAUSE NO. 2:22-CV-412-JRG
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
ADT, LLC.,                        (   MARSHALL, TEXAS
                                  )   MARCH 16, 2022
          Defendant.              (   9:00 A.M.
_____

_____

PRETRIAL CONFERENCE


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2       FOR THE PLAINTIFF:     SUSMAN GODFREY, LLP
                                1000 LOUISIANA ST., STE. 5100
 3                              HOUSTON, TEXAS  77002-5096
                                (713) 651-9366
 4                              BY: MR. MAX TRIBBLE
                                    MR. JOSEPH GRINSTEIN
 5                                  MR. JUSTIN NELSON

 6                              SUSMAN GODFREY, LLP
                                ONE MANHATTAN WEST, 50TH FLOOR
 7                              NEW YORK, NEW YORK  10001
                                (212) 336-8330
 8                              BY:  MR. JAMES SMYSER

 9                              SUSMAN GODFREY, LLP
                                401 UNION STREET, SUITE 3000
10                              SEATTLE, WASHINGTON  98101
                                (206) 516-3880
11                              BY:  MS. KELSEY TOUHY

12                              WARD, SMITH & HILL, PLLC
                                1507 BILL OWENS PARKWAY
13                              LONGVIEW, TEXAS  75604
                                (903) 757-6400
14                              BY:  MR. JOHNNY WARD, JR.

15                              CAPSHAW DeRIEUX, LLP
                                114 E. COMMERCE AVENUE
16                              GLADEWATER, TEXAS  75647
                                (903) 845-5770
17                              BY:  MS. ELIZABETH DeRIEUX

18       FOR THE DEFENDANTS:    PILLSBURY WINTHROP SHAW
                                PITTMAN, LLP - PALO ALTO
19                              2550 HANOVER STREET
                                PALO ALTO, CALIFORNIA  94304
20                              (650) 233-4500
                                BY:  MR. MICHAEL ZELIGER
21                                   MS. RANJINI ACHARYA

22                              GILLAM & SMITH, LLP
                                102 N. COLLEGE, SUITE 800
23                              TYLER, TEXAS  75702
                                (903) 934-8450
24                              BY:  MR. TOM GORHAM

25
```

1    OFFICIAL REPORTER:  SHAWN M. McROBERTS, RMR, CRR
2              100 E. HOUSTON STREET
                MARSHALL, TEXAS  75670
3              (903) 923-8546
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          THE COURT:  Be seated, please.

2       All right.  This is the time set for pretrial matters

3    before the Court in Fractus versus ADT.  This is Civil Case

4    No. 2:22-CV-412.

5       Let me ask for announcements on the record.

6       What says the Plaintiff?

7          MR. TRIBBLE:  Good morning, Your Honor.  Max Tribble

8    for the Plaintiff Fractus.  And with me today is Justin

9    Nelson, Joe Grinstein, Craig Smyser, Kelsey Tuohy, and Johnny

10   Ward.  And also attending is Elizabeth DeRieux.  The Plaintiff

11   is ready for trial, Your Honor.

12          THE COURT:  All right.  Thank you, counsel.

13       What's the announcement for the Defendant?

14          MR. GORHAM:  Good morning, Your Honor.  Tom Gorham

15   on behalf of Defendant ADT.  With me here today is Michael

16   Zeliger and Ranjini Acharya.  Defendant is ready, Your Honor.

17          THE COURT:  Thank you.

18       Counsel, let me go through some housekeeping matters with

19   you and then we'll get onto the disputed issues before the

20   Court.

21       This case is set to go to trial on Monday July the 8th.

22   As it stands right now, it looks like it's probably the number

23   one case.

24       When we select the jury, I'm going to afford each side 30

25   minutes per side to examine the venire panel.  And as is the

1    Court's typical practice, should you choose to, I'll afford

2    you up to three minutes at the beginning of your examination

3    of the panel to give a very high-level, non--argumentative

4    overview of the issues in the case.  If you lapse into

5    argument, I'll probably stop you and embarrass you, so be sure

6    you don't do that.

7         I'm going to select eight jurors to hear the evidence,

8    and there will be four peremptory challenges per side.  Each

9    side will have 11 hours per side to put on their evidence,

10   which does not include selecting the jury, opening statements,

11   or closing arguments.  Each side will be afforded 30 minutes

12   per side for opening statement and 40 minutes per side for

13   closing arguments.

14        I'm going to direct that the parties follow the Court's

15   usual practice with regard to exchange of demonstratives and

16   meeting and conferring with regard to potential disputes.

17   I'll be in chambers each morning before we begin the trial and

18   can take those up if they have survived the overnight meet and

19   confer process.

20        You'll need to report to my staff by email not later than

21   10:00 p.m. the night before and advise us of what disputes

22   might still be existing between the parties at that time, but

23   you're then to continue your efforts to resolve those

24   disputes.  And if by 7:00 a.m. the next morning you still have

25   surviving overnight disputes, then you're to furnish a jointly

1    prepared three-ring binder to chambers at 7:00 a.m. containing

2    the disputed slide, if that's the case, but, in addition, a

3    single paragraph narrative from each side as to what their

4    positions are.  You'd be surprised how many times I get a

5    binder with slides in it and no idea what the problems are

6    between the parties.  So make sure I have at least a single

7    paragraph on each dispute giving me both Plaintiff and

8    Defendant's position.

9        If you have disputes regarding the designation or

10   counterdesignation for deposition testimony for deposition

11   witnesses, I'll take those on a rolling basis, but my rule is

12   I need to know about any disputes regarding deposition

13   testimony the day before the day it's going to be presented.

14   I don't want those disputes to arise on the day it would be

15   presented and risk having to automatic delay of the trial

16   because of technical issues.

17       I'll take up and hear motions from either party pursuant

18   to Rule 50(a) of the Federal Rules of Civil Procedure after

19   the close of all of the evidence; not at the close of the

20   Plaintiff's case in chief, but at the close of all the

21   evidence.

22       After I've heard and ruled on motions from either party

23   pursuant to Rule 50(a), then I'll conduct an informal charge

24   conference, typically in chambers, definitely off the record,

25   with a free-flowing exchange of information between counsel

1    and the Court where we can discuss any areas where you're not

2    in agreement with regard to the charge and verdict form, and

3    the Court can probe you as to any issues that would be helpful

4    to the Court to discuss.

5         After that, I'll take your input into account through

6    that informal charge conference, I'll generate what I believe

7    to be the appropriate and proper final jury instruction and

8    verdict form, I'll furnish it to you with a chance to review

9    it, and then conduct a formal charge conference on the record

10   where any party may lodge such suggestions as they think are

11   necessary and in the interests of their clients.

12        Let me remind you it's the Court's practice to avoid use

13   of first names only in testimony before the jury.  That

14   practice is inherently confusing and it is not in keeping with

15   the proper decorum for a United States District Court.  Make

16   sure you have informed your witnesses of this.  If your

17   witnesses violate this instruction, then you'll get credit

18   because you didn't teach them not to.

19        I'll refer you to the Court's standing order on

20   protecting confidential or proprietary information by means of

21   sealing the courtroom and that portion of the record.  My only

22   request is that you try, where appropriate, to avoid sealing

23   and unsealing in rapid succession so it's on/off, on/off, and

24   we spend a lot of time people going in and out of the

25   courtroom.  To the extent you can group or segregate your

1    confidential testimony so that we can minimize the number of

2    times we have to seal and unseal the courtroom, that will be

3    the Court's request.  Obviously I'm not going to tell you how

4    to present your evidence, but to the extent we can avoid this

5    on/off, in/out back and forth, that would be helpful.

6        All right.  I believe we already have a juror

7    questionnaire in this case, and I'll refer you to

8    Ms. Clendening, the Deputy-In-Charge for this division, as

9    regards access to and use of the information from those jury

10   questionnaires.  I'll simply remind you that the Court

11   represents to the public summons for jury duty that they don't

12   need to be concerned about lawyers or jury consultants or

13   anybody else retaining the information in those questionnaires

14   so that they can be as candid as possible, which helps you and

15   helps the Court.  So you're not to copy, you're not to scan,

16   you're not to retain in any way any of the information from

17   those jury questionnaires.  Simply put, you'll probably be

18   given access to a hard copy, a chance to look at the hard

19   copy, and then an opportunity to return to hard copy to the

20   Clerk.

21       And I don't know how you have taken the depositions that

22   have been taken in this case.  To the extent you have the

23   accompanying text with the audio and video, it's always

24   helpful that your clips include that accompanying text, and

25   where it's available I want you to include that.

1       We'll take up the pre-admission of exhibits after we've

2   dealt with disputed motions and disputes regarding motions in

3   limine.  We'll follow the Court's standing order with regard

4   to the number and use of pre-admitted exhibits.

5       I will tell you this.  In the last trial that I conducted

6   which ended last Friday, there were two instances where the

7   parties came to the Court in the middle of trial and told me

8   that they had determined -- or one party had determined that

9   they had inadvertently overlooked a matter that should have

10  been a pre-admitted exhibit and they wanted the Court to admit

11  it on the fly in the middle of the trial in front of the jury.

12  The other side said they had no objection to it, and it was

13  clear to me that they had reached that conclusion or

14  realization at least before the trial started.

15      The Court's standing order has a mechanism where each

16  side can potentially admit after the pretrial process up to

17  four exhibits if they've truly been inadvertently overlooked,

18  but I would simply say when you realize it's been

19  inadvertently overlooked, bring it to my attention

20  immediately; don't work it out with the other side and forget

21  to tell me when the jury's in the box in the middle of trial.

22  One thing the Court doesn't like is surprises.  I asked both

23  sides in the prior trial why, and I got a bunch of blank

24  stares, so let me just remind you if that comes up and that

25  provision, the standing order, is implemented, which is

1   perfectly fine, just make sure the Court knows as soon as you

2   know.

3       I don't think we're going to have any witnesses who will

4   testify with the aid of an interpreter in this case.  Is that

5   correct, counsel?  Anybody aware of anybody who will be using

6   an interpreter?

7           MR. TRIBBLE:  Your Honor, I believe that we have one

8   may call witness that may -- that we currently don't expect to

9   call her, so --

10          THE COURT:  Other than that, you're not expecting

11  any use of interpreters?

12          MR. TRIBBLE:  No, Your Honor.

13          THE COURT:  How about Defendant?

14          MR. GORHAM:  None for ADT, Your Honor.

15          THE COURT:  Okay.  Well, if that possibility

16  presents itself, Mr. Tribble, just make sure the Court knows

17  when you know.

18          MR. TRIBBLE:  We'll try to expedite our process.  In

19  part, of course, it depends on how the trial goes.

20          THE COURT:  All right.  Thank you.

21      I'm going to direct that the parties prepare and deliver

22  to chambers not later than 4:00 tomorrow 12 juror notebooks

23  for use during the trial.  I need them tomorrow because

24  Thursday and Friday are federal holidays.  And I think you're

25  both -- both sides are familiar with what these need to

1    contain, but to avoid any doubt, they need to contain a

2    complete single-sided printed copy of both of the

3    patents-in-suit, they need to contain a single chart showing

4    any claim language that the Court has construed with the

5    adopted construction on the corresponding column to the right

6    so that you have a side-by-side comparison of claim language,

7    adopted construction, claim language, adopted construction;

8    nothing else from the claim construction opinions to be

9    included.

10       I also want there to be a witness page for each potential

11   witness, either live or by deposition, that includes a

12   head-and-shoulders photograph of the witness imposed during

13   the top of the page with their name underneath.  You're not to

14   characterize them with some explanation of who they are;

15   simply put their name.  If they've got an earned terminal

16   degree, put 'doctor' in front of it.  And then the remainder

17   of those pages should be ruled lines for possible note-taking.

18   And each of those pages should be tabbed with the witness'

19   name on the tab so the jury can more easily and quickly get to

20   the right page when the next witness is called.

21       Then behind those witness pages there should be a new

22   legal pad with three holes punched included in the notebook

23   for additional note-taking.  And in the front pocket, please

24   insert a pen.  Please make sure it's a pen that doesn't click.

25   I've had that experience before.

1          Also I am directing that each side provide the Court with

2    the actual reports of any testify experts they expect to call,

3    and I want those reports presented in both hard copy in

4    binders and electronically by way of a zip file or appropriate

5    electronic transfer furnished to the Court.  And those need to

6    come in by 4:00 tomorrow with the juror notebooks.

7          All right.  All right.  Any questions about any of

8    those instructions?

9       Any questions from Plaintiff?

10          MR. TRIBBLE:  No, Your Honor.

11          THE COURT:  Any questions from Defendant?

12          MR. GORHAM:  No, Your Honor.

13          THE COURT:  Let's turn to the disputed motions that

14   are before the Court.  You've given me an email with your

15   suggested order, and I don't have any problem trying to follow

16   that order.  I'll do my best to do that.  And based on that it

17   looks like the first item we need to take up is Defendant's

18   motion for summary judgment of non-infringement, which is

19   Document 137.  No--I'm sorry--138.

20       And let me hear from the moving Defendant on this first.

21          MR. ZELIGER:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. ZELIGER:  Defendant has moved for summary

24   judgment of non-infringement because none of the accused

25   panels in this case is a mobile communication device or a

1   handheld multifunction wireless device.

2           THE COURT:  And Mr. Zeliger, for formality you need

3   to identify yourself for the record before you go into your

4   argument.

5           MR. ZELIGER:  Thank you, Your Honor.  Michael

6   Zeliger for the Defendant ADT.

7           THE COURT:  Thank you.

8           MR. ZELIGER:  There are three asserted patents in

9   this case--the '365 and the '887 Patent.  All of the asserted

10  claims of that patent contain the phrase 'mobile communication

11  device'.  And the third patent, the '103 Patent, all asserted

12  claims the phrase 'handheld multifunction wireless device'.

13          THE COURT:  Right.  And I think I misspoke when I

14  said the two patents-in-suit; it's the three patents-in-suit.

15  You're correct.

16          MR. ZELIGER:  On the first issue, Your Honor, the

17  term 'mobile communication device', the Court has construed

18  that this term should be ascribed its plain and ordinary

19  meaning.  That construction is consistent with the

20  specification of the -- shared among the two patents, the '365

21  and the '887, and there are examples in the specification of

22  mobile communication devices, such as cell phones and PDAs.

23  Those can be found at figures 12 and 13.

24      This construction is also consistent with the file

25  history during which the patentee amended claims and

1    specifically claimed the term 'mobile communication device'.

2         The Plaintiff in this case has tried to after-the-fact

3    change the plain and ordinary meaning by offering an extrinsic

4    construction concerning the mobile electronic--excuse

5    me--'mobile magnetic spectrum', and that's the term that they

6    would like the Court to apply, instead of the term's plain and

7    ordinary meaning.  The problem is that's a made-up term

8    entirely for this case.  It doesn't appear in the intrinsic

9    record anywhere, and the Plaintiff hasn't provided any

10   indication that it appears elsewhere in the art.  It's a term

11   that's been invented for this case.

12        Taking that plain and ordinary meaning and apply it to

13   the accused devices in this case and it becomes clear that the

14   ADT security panels are fixed.  They are most typically

15   mounted to a wall, bolted to a wall, hard-wired for power into

16   the house's electrical supply.  They are designed not to move.

17        Now, you will hear some evidence and you've seen in the

18   papers an indication about an alternate method of housing the

19   device; what I will refer to as the tabletop mount.  It

20   doesn't change the issues for summary judgment.  In some

21   limited instances, someone can have a panel bolted to a

22   housing support that support -- that sits on a table, but that

23   housing itself is, likewise, hard-wired to the house; it is

24   not designed to move.

25        Plaintiff will try to explain that the hard-wired power

1   supply has a back-up battery, giving the implication that you

2   can then use this battery as you move around the home with

3   your security panel.  That's not the purpose of the back-up

4   battery.  The purpose of the back-up battery is so that the

5   fixed device works even during a power outage.  And ADT is

6   required to have a hard-wired power connection and the battery

7   back-up in order to be consistent with the UL specifications.

8       Let me pause and see if the Court has any questions on

9   the issue of 'mobile communication device'.

10          THE COURT:  Counsel, I'll jump in if I have

11  questions.  Thank you.  Please continue your argument.

12          MR. ZELIGER:  The remaining patent, the '103 Patent,

13  claims 'a handheld multifunction wireless device'.  Similarly,

14  the Court has construed this to have its plain and ordinary

15  meaning.  Once again, the specification is consistent with

16  this.  It talks about a number of different portable handheld

17  devices.  The file history is also consistent with the

18  construction where the patentee actually added the term

19  'handheld' during prosecution.

20      And Fractus offers no other construction.  Its expert has

21  not proposed a different definition, and so, likewise, these

22  terms -- this term should be consistent with the plain and

23  ordinary meaning of 'handheld'.  And the same devices, for the

24  reasons that they are not mobile, are also not handheld.  They

25  are bolted to the wall or bolted to a frame that sits on a

1    table that is specifically designed not to move around being

2    held in your hand.

3          Now, to the extent that the Court decides that there's

4    a latent claim construction issue, which Defendant does not

5    assert, but to the extent the Court thinks there is one, we

6    specifically refer to the Court to the *Eon* case which is

7    instructive both in terms of its -- the law and the facts.

8          That is all I have in terms of our opening remarks, Your

9    Honor.

10               THE COURT:  All right.  Let me hear a response from

11   Plaintiff, then.

12               MR. SMYSER:  May I approach, Your Honor?

13               THE COURT:  You may.

14               MR. SMYSER:  Would you like more than one copy?

15               THE COURT:  Just one for me.  That's fine.  Please

16   proceed.

17               MR. SMYSER:  Good morning, Your Honor.  Craig Smyser

18   for the Plaintiff Fractus.

19          We have a few slides to aid in the presentation of our

20   argument today, if I might display those to the Court.

21               THE COURT:  If you'll slow down a little bit.

22               MR. SMYSER:  Yes, sir.

23               THE COURT:  Good.

24               MR. SMYSER:  So where I would like to start here --

25          Mr. Bolles, if we could show the next slide.  Thank you.

1         -- is on the standard -- the legal standard that the

2    Court should be applying to adjudge infringement of these

3    apparatus-only claims.

4         So I think you heard in my colleague's argument that he

5    urges the Court to apply a kind of typical use approach to

6    adjudging infringement of these claims; specifically that

7    because ADT believes the products are not typically used

8    either in a desk mount configuration or a handheld

9    configuration, there is, thus, no infringement, but that is

10   simply the incorrect standard to apply when judging

11   infringement of an apparatus-only claim.

12             THE COURT:  Let me ask you this, Mr. Smyser.  How

13   much of what I heard from Defendant was argued to Judge Payne

14   during claim construction and not accepted?

15             MR. SMYSER:  Your Honor, with respect to 'mobile

16   communication device', we believe all of it was argued to

17   Judge Payne and not accepted.  That's detailed in our brief

18   and also in the slides here.  At the claim construction

19   hearing, Magistrate Judge Payne characterized -- grouped a set

20   of terms involving 'wireless device', 'portable device', which

21   is no longer in the case, and 'mobile communication device' as

22   the, quote, wireless terms, and described ADT's position as

23   quote, one of the hardest sells that he had dealt with.  So we

24   believe this is already resolved and ADT should be precluded

25   from arguing, as ADT did not, for example, move to challenge

1    or appeal Judge Payne's claim construction order on this

2    point.

3         The situation with 'handheld' is similar, although it was

4    not addressed at the claim construction hearing.  In ADT's

5    opening claim construction brief, they noted that the parties

6    had dropped the phrase 'handheld multifunction' for

7    construction instead to focus on 'wireless device'.  When

8    dropping 'handheld multifunction', ADT noted that the only

9    thing that dropped out of its proposed construction was the

10   capacity of the device to word process or interact with

11   spreadsheets or interact with slides.

12        And so we believe ADT's precluded from arguing this

13   based on its position on claim construction that 'handheld

14   multifunction' actually referred to the capabilities of the

15   device to do things like word processing or PowerPoint slides,

16   for example.

17             THE COURT:  All right.  Continue, please.

18             MR. SMYSER:  Returning to the standard issue, the

19   correct standard to apply for an apparatus-only claim is

20   whether the device is reasonably capable of performing the

21   claimed function without significant alteration.  That's

22   actually a standard that we believe ADT agreed with in its

23   opening brief.  In its opening brief it quotes the standard

24   for infringement as taking the claims as construed by the

25   Court and comparing them to the limitation -- comparing them

1    limitation-by-limitation to the features of the allegedly

2    infringing device; not how the device is typically used, as

3    ADT would have it.

4        I want to pause here to provide a brief overview of the

5    accused products in the case.

6        So on the left of the slide here, you'll see the devices

7    -- examples of the devices that are accused on the '103

8    Patent.  These devices are essentially what I would call

9    iPad-type devices.  The asserted claims of the '103 require

10   that all the devices have touch screens, processing units,

11   memory modules, multimedia functionalities or smartphone

12   functionalities, and that's embodied in the devices accused

13   here.

14              THE COURT:  Let me ask you to slow down, please.

15   We've got a long day ahead of us.

16              MR. SMYSER:  Of course, Your Honor.  My apologies.

17              THE COURT:  That's all right.

18              MR. SMYSER:  So on the left here you can see the ADT

19   command AIO7.  'AIO' I believe stands for all-in-one and 7

20   refers to the screen size.

21       We've actually got one of those devices over at counsel

22   table with the desk mount.  You can see it's -- as Mr.

23   Grinstein helpfully demonstrates, it is free to move around,

24   it is free to be interacted with, it is not in any fixed to

25   counsel table by virtue of the desk mount.

1          Similarly, on the bottom of this slide you can see the

2     IQ panel 2.  That device similarly is at counsel table and,

3     again, possesses a touch screen, a desk mount.

4          Mr. Grinstein, if you don't mind tapping the screen on

5     that.

6          As you can see, it is on even though it is not connected

7     to power.  You're able to interact with it.  That is true of

8     the '103 accused products.

9          Now, the devices accused on the '365 and '887 include all

10    of those '103 devices, but they also include a few other type

11    of devices.  So you'll see on the slide here the LTE/IA, which

12    is this white sleek-looking panel, that is designed to enable

13    cellular communications for ADT's systems.  Again, it has

14    rechargeable batteries.  And you'll see on the right the

15    ADT2X16 AIO, which similarly can be desk mounted and possesses

16    the rechargeable batteries and cellular communications

17    technologies.

18         Moving to the question of 'mobile communications device',

19    I've already explained to the Court why we believe ADT should

20    be precluded from even making this argument in the first place

21    given that they lost it at claim construction and did not

22    appeal that order.

23         Now, Mr. Zeliger argued that the specification does not

24    agree with Fractus' proposed construction or the way Fractus'

25    expert interpreted this term when performing the infringement

1    analysis, but I think that's simply incorrect.

2         On the screen here you can see excerpts from the

3    specification of the '365 and '887 Patents, and in those

4    patents it described the, quote unquote, operating frequencies

5    of a mobile communications device, and then goes on to list a

6    number of frequencies and cellular communication standards--in

7    particular, frequency bands.

8         And Mr. Zeliger pointed to figures in the patent,

9    examples, embodiments disclosed until the patents in which the

10   devices were cell phones or PDAs.  But it's clear that the

11   patents don't conceive of those as limiting because if you

12   look at the dependent claims of both patents, each one has a

13   dependent claim that indicates a mobile communication device

14   where the mobile communication device is a cell phone or a

15   mobile communication device where that device is either a cell

16   phone or personal digital assistant.  That proves, I think,

17   that the patents are contemplating the term 'mobile

18   communication device' in a way broader than just a cell phone

19   or PDA, as ADT would have it.

20              THE COURT:  What else?

21              MR. SMYSER:  Again, our expert adopts a construction

22   entirely consistent with this intrinsic evidence.  The

23   definition adopted in his report, which was not challenged via

24   *Daubert* or motion to strike, is that the mobile communication

25   spectrum includes frequencies between 600 megahertz and 3.5

1    gigahertz.  As pointed out, the specification of the patents

2    refers to the mobile frequencies -- the operating frequencies

3    of a mobile communication device in exactly this manner.

4         ADT has suggested that the proper inquiry for this case

5    is guided by the *Eon* case, but *Eon* is not on point either with

6    respect to the patents that were at issue in that case or the

7    products at issue in that case.

8         The patents in *Eon* required portability and mobility in

9    the claim language, and then the patent specification

10   discussed the device moving across, quote, cell boundaries.

11   There's no similar language either in the claims or the

12   specification of the '365 or '887 here, as we've just

13   discussed.

14        And then with respect to the patents in *Eon*--or, pardon

15   me--the products in *Eon*, these were electric utility meters,

16   which I'm sure Your Honor has probably encountered either --

17   maybe even outside the courthouse.  Those were bolted in place

18   with a tamper-proof collar.  There was unequivocal evidence

19   that this was the only way they could be installed to operate.

20   They required a certified electrician to use -- to install

21   them to a 240-volt line.  And I submit that just doesn't bear

22   resemblance to the products accused on the '365 and the '887

23   here, which, as we've discussed, can be operated while moving

24   due to their rechargeable batteries and their capacity to

25   communicate via cellular frequencies.

1        Finally, even under ADT's interpretation of 'mobile

2    communication device', we've submitted I believe undisputed

3    evidence showing that these accused products are mobile, even

4    under ADT's understanding.  They are all capable of being

5    disconnected from power, thanks to their rechargeable

6    batteries, while continuing to operate.  And although ADT does

7    not go through individually device by device, I would also

8    note that because all of the '103 devices are accused on the

9    '365 and '887, many of these devices have touch screens, desk

10   mounting, and are essentially iPads.  They are, thus,

11   reasonably capable of mobile operation, even under ADT's

12   interpretation of the term in question.

13       I think the final point on this is that ADT's only

14   evidence regarding the, quote unquote, typical use of these

15   products is this Underwriters Laboratory certification, but I

16   think that's confusing a third-party certification or a

17   third-party statement with an inherent physical feature of the

18   device.  In order to assess infringement, you would not look

19   at what a third party certifies about the device and how it is

20   used; instead, you would look at the actual capabilities of

21   the device in question.

22       With that I would move on to 'handheld', unless Your

23   Honor has further questions.

24            THE COURT:  Go ahead.

25            MR. SMYSER:  As to 'handheld', we've already

1    discussed why we believe ADT should be precluded from making

2    this argument.  But even if ADT is permitted to make this

3    argument, we believe the patent specification indicates a

4    clear intent and a clear understanding that the phrase

5    'handheld multifunction wireless device' refers to devices of

6    a particular size or size range.  So this is laid out in our

7    brief on the question and the excerpts of the specification

8    cited are here on this slide.

9         But essentially what the patent describes is a range of

10   devices being characterized as portable or handheld or

11   multifunction wireless devices, which range in size,

12   essentially, from smartphone to a desktop.  All of the

13   products here would -- accused on the '103 would qualify under

14   that understanding, and the intrinsic evidence in the patent I

15   think demonstrates that 'handheld' was considered to be a term

16   referring to essentially the size of the device rather than

17   its need to be operated while held in the hand.

18        That being said, these devices can be operated while held

19   in the hand.  As Mr. Grinstein helpfully demonstrated, you can

20   pick up the device off the desk, you can hold it in your hand,

21   and, in fact, the fact that all of these devices have touch

22   screens, we would submit, indicates that they are made to be

23   used by hand.  As with the '365 and '887 devices, they have

24   rechargeable batteries, and, thus, they are reasonably capable

25   of handheld operation, even under ADT's interpretation of that

1   term.

2       With that, Your Honor, I'm happy to take further

3   questions.

4           THE COURT:  I don't think I have any additional

5   questions.

6           MR. SMYSER:  Thank you, Your Honor.

7           THE COURT:  Anything further from the moving

8   Defendant?

9           MR. ZELIGER:  Thank you, Your Honor.  Michael

10  Zeliger for ADT.  Just two points, Your Honor.

11      The first was Mr. Smyser referred to a portion of the

12  specification that's shared by the '365 and '887 Patents where

13  it says "the operating frequencies of a mobile communication

14  device," he highlighted that, and then there's a list of some

15  particular bands of the electromagnetic spectrum.  Those bands

16  of the electromagnetic spectrum are not uniquely for mobile

17  devices.  That refers to the character of the ways that they

18  project and receive, and that is true whether a device is a

19  fixed device or a mobile device.  This idea that there is a

20  mobile spectrum is entirely manufactured for this litigation.

21      The other point I'd like to make, Your Honor, is that

22  after -- Mr. Smyser made a point of saying that these claims

23  should not be construed based by -- on how the devices might

24  be used.  He then suggested that the evidence of infringement

25  is how the devices might be used.  He said things like they

1    are reasonably capable of being held in your hand or they are

2    reasonably capable of being moved.

3         Even if that were the case, there is no evidence in this

4    record, ████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████

6    ████████████████████████  ████████████████████████████████

7    ████████████████

8         And as to the claim construction issues, Your Honor, some

9    of what we've discussed may have been heard by Judge Payne,

10   but the reality is Judge Payne chose a construction that was

11   different from what the parties were proposing, and at this

12   point we are simply trying to apply the claims as construed by

13   Judge Payne.

14        Nothing further.  Thank you.

15             THE COURT:  All right.  Thank you, counsel.

16        Well, with regard to Defendant's motion for summary

17   judgment of non-infringement, let me say this.  Where the

18   Court has construed certain claim language to have its plain

19   and ordinary meaning, that does not in any way mean that those

20   two different terms have the same plain and ordinary meaning.

21   They each have their own plain and ordinary meaning, which is

22   almost always different than another term's plain and ordinary

23   meaning.  Unless the Court specifically finds that the plain

24   and ordinary meaning of A is the same meaning of plain and

25   ordinary meaning of B, you cannot assume that is the case, and

1    I don't find that there's been any such designation here.

2         At the end of the day, counsel, these issues are replete

3    with fact questions that would preclude the entry of summary

4    judgment pursuant to Rule 56, and the Court is not going to

5    substitute its judgment for the jury's fact-finding obligation

6    at this stage.

7         So I'm going to deny the motion, and the jury's going to

8    decide what the plain and ordinary meaning of these terms are,

9    and it's going to hear from competing experts and it's going

10   to judge the credibility and believability of the evidence and

11   determine which version of the story it accepts.  And that's

12   what this trial is going to be about, and I'm go not going to

13   grant summary judgment on this issue.

14        Okay.  Let's go next to Defendant's motion to exclude the

15   testimony and opinions of Robert Mills.  This is Document 137.

16   The parties have also referenced Documents 212 and 219, but

17   we're going to take these up singularly and not collectively.

18        So let me hear from the Movant, the Defendant on the

19   motion to exclude the testimony of Mr. Mills.

20             MR. ZELIGER:  Thank you, Your Honor.  This is

21   Michael Zeliger for ADT.

22             THE COURT:  Please proceed, Mr. Zeliger.

23             MR. ZELIGER:  Your Honor, the Defendant moves under

24   *Daubert* to exclude the testimony of Mr. Mills for -- on

25   multiple grounds, but the first thing I want to make clear, if

1   the Court looks at the proposed order and the motion in its

2   entirety, the relief that we sought in the original *Daubert*

3   motion was a complete rejection of Mr. Mills' opinion and that

4   it be disqualified in its entirety.  The reasons are as

5   follows.

6          THE COURT:  Let me stop you with a question,

7   Mr. Zeliger.

8          MR. ZELIGER:  Yes.

9          THE COURT:  The ██████████████ is out of this

10  case, as I understand it.

11         MR. ZELIGER:  I think I understand that as well,

12  Your Honor, although there seemed to be some reservation of

13  rights about that.

14         THE COURT:  We'll get to the disputed MILs later,

15  but assuming for purposes of discussion that the ████████

16  ████████ is out of the case, is there any reason to maintain

17  Mr. Mills' opinions that rely upon that?  It seems to me those

18  should fall.  But --

19         MR. ZELIGER:  Your Honor, we agree with that.

20         THE COURT:  If you see it differently, tell me.

21         MR. ZELIGER:  No.  In fact, the entire upper range

22  of Mr. Mills' damages report was based on reliance on the

23  ███████████████.  In our view, it should be stricken.  And

24  prior to bringing this to the Court, when Fractus approached

25  us and said, We're thinking about withdrawing reliance on the

1    ███████████████, our first question was, Will you still be

2    offering the upper end of the range, and, if so, what's is the

3    basis for it.

4         We didn't get an answer, and we first see an answer in

5    yesterday's filing in which Fractus says for the first time

6    that there was a conversation between Mr. Mills and a

7    gentleman named Mr. Ilario and in the -- yesterday's filing

8    you see they make a reference to paragraph 219 of Mr. Mills'

9    original expert report.  That paragraph 219 does not cite to a

10   conversation with Mr. Ilario.  So we think there's no evidence

11   to support the high end of the range.

12        But even if the Court were to consider that Mr. Mills

13   had spoken with Mr. Ilario, Mr. Ilario is Fractus' licensing

14   employee.  And so basically what they're saying is, I, the

15   expert, Mr. Mills, are recommending this higher end of the

16   damages range because that's what Fractus wants.  And the

17   testimony that he says he got -- or the conversation that he

18   said he had with Mr. Mills-- excuse me--with Mr. Ilario is,

19   Mr. Ilario informed me that he would not have accepted less

20   than ████████ per prescriber.  So you have them -- the expert

21   saying, I'm going to offer as my opinion what the Plaintiff

22   wants.

23             THE COURT:  Well, again, I'm going to take up

24   Document 219 separately --

25             MR. ZELIGER:  Yes, Your Honor.

```
 1              THE COURT:  -- I don't want to get into this

 2   emergency motion issue right now.  I want to talk about 138

 3   and--excuse me--137 and the underlying *Daubert* motion here.

 4              MR. ZELIGER:  Yes, Your Honor.

 5        And to answer your question more succinctly, then, we

 6   think there is no basis to support Mr. Mills' report with

 7   respect to the higher end of his damages range when the

 8   ██████████   proposal is no longer relied upon.

 9              THE COURT:  All right.  Let me hear the rest of your

10   position, then.

11              MR. ZELIGER:  With respect to the original *Daubert*

12   motion, Your Honor?

13              THE COURT:  Yes.

14              MR. ZELIGER:  Okay.  Very well.

15        ADT also challenges Mr. Mills' opinions on a number of

16   other bases.  The first is that the Vivint license itself is

17   not adequately proven as a comparable in this case.  Now, it's

18   easy to do what Fractus suggests and say, Hey, this is your

19   close competitor, how could it not be a comp; but more is

20   required to demonstrate that something is comparable, and

21   Mr. Mills did not meet those standards.  He did not consider

22   that there are actually different patents asserted against

23   Fractus--excuse me--against Vivint as are now asserted against

24   ADT, with one exception--the '103 Patent overlaps.  The other

25   five patents asserted against Fractus--excuse me--against
```

1    Vivint are not at issue in this case.

2         He also, we think, didn't adequately consider that Vivint

3    got ███████████████████████████████████████████████

4    ██████████████████ as opposed to the hypothetical negotiation

5    which would only involve the three asserted patents.  And on

6    this topic, Mr. Mills simply said, Well, I made some slightly

7    downward adjustment, which isn't quantified or really

8    reflected in the conclusions at all.

9         And we've already discussed the ███████████ -- so those

10   are the issues with respect to that.

11        The last piece is a more general concern about Fractus'

12   view that it can tax ADT twice--once for the acquisition of

13   the hardware and a second time for its use.  And we refer the

14   Court to the *Caltech* decision, which really is, by analogy, in

15   fairness, because there are two different licensees discussed

16   in the *Caltech* decision, but the reasoning is sound, and that

17   is someone would not in a hypothetical negotiation consider

18   paying X for a device, get a license to that device, and then

19   separately pay Y for use of the licensed device.  That

20   violates the principles of exhaustion and it doesn't make

21   sense.

22              THE COURT:  How does *Caltech* apply when there were

23   two separate negotiations there; there's only one negotiation

24   here?

25              MR. ZELIGER:  Because the logic of *Caltech* was that

```
 1    you can't separately tax the acquisition of the hardware and

 2    its use.  And what's happening in this case is Mr. Mills is

 3    saying ADT itself would agree that it would pay two licenses;

 4    it would pay first to acquire the panels with the antennas and

 5    then separately would pay every month for their use.  There's

 6    no reason that Mr. Mills couldn't have come up with an

 7    appropriate royalty rate on either the device or its use, but

 8    to think that a party would agree to pay twice is unreasonable

 9    and is, in fact, belied by the record in this case.

10        In addition to ████████, Fractus made a proposal to 15

11    other companies with this kind of divided -- like device and

12    use ongoing royalty and none of them has accepted it.  So not

13    only is it unreasonable in concept; in practice it has proven

14    to be commercially unviable.

15        And for those reasons we challenge Mr. Mills' report in

16    its entirety.

17              THE COURT:  All right.  Let me hear from the

18    Plaintiff in response.

19              MR. NELSON:  Your Honor, may I approach?

20              THE COURT:  You may.

21              MR. NELSON:  Good morning, Your Honor, and may it

22    please the Court.  Justin Nelson from Susman Godfrey.

23              THE COURT:  Good morning, counsel.  Go ahead.

24              MR. NELSON:  Your Honor, I'd like to start just with

25    a direct answer to Your Honor's questioning to Mr. Zeliger and
```

```
 1    also about this two-license issue.

 2         Obviously we believe Caltech is not relevant.  The issue

 3    here is that at the same time as Fractus filed the ADT

 4    complaint, it filed the Vivint complaint.  There is a combined

 5    Markman, and after the Markman hearing, Vivint settled for a

 6    ██████████████.  That license specifically discusses a few

 7    things, including the fact in the third 'whereas' clause that

 8    ████████████████████████████████████████████

 9    ████████████████████████████

 10   ████████████████████████████████████

 11   ████████████████████████████████████████

 12   ██████████████████████████████████████████████

 13   ██████████████████

 14   ████████████████████████████████████████

 15   ██████████████████████████████████████████████

 16   ████████████████  ████████████████████

 17   ████████████████████████████████████

 18   ████████████████████████████████████████████

 19   ████████████████████████████████████

 20   ████████████████████████████████████

 21   ████████  ████████████████████████████████

 22   ████████████████████████████████████

 23   ██████████████████████  ████████████████████

 24   ██████████████████

 25       ████████████████████████████████████████████at
```

```
 1   ███████████████████████████████████████████████

 2   █████████████████████████████████████████████

 3   ██████████████████████████████████████

 4        As to whether it includes █████████████████

 5   ██████████████████████████████████t--this is the

 6   Ericsson case--"allegedly comparable licenses may cover more

 7   patents than are at issue in the action; the fact that a

 8   license is not perfectly analogous generally goes to the

 9   weight of the evidence, not its admissibility."

10        In this Court's Intellectual Ventures case, it did not

11   strike a comparable license that involved a portfolio license

12   of thousands because such arguments should be reserved for

13   cross examination at trial.

14        Likewise, in VirnetX, the degree of comparability of the

15   license agreements was a factual issue best addressed by cross

16   examination and not by exclusion.

17        And another case, Your Honor, from this Court, "a party

18   may use the royalty rate from sufficiently comparable

19   licenses, value the infringed features based upon comparable

20   features in the marketplace... challenges to the factual

21   accuracy of a benchmark go to evidentiary weight, not

22   admissibility."

23        With respect as well to the services component of it, how

24   ADT uses this is, in fact, to monitor on an ongoing basis.  In

25   fact, ADT actually denies it even sells the products.  We
```

 1   disagree with that, of course.  But then it is built into the

 2   ongoing recurring revenue stream that occurs on a monthly

 3   basis, ███████████████████████████████████████

 4   ████████████████████████████████████████████

 5   ████████████████████████  ████████████████████████

 6   ████████████████████████████████████████████

 7   ████████  ████████

 8        ████████████

 9        ████████████████████████████████████████

10   ████████████████████

11        And, for example here, when we're talking about the

12   incremental profits, how much in the assertions that they

13   should have adjusted for this, that, or the other should

14   quantify how much of the incremental profits were attributable

15   to non-patented benefits can be addressed there cross

16   examination at trial.

17        And then I want to skip, let's see, all the way to -- on

18   the ████████████████, I'm happy to address that as well,

19   Your Honor, or we can save that, because I think that is

20   really built into more of the supplemental report as well, but

21   I'm happy to address ████████████ now or later.

22             THE COURT:  Go ahead and address it now, if you

23   will.

24             MR. NELSON:  Yes, Your Honor.

25        Well, first of all, in ADT's original motion it was clear

```
1    -- just the title of it, by the way, was not to completely

2    exclude Mr. Mills.  You can look at the title, as Your Honor

3    has, and it's literally on Docket 137 in terms of the order.

4    What does it say?  "ADT's motion to exclude in part the expert

5    disclosure and testimony of Robert Mills."  It was not a

6    complete motion to exclude.

7         And so when we look exactly at part 3 of the original ADT

8    Daubert motion to exclude Mr. Mills, it says -- the title is

9    "his reliance on the ███████████████████████ is

10   improper."  And then in the conclusion, what's highlighted on

11   the screen, "What are they asking for with respect to this

12   part?  To preclude Fractus' expert from presenting any

13   testimony regarding ADT's subscription revenues, the Vivint

14   agreement, or the ████████████████████████."  That's what

15   they asked for.

16        So we did not address the larger issues because they

17   didn't say, Therefore, please conclude the entire ████████████

18   end of the range.  We just -- it did not come up.  That was

19   not the issue.  We addressed the █████████████████, and in

20   order to narrow the issues for trial we agreed with their

21   limine in their part three of that that Mr. Mills is not going

22   to address the ███████████████.  We do not believe that

23   the high end of the range falls out because of that, but he is

24   not going to address it.

25        When we said, We'll stipulate it, we'll agree to your
```

1    limine that you have on this, they said, No.  But we're happy

2    -- we intend to honor that; we just don't understand what the

3    line is going to be.  We can certainly address it later in

4    terms of we -- if we're not going to talk about ███████, we

5    don't believe they should be able to talk about ███████

6    either.  But just to be clear --

7              THE COURT:  No, if it's out it's out --

8              MR. NELSON:  Correct.

9              THE COURT:  -- across the board.

10             MR. NELSON:  Correct.  And we are agreeing to that,

11   Your Honor.  And so we don't -- I'm sorry, Your Honor.

12             THE COURT:  Go ahead.

13             MR. NELSON:  No, no.  So we don't understand any

14   other issue aside from the fact that we are not going to

15   mention ███████, we have agreed to that, and we're sticking

16   by that, but that does not affect the high end of the range.

17             THE COURT:  What else?

18             MR. NELSON:  That's it for this motion, Your Honor.

19   Thank you.

20             THE COURT:  All right.  Any follow-up, Mr. Zeliger?

21             MR. ZELIGER:  Just briefly, Your Honor.

22      If there were any doubt about the scope of our motion,

23   take a look at their opposition where they spend the first 12

24   of their 14 pages talking about things other than ███████

25   as well as the form of our proposed order which asks the Court

1    to strike Mr. Mills' report in its entirety.

2        Thank you, Your Honor.

3            THE COURT:  All right.  Well, with regard to

4    Defendant's motion to exclude the testimony and opinions of

5    Robert Mills, Document 137, I don't find that the analysis of

6    Mr. Mills as to sales and subscription revenues is erroneous.

7    I don't think *Caltech* applies.  I'm going to deny the portion

8    of the motion directed to his opinions on sales and services

9    and the revenues related thereto.

10       I don't find that the Vivint license is not comparable.

11   I think that's a fairly weak argument; and to the extent it

12   has merit, it clearly goes, in my view, to weight and not to

13   whether it should be excluded, so I'm going to deny the motion

14   as to the Vivint comparable license.

15       As to Mr. Mills' apportionment, he does not assume that

16   all the Defendant's products infringe, and I don't find the

17   Defendant's argument either, in its oral argument today or its

18   briefing, compelling here, and I'm going to deny that portion

19   of the motion as well.

20       To preview some of what may come later in the pretrial

21   today, the Court accepts the apparent agreements of both

22   sides, and the ████████████████ is going to be out of the

23   case for both sides, and it's not going to be out for one and

24   not out for the other--it's out for everybody.  And with that

25   being the case, the Court is going to strike paragraphs 176,

```
 1    177, 180, and 221 of Mr. Mills' report that focus on the

 2    ████████████████ .

 3         Now, that ruling does not necessarily curtail the damages

 4    ask of the Plaintiff.  We'll take that up as we go through.

 5    And it's my understanding that the Plaintiff believes there is

 6    additional evidence that supports their damages case.  So I

 7    don't want somebody to inappropriately construe my ruling on

 8    ████████████   I'm simply striking those four paragraphs.

 9    Whether something is otherwise supported or not is not covered

10    by this ruling.

11         Now, we've got these related companion motions that

12    relate to the MIL's matter, and that includes Plaintiff's

13    motion to supplement the damages report of Mr. Mills.

14         Let me hear from the Plaintiff on this at this juncture.

15              MR. NELSON:  I'm sorry, Your Honor.  When you

16    said --

17              THE COURT:  This is Document 212.

18              MR. NELSON:  Yes, Your Honor.

19         Your ruling just now on the paragraphs that are out,

20    section 221 does not mention ████████ .  That is the

21    conclusion of the range.  Section 219 does mention ██████████

22    And based on Your Honor's comments, I just want to clarify

23    which paragraphs Your Honor was referring to.

24              THE COURT:  Let me check those numbers real quick.

25         I think you're right, counsel.  I think it should be 219
```

1    instead of 221.

2              MR. NELSON:  Thank you, Your HOnor.

3              THE COURT:  For clarity of the record, it's 176,

4    177, 180 and 219.

5         All right.  Let's go on to Document 212, Plaintiff's

6    motion to supplement the report of Mr. Mills.

7         Let me hear from Plaintiff on this.

8              MR. NELSON:  Thank you, Your Honor.

9         And I don't know who is else is in the courtroom.  This

10   might get into some sealed material, and so to the extent that

11   it does.

12             THE COURT:  Is there anybody in the courtroom who's

13   not subject to the protective order that's been entered in

14   this case?

15        All right.  Then I'm going to order the courtroom sealed

16   for this motion, and I'll direct that anyone present who's not

17   subject to the protective order excuse themselves until the

18   courtroom is reopened and unsealed.

19                       (Courtroom sealed.)

20             THE COURT:  This is based on counsel's

21   representation that there will be confidential information.

22             MR. NELSON:  Justin Nelson again from Susman

23   Godfrey.

24             THE COURT:  Go ahead, Mr. Nelson.

25             MR. NELSON:  The issue, frankly, it's ADT's material

```
 1    and we are trying to be very careful about relying on it.  We

 2    may disagree with what they have said, but given that they

 3    have designated virtually -- I don't want to be -- I do not

 4    want to over-speak.  Much of what they have designated is

 5    currently deemed AEO, and we want to be cognizant of that.

 6         So to back up, Your Honor, this is -- what we're looking

 7    at on the screen are ADT's two sales channels.  This is from

 8    their 10-K.  This is also in Mr. Mills' report.  There is a

 9    direct channel, which is ADT's direct sales to customers, and

10    then there is an indirect channel, which is that -- if Your

11    Honor sees in the first paragraph, under 'indirect channel',

12    it's called the ADT authorized dealer program in that second

13    line, where ADT uses dealers to sell the product in the first

14    instance and then ADT usually, ███████████████████████████

15    ████████████████████████████████████████████████████████████

16    ████████████████████████████████████████████████████████████

17    ████████████████████████      ██████████████████████████████

18    █████████████████████████████

19         THE COURT:  This comes from the initial report, not

20    the proposed supplement.  Correct?

21         MR. NELSON:  Correct.  I'm giving history, Your

22    Honor, about why we are timely in our supplement and our

23    requests during this, Your Honor, but this is from the initial

24    report.

25         During discovery, Your Honor, we were very much aware of
```

1    this issue.  This is an email that Mr. Smyser sent on February

2    1st asking that ADT will supplement its response to Fractus'

3    relevant interrogatory to provide accurate install and

4    purchase data for the accused products.  And to the extent ADT

5    relies on third parties to install the accused products, that

6    ADT will produce documents reflecting or tracking those

7    third-party installations.

8        We then consistently asked ADT witnesses in deposition

9    about this issue.  So, for example, ██████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████

13        ██████████    ██████████████████████

14        ████████████████████████████████████████████

15   ██████████████████████████████████████████████

16        ██████████    ████████████████

17        ████████████████████████████████████████████████

18   ████████████████████████████████████████████

19        ████████████████    ████████████████████████

20        ████████████████████████████████████

21        ████████████████████████████████████████████

22   ████████████████████████████████████████████

23        ██████████████████████

24        ████████████

25        ████████████████████████████████████████████

1  ████████████████████████████████████████

2  ██████████████████

3       So there is confusion about that.

4       This came up in a motion to compel to this Court, and

5  then ADT responded to that motion to compel saying that it

6  would serve a supplemental response to Interrogatory 10 to

7  clarify the nature of the purchase and install data that it

8  has accurately produced, and ADT agrees to a corporate

9  representative to testify on this document, ADT_FRACTUS_8960.

10      And then in the conclusion of page 7 of its response,

11 "With respect to the purchasing, distribution, installation of

12 the accused products, ADT already has produced accurate data,

13 agrees to supplement its response to Fractus' Interrogatory

14 10, and agrees to provide an additional 30(b)(6) deposition

15 for a corporate representative to testify regarding this

16 purchase and installation data."

17      Your Honor issued an order believing those

18 representations from ADT.  This is Your Honor's order on

19 page 3, your Honor's May 1st order.  Your Honor stated, "ADT's

20 supplemental response, filed hours before the filing of this

21 motion to compel, states that ADT_FACTUS_8960 contains

22 accurate purchase data."

23      On page 4, again, "Following this deposition, counsel for

24 ADT represented that ADT_FRACTUS_8960, one of the documents

25 shown to Mr. Pope, contains the accurate purchase data, and

1    ADT supplemented its interrogatory response to reflect such."

2       Again, on page 5, "In its response brief, ADT argues that

3    its supplemental interrogatory response is correct.

4    ADT_Fractus_8960 reflects accurate purchase data."

5       And then Your Honor said, "The Court is not persuaded by

6    Fractus' argument that ADT_FRACTUS_8960 reflects inaccurate

7    purchase and installation data.  When Mr. Pope answered that

8    he did not know, ADT took corrective measures by supplementing

9    its interrogatory response to identify which of the produced

10   spreadsheets contained the most accurate and complete data."

11      And then Your Honor said, "The parties appear to agree

12   that a supplemental response and additional 30(b)(6) time is

13   appropriate."

14      That occurred actually the day before Your Honor's order.

15   We got it -- a sixth supplemental response that, of course,

16   still did not answer the question and left it open.

17      Here is what we asked -- here's what I asked their

18   30(b)(6) corporate representative the next day.  ████████

19   ██████████████████████████████████████████████████████████

20   ████████████████████████████████

21          ██████████  ████████

22      And just -- again, compare this, Your Honor, to the slide

23   before where they have represented to us -- I'm not saying it

24   was necessarily malicious.  Evidently there was confusion from

25   the testimony of Mr. Pope.  Perhaps they thought that it

1    included this purchase data.  But the representations to us,

2    to the Court, was that FRACTUS_8960 -- ADT_FRACTUS_8960 was

3    complete and accurate, and that turned out the next day to be

4    untrue; actually the day before to be untrue.

5          THE COURT:  Well, let me stop you with just a very

6    practical real-world question.  Without going back and

7    assigning blame for how we got to where we got to, we have a

8    six-page, give or take, supplement proposed which was filed on

9    the docket the 19th of June.  We're having pretrial today,

10   which I believe today's the 2nd of July.  We're picking a jury

11   next Monday the 8th of July.  Thursday and Friday are

12   Independence Day holidays.

13         How in the world is the Defendant going to have an

14   opportunity to pose this supplement -- or Mr. Mills on this

15   supplement between now and the trial date, given that the

16   Defendant has not had an opportunity to query the expert on

17   this six pages under oath?  I mean, you can point to why it

18   should have been done long ago, but good, bad, or in between,

19   we are where we are today.  Practically speaking, how in the

20   world is this going to get taken up and Defendant is going to

21   have a fair opportunity to depose the expert on this

22   supplement prior to trial?

23         MR. NELSON:  The short answer, Your Honor, is that

24   we have absolutely no problem offering Mr. Mills for

25   deposition over the weekend, limited to an hour on a

1   supplemental report.

2       And just to back up by a couple of weeks about why we are

3   in this predicament, starting in early June as soon as --

4   after this deposition we got the new data, we asked for a new

5   30(b)(6) deposition.  We told them in early June that we were

6   going to supplement.  We were expecting them we had a meet and

7   confer.  We were expecting them to want another deposition.

8   They never asked for any of this.  As Your Honor is

9   well-aware, they didn't ask us for an expedited briefing

10  schedule; instead all we got was this emergency motion.

11      We are more than prepared to offer Mr. Mills again in a

12  supplemental deposition.

13          THE COURT:  I haven't gotten to the merits or lack

14  of merit in the emergency motion yet.  I'm talking about your

15  motion to supplement the report of Mills.

16          MR. NELSON:  Thank you, Your Honor.

17      And that -- we were surprised this was opposed to begin

18  with because we were prepared, we filed the supplemental

19  report.  As -- obviously, as Your Honor is aware, it is

20  relatively common for there to be supplemental reports and

21  relatively common for there to be an additional deposition to

22  reflect a supplemental report.

23          THE COURT:  The supplemental report, as I see it,

24  was filed on the 19th of June.  From the 19th of June until

25  now was there ever any overture from Defendant about, We need

1    to take Mr. Mills' deposition, we need to query him about this

2    six-page supplement.

3          MR. NELSON:  No, Your Honor.

4          THE COURT:  Did that ever get initiated from the

5    Defendant?

6          MR. NELSON:  Mr. Zeliger will correct me if I'm

7    wrong--I am not aware of any.

8          THE COURT:  All right.  What else do you have on the

9    motion to supplement?

10         MR. NELSON:  That's it, Your Honor, except to say,

11   just to follow the chain through, we were diligent from this

12   very time on in obtaining the data and talking to them about

13   the data and telling them in early June, By the way, the

14   numbers don't line up.  And so by talking to them in early

15   June about these issues, telling them we intended to file a

16   supplemental report.  This timeline is laid out in our reply

17   brief filed yesterday morning about the steps that we took.

18   At every step had a meet and confer about it.  All they did

19   was oppose -- said they were going to oppose it, and said --

20   and as early as possible that we intended to file this report

21   as -- within a week of the additional 30(b)(6), which we did.

22       Thank you, Your Honor.

23         THE COURT:  Let me hear from the Defendant.

24         MR. ZELIGER:  Thank you, Your Honor.  This is

25   Michael Zeliger for ADT.

```
1          THE COURT:  So once the supplemental -- proposed

2    supplemental report of six pages came in and was filed on the

3    19th of June, tell me why you never asked to depose Mr. Mills

4    on this supplement.  Is there a lack of interest or just don't

5    care or didn't get around to it?  I mean, what happened to the

6    time between the 19th of June and today?

7          MR. ZELIGER:  Your Honor, a deposition wouldn't

8    alone be sufficient.  We thought that that would be futile.

9    So if that was a mistake, then take the blame for that--that

10   was my decision.

11        But the issue here -- let me just give you a little

12   context.

13          THE COURT:  All right.

14          MR. ZELIGER:  The six-page report proposes a royalty

15   base that defies the entirety of ADT's business.  This is

16   complicated material, and the reason is ADT doesn't track any

17   of this information.  ██████████████████████████████████

18   ████████████████████████████████████████      ████████████

19   ████████

20        We've been working collaboratively with Fractus' counsel

21   throughout.  We've had a number of informal discussions.

22   We've gave them access to our witness informally for

23   conversations.  We produced stuff that was not required by the

24   motion to compel voluntarily.  We went outside and talked to

25   our technology partner alarm.com and persuaded them to provide
```

```
 1    information in the case.

 2              THE COURT:  Let me stop you.  If deposing Mr. Mills

 3    is not adequate here, what do you suggest is adequate in light

 4    of this six-page supplement?

 5              MR. ZELIGER:  A deposition to understand how he came

 6    up with a number that exceeds the number of units in the field

 7    and then a supplemental responsive report from our expert.  We

 8    don't understand his logic, so it's not like our expert can

 9    even begin to oppose it.  ████████████████     █████████

10    █████████████████████████████

11              THE COURT:  I'm not saying it's not important,

12    counsel --

13              MR. ZELIGER:  Okay.

14              THE COURT:  -- but I don't understand how if at the

15    end of the day you wanted an opportunity to have your expert

16    supplement his or her opinion that you didn't move forward to

17    depose Mr. Mills on this as a predicate to then being able to

18    ask for an opportunity to have a supplement from your expert

19    in which your expert would then be deposed on that targeted

20    matter by the Plaintiff.

21         I mean, we don't have an explanation, or at least I don't

22    have an explanation as to why between the 19th of June and

23    today there was dead silence on this.

24              MR. ZELIGER:  I understand, Your Honor.

25              THE COURT:  All right.  Do you have anything else
```

1    for me on this?

2              MR. ZELIGER:  On this issue, no.

3              THE COURT:  Okay.  I'm going to do this with regard

4    to the supplement for Mr. Mills.  I'm going to grant leave for

5    the Plaintiff to supplement Mr. Mills' report with this

6    proffered supplement of six pages.  I'm going to require the

7    Plaintiff to make Mr. Mills available for a one-hour

8    deposition to be conducted at a mutually agreeable time

9    between the parties between now and Monday of next week, the

10   8th.

11        Whether it's over the weekend, whether it's on Friday, I

12   trust it won't be on the 4th of July, but sometime between now

13   and the 8th of July at a time the parties can agree to,

14   Plaintiff's going to present Mr. Mills for a one-hour

15   deposition on the supplement.

16        I don't see that a supplement by Defendant's expert is

17   feasible here, and, quite honestly, any blame for why a

18   supplement from Defendant's expert would not be made available

19   falls, in my view, on the Defendant who saw the request for

20   leave to supplement regarding Mr. Mills on the 19th when it

21   was filed on the docket, the 19th of June, and apparently had

22   no communications and didn't initiate any discussions with

23   Plaintiff about how to go forward with this until today when

24   we're in the middle of pretrial.

25             So to the extent -- the Defendant is going to get an hour

 1    to depose Mr. Mills on this, but beyond that I'm not going to

 2    grant any additional relief.  And to the extent Defendant is

 3    unhappy with that, I think they need to look in the mirror,

 4    and I find that any justification for a potential supplement

 5    from Defendant's expert has effectively been forfeited by

 6    Defendant's failure to raise the issue of the Plaintiff's

 7    supplement, deposing their expert, and opening the door to the

 8    possibility that then their expert could offer a supplement.

 9    I think that's been squandered by the Defendant between the

10    19th of June and today.

11         So I'm going to allow -- I'm going to require the

12    one-hour deposition of Mr. Mills for the Defendant to take

13    that one-hour deposition focusing on this six-page supplement

14    and nothing else.  And that's all the relief I'm going to

15    grant.  But I am going to grant leave -- in light of the

16    totality of the circumstances, I'm going to grant leave for

17    Fractus to supplement Mr. Mills' report with the six-page

18    supplement as tendered on the 19th of June.

19         Now, I want to turn next to the last leg in the

20    three-legged stool about Mr. Robert Mills, and that's the

21    emergency motion for leave to challenge Mr. Mills'

22    supplemental report.  That's Document 219.

23         I assume there's not any need to maintain the seal on the

24    courtroom to take up this emergency motion.  If there is, let

25    me hear from you; if not, I'm going to order the courtroom

1    reopened.

2              MR. ZELIGER:  No need.

3              THE COURT:  Then I'll order the courtroom reopened

4    and unsealed.

5         And we're going to turn to Document 219.

6                   (Courtroom unsealed.)

7              THE COURT:  And let he hear from ADT.

8              MR. ZELIGER:  Thank you, Your Honor.  This is

9    Michael Zeliger.

10        I'd like to begin by apologizing to the Court by filing

11   this motion on an emergency basis.

12             THE COURT:  I think you should, Mr. Zeliger, because

13   the local rules of this Court make it abundantly clear that

14   emergency motions are only those necessary to avoid imminent

15   and irreparable harm, and there are only those that a motion

16   to shorten the response period is inadequate to address.  And

17   I don't know how this could be imminent and irreparable harm

18   when these topics were all set for pretrial that was scheduled

19   for today.

20        You know, local rule I believe it's 7, Local Rule CV-7,

21   subpart (l), makes it abundantly clear emergency motions are a

22   very unique and rarely-used tool in this court under these

23   local rules.  To give you an illustration, it's the person

24   throwing the emergency brake on the speeding train.  It throws

25   everything out of place.  It stops everything else.  It forces

1     the Court to drop whatever it's doing and turn to that

2     particular motion, which is what I had to do when you filed

3     this a few days ago.

4         And I don't find any basis for it and I'm wondering why

5     that kind of conduct is not sanctionable.  You're charged with

6     a fair reading of the local rules, and I don't see how a fair

7     reading of the local rules would justify this kind of a

8     motion.  But I want to hear from you on that.

9              MR. ZELIGER:  Your Honor, in terms of the urgency, I

10    think that it's our fault.  It's our -- you know, we get into

11    these cases and lose sight of the outside perspective and it's

12    wrong.

13             THE COURT:  Let me ask you this, Mr. Zeliger.

14             MR. ZELIGER:  Yes.

15             THE COURT:  I noticed your firm signed off on the

16    emergency motion, but your local counsel did not.

17             MR. ZELIGER:  They did not.

18             THE COURT:  Was there a conscious decision by local

19    counsel not to join in the emergency motion?

20             MR. ZELIGER:  No, it was on oversight on our part.

21    And thanks to the good counsel I received from Mr. Gorham

22    since, we understand the error of that as well and will not

23    repeat that mistake.

24             THE COURT:  Why didn't your good sense cause you to

25    pick up the phone and ask Mr. Gorham if he thought this was an

1    appropriate thing to do before you did it?

2              MR. ZELIGER:  Well, all I can say to that, Your

3    Honor, is I take full responsibility personally for that

4    decision, and defer to the Court for what's an appropriate

5    outcome.  We were wrong and I apologize for it and it won't

6    happen again.

7              THE COURT:  You know, Mr. Zeliger, the problem I

8    have is that everything I do is scrutinized by the entire bar,

9    and if I let you flippantly and without any justification file

10   an emergency motion, that signals to everybody else out there

11   it's okay to do that.

12             MR. ZELIGER:  May I respond to that, Your Honor?

13             THE COURT:  Please.

14             MR. ZELIGER:  It was not flippant; it was wrong and

15   it was misguided, but it was sincere.  We just significantly

16   misunderstood the local rule on the practice.  It was not

17   flippant, but -- I'm not trying to forgive it --

18             THE COURT:  Tell me how in the world you could

19   seriously and sincerely believe that this matter was -- causes

20   imminent and irrevocable harm when the subject matter is part

21   of the pretrial we are conducting today and that was already

22   scheduled?  How in the world could it be irrevocable and

23   imminent?

24             MR. ZELIGER:  I'm not defending decision, Your

25   Honor; I'm only trying --

1          THE COURT:  You said you sincerely believed that the

2     local rule applied.  I don't understand how in the world you

3     could have.

4          MR. ZELIGER:  Because I was wrong.  All I'm taking

5     issue is was the intent.  I did not intend to disrupt and

6     didn't appreciate the significance of the decision that we

7     made, but I accept responsibility for it.

8          THE COURT:  Let me see if Plaintiff has anything to

9     add to the discussion of this matter.  If you do, fine; if you

10    don't, fine.

11         MR. NELSON:  Your Honor, with respect to this, we

12    take no position and we have nothing to add.

13         THE COURT:  All right.

14      Mr. Zeliger, I am going to penalize the Defendants 15 of

15    your designated trial time.

16         MR. ZELIGER:  Very well.

17         THE COURT:  That means instead of 11 hours to put on

18    your evidence, you have 10 hours and 45 minutes.

19         MR. ZELIGER:  Very well, Your Honor.

20         THE COURT:  I do not feel I can simply gloss over

21    this and slap your wrist and say, Don't do it again, and send

22    you on your way, because of the signal that would send to

23    everybody else out there, and I just -- I feel compelled to

24    impose some kind of penalty for what's happened.  I think this

25    is very limited and very targeted, but it has -- I have to do

1    something here.

2              MR. ZELIGER:  I understand, Your Honor.  We do

3    not -- we accept the consequence of that decision.

4              THE COURT:  All right.  Let's move on, then.

5         That should get us past the topic of Robert Mills one way

6    or the other.

7              MR. ZELIGER:  Your Honor?

8              THE COURT:  Yes, sir.

9              MR. ZELIGER:  I think there's still the issue about

10   whether Mr. Mills has any basis for the upper end of his

11   damages range as a result of the Court's decision to strike

12   paragraph 219, and, in our view.  There's nothing other than a

13   vague reference to some *Georgia-Pacific* factors that justifies

14   them -- his opinion that the appropriate damages here would be

15   ████████   per subscriber month.  That number comes from the

16   ███████████████.  It appears nowhere else in this record.

17             THE COURT:  Well, I assume that's something you're

18   going to talk to Mr. Mills about when you take that one-hour

19   deposition between now and Monday as a part of his

20   supplemental report.

21        Let's just -- this issue appears to be joined whether

22   it's properly before the Court in a motion or not.

23        Let me hear from the Plaintiff on its response to what

24   Defense counsel is arguing here.  My understanding is

25   Plaintiff's position is that there is other evidence besides

1    the ███████████ that would support this opinion, and

2    that's something I guess we need to get out in the open.

3              MR. NELSON:  That's absolutely correct.  We laid it

4    out, including -- because it was not addressed in the original

5    motion, we laid it out in yesterday's response.  But at

6    paragraphs 141 through 160 of Mr. Mills' report goes through a

7    number of *Georgia-Pacific* factors, including specifically the

8    incremental profits analysis, which is actually part and

9    referenced in section -- paragraph 220 of the Mills report

10   specifically talks about the incremental profits analysis,

11   referencing back to those sections and those paragraphs of the

12   report where the profit is quite high, it's laid out in the

13   actual briefing--I'll be vague because we're in an open

14   courtroom--but he has a very strong opinion about that when

15   during Mr. Mills' original deposition he was asked about this.

16   He talked about the two different methodologies, and he talked

17   about the Vivint license for one and he talked about the

18   incremental profits analysis for the other laying out that

19   particular methodology.

20       Thank you, Your Honor.

21             THE COURT:  Well, let me say this.  I've dealt with

22   the emergency motion procedurally and I've imposed a penalty

23   on Defendant for having improperly and without any

24   justification presented this to the Court as an emergency

25   motion.  Let me now turn to the substance of it, and the

1    substance of it leads me to conclude that this has effectively

2    been waived because it was not raised as a part of the

3    original *Daubert* motion, and you can't come in six days before

4    jury selection and file an improper emergency motion and move

5    for something that you've omitted from your *Daubert* motion.

6         So I am going to deny substantively the Defendant's

7    relief to preclude Mr. Mills from this ███████████

8    monthly royalty rate.  To the extent it's supported by his

9    opinion as supplemented and by the other evidence in the case,

10   I'll allow him to put it on.  Whether he can persuade the jury

11   that it's credible or not is another matter, but I'm not going

12   to strike or curtail Mr. Mills' opinions with regard to the

13   subscriber monthly royalty rate.

14             MR. NELSON:  Thank you, Your Honor.

15             THE COURT:  All right.  Are we all clear?

16        Then let's move on to Mr. -- or Doctor Feuerstein.

17   That's Document 140.  And this is Plaintiff's motion to strike

18   Doctor Martin Feuerstein.

19             MR. GRINSTEIN:  Good morning, Your Honor.  Joe

20   Grinstein for the Plaintiff Fractus.

21             THE COURT:  Good morning, counsel.  Please proceed.

22             MR. GRINSTEIN:  Your Honor, may I approach with some

23   slides?

24             THE COURT:  You may.

25             MR. GRINSTEIN:  Your Honor, these were three motions

1    that are grouped together in your motions chart.  With the

2    Court's permission, there's a lot of overlap in the motions,

3    and I actually think the most efficient way to deal with the

4    motions would be to first discuss the motion as to Doctor

5    Tentzeris, then discuss the motion to Doctor Feuerstein

6    focusing on just whatever is new and is not already covered.

7    And then I'd like to last handle the motion as to Mr. Andrien,

8    to the extent there's anything in that motion that I haven't

9    already touched on.

10            THE COURT:  And you think we can wrap all three of

11   these people into one argument and not get lost in the

12   process?

13            MR. GRINSTEIN:  I do believe so; yes, Your Honor.

14            THE COURT:  Does that create any problem for you,

15   Mr. Zeliger, or for Defense counsel?

16            MS. ACHARYA:  No; that's fine.

17            THE COURT:  All right.  Then proceed on that basis,

18   Mr. Grinstein.

19            MR. GRINSTEIN:  So let's start with the motion to

20   exclude with respect to Doctor Tentzeris, and that's Docket

21   141.  The fundamental issue with respect to this motion, Your

22   Honor, is that Defendant's damages expert Mr. Andrien wants to

23   present to the jury detailed technical opinions, whose origin

24   is Doctor Tentzeris but which Doctor Tentzeris never included

25   in any expert report.

1          And Your Honor, I know damages experts talk to technical

2     experts all the time and all the time technical experts give

3     damages experts background information, and that's fine.  So,

4     for example I'm showing on the screen paragraph 26 from

5     Mr. Andrien's report where he reports an interview with Doctor

6     Feurstein who gave him some background information about the

7     patents and the technology in this case.  That's fine.  We

8     haven't moved to exclude that.  That's totally within the

9     proper ambit of one expert talking to another expert.

10          The problem in this motion, though, is that Mr. Andrien

11     goes much, much further than this.  And so, for example, in

12     paragraph 46, he relates an opinion from Doctor Tentzeris

13     where Dr. Tentzeris apparently reviewed all of the patents

14     that were part of the Vivint settlement, used some criteria,

15     and then determined ████████████████████████████████████

16     ████████████████████████████████████████████████████████

17     That discussion that is related in paragraph 46 appears

18     nowhere in Doctor Tentzeris's report.

19          THE COURT:  Let me stop you for a question.  Are you

20     telling me that for Expert A to have an opinion and put it in

21     his report that he relied upon Expert B and the information

22     Expert B provided him, that Expert B's opinion has got to be

23     in a report Expert B filed, and if it's not in a report, if

24     it's just in a discussion or a conversation, Expert A can't

25     rely on it?

1          MR. GRINSTEIN:  If it's a detailed technical opinion

2     that ought to be subject to *Daubert*, that is our position,

3     Your Honor.  And that's our position because -- and there's

4     several --

5          THE COURT:  I have expert witnesses all the time

6     that rely on pure hearsay from some other source as the basis

7     for the opinion that's in their report, and that opinion in

8     their report gets queried and attacked and subjected to

9     *Daubert*, but it's not in and of itself excludible because it

10    comes from some third-party hearsay source.

11         MR. GRINSTEIN:  That's third-party hearsay source,

12    but the difference is Rule 26 requires that an expert's

13    opinion appear in an expert report.  You can't get around Rule

14    26 and say, You know what, we're going to have our damages

15    expert relate some other expert opinion.  And this is what

16    that is.

17        Look at paragraph 46.  That is an expert opinion.  That's

18    the sort of thing that belongs in the report, but it's not

19    going to be subjected to cross examination at trial because --

20    well, first of all, Doctor Tentzeris isn't even showing up to

21    trial; but secondly, how do I cross examine Doctor Tentzeris

22    about this opinion at trial when Doctor Tentzeris is forbidden

23    at trial from going outside the scope of his report?  He's not

24    allowed to.  He can't mention this opinion at trial, if he

25    were even coming to trial, because he's not allowed to.

1        And I can't ask Mr. Andrien about this particular opinion
2   because I tried to do that at his deposition and every single
3   question I had about this opinion why is one patent more
4   valuable than the other, what are the various criteria that
5   was used by Doctor Tentzeris to come up with this, how do you
6   come up with the numbers here ███████████████████████ every
7   single one of those questions was answered, I don't know; ask
8   Doctor Tentzeris.  But we can't ask Doctor Tentzeris because
9   he's not going to be at trial, and because he's not allowed to
10  talk about these things anyway because they weren't part of
11  his report.
12       So, Your Honor, I think Your Honor has to draw a line
13  right here, and other cases in this district have drawn that
14  line.  You have to draw a line right here and say one expert
15  can't launder opinions from another expert and excuse that
16  expert from getting up here and defending them, or create a
17  situation, you know, that, frankly, puts us between a rock and
18  a hard place.  And the rock and the hard place that we're in
19  is Mr. Andrien can't tell us anything about these opinions
20  because we asked him in his deposition and he punted on every
21  single question.  And Doctor Tentzeris can't tell us anything
22  about these opinions because they're not in his report and
23  this Court's Motion in Limine 23 says he's not allowed to talk
24  about these things in trial.  And we shouldn't be put into the
25  conundrum, Your Honor, of waiving the protections of Motion in

1    Limine 23 and allowing Doctor Tentzeris to just go freestyle

2    it before the jury talking about things that weren't in his

3    report.

4         And that is why, Your Honor, I tried to focus in on

5    paragraph 26 of the report, and I'm trying to draw a line

6    right here.  Basic background information, basic factual

7    information, of course a damages expert can talk to a

8    technical expert and rely on that kind of hearsay, and of

9    course that's not excludible, and that's why we haven't moved

10   against paragraph 26.  But this situation is different, Your

11   Honor.  This is like having a -- you know, damages -- an

12   infringement expert opine, I hereby declare that all of the

13   patents are not infringed, but he doesn't put a report in on

14   that and he just lets the damages expert repeat that opinion.

15   That is an end-run around Rule 26, it's and end-run around the

16   Court's disclosure rules, and it's an end-run around Motion in

17   Limine 23.

18        And so there are -- the only way I can answer Your

19   Honor's inquiry is that there is lines of -- there's

20   variances, there's gradations on this point.  Some of this

21   hearsay that an expert can talk to another expert about has

22   got to be okay, and some of it has not got to be not okay, and

23   we're on the not okay part of the line.

24        That's our --

25             THE COURT:  I am concerned about your argument that,

1    intentional or unintentional, this series of events has

2    resulted in you being unable to test the opinions.  Both sides

3    get the test the other side's opinions before we end up in the

4    middle of the trial with a jury in the box.  That is my most

5    concerning point that you've argued so far.

6             MR. GRINSTEIN:  And I will say this, Your Honor.  We

7    did not depose Doctor Tentzeris, and I am sure the other side

8    will come up and mention that fact so I will address it now.

9    We did not depose him.  We often don't depose the other side's

10   technical experts.  And that's a strategic issue.  We don't

11   like to teach them what their cross examination's going to be

12   like at trial.  That should have nothing to do with Your

13   Honor's inquiry that you just made, though.

14        The reasons are two-fold.  Number one, there's no

15   addendum to Rule 26 that says you have to put your opinions in

16   an expert report, but if you don't you can just supplement

17   that with a depo -- a deposition; it doesn't matter.

18        But point number two, and more to the point, what if we

19   had deposed Doctor Tentzeris about these opinions?  What if we

20   had done that?  And what if we'd exposed some really

21   embarrassing flaws that Doctor Tentzeris had come up with his

22   opinions; that he, you know, reached his ████████ valuation

23   by using a dart board?  How would we have used that at trial,

24   Your Honor?  We couldn't have crossed Mr. Andrien using Doctor

25   Tentzeris's deposition because Mr. Andrien would just say, I

1    don't know; I don't know what Doctor Tentzeris; did you have

2    to ask him.  And we couldn't cross Doctor Tentzeris, if he was

3    coming to trial, with Doctor Tentzeris' deposition because

4    he's not allowed to sponsor these opinions in the first place.

5    So how do we cross him at trial with a deposition on opinions

6    that are outside the scope of his report that he's not allowed

7    to testify?  I mean, it shouldn't be the price of admission

8    that we have to waive our protections of Motion in Limine 23

9    in order to talk to Doctor Tentzeris.

10        So, in our opinion, failing to put these in the report

11   is what denies us the ability to test these opinions, either

12   pretrial or at trial, and that's because of this Court's

13   Motion in Limine 23, among other things.

14        To move things along, Your Honor, I will move to the

15   Doctor Feurstein motion in limine.  Dr. Feurstein's -- I'm

16   sorry; motion to exclude.  Doctor Feurstein's motion to

17   exclude raises two separate issues.

18        And I'm sorry.  One additional point on Mr. Andrien.  I

19   direct the Court's attention, for example, to the *Blitzsafe*

20   opinion--I think it's a Judge Payne opinion; there's several

21   other like it--where experts' opinions that don't appear in

22   their report do get excluded.

23            THE COURT:  Do you have anything else on Doctor

24   Tentzeris?

25            MR. GRINSTEIN:  I do not, Your Honor.  That's why

1    I'm moving to Doctor Feurstein.

2              THE COURT:  Okay.

3              MR. GRINSTEIN:  Doctor Feurstein raises two separate

4    issues.  The first is the same one I just mentioned with

5    respect to Doctor Tentzeris.  We've identified the opinions

6    about design-arounds and about the valuation of the patents

7    that Doctor Feurstein does the same thing as Doctor Tentzeris

8    does, so I won't repeat that part of my argument.

9         There is a second part of a problem we have with Doctor

10   Feurstein's report, and that relates to his non-infringing

11   alternative discussion.  This is a different argument, Your

12   Honor, because these opinions do appear in his report.  He

13   does identify ███████████████████████ and discussed

14   them in his report.  So we're not making the argument that

15   they don't appear in his report; we are making two other

16   arguments against those non-infringing alternatives, though.

17        The first argument we make is the fact that these

18   opinions from Doctor Feuerstein about these ████

19   ████████████████ only appear in Doctor Feurstein's

20   rebuttal expert report.  They were not present in an opening

21   report.  And as this Court held via Judge Payne in the *Correct*

22   *Transmission* case just a few months ago -- although I will

23   note before these reports went in, an expert's opinions that

24   something is a non-infringing alternative or not are akin to

25   an affirmative defense by the defendant and they need to go in

1    an opening expert report.  Doctor Feurstein's report was a

2    rebuttal report.  And what Judge Payne did in the *Correct*

3    *Transmission* case is exclude the defendant's non-infringing

4    alternatives opinions because they waited too long and put

5    them in a rebuttal report.  And Judge Payne held that the

6    prejudice from the timing of that and forcing all those

7    opinions in late, in a late round, was sufficient to uphold

8    their exclusion.

9        So our first point about these ███████████████

10   ██████████, Your Honor, is that they were too late.  Doctor

11   Feurstein should have put them in an opening report.  They

12   were in a rebuttal report.  There is direct authority from

13   Judge Payne just a few months ago on this exact issue.

14           THE COURT:  Wasn't the ██████ disclosed during fact

15   discovery?

16           MR. GRINSTEIN:  That's my second point, Your Honor,

17   but I will say that point has nothing to do with my first

18   point, whether the ██████ was disclosed in fact discovery or

19   not.  What I'm talking about is an expert opinion that says, I

20   have looked at the ██████ and I hereby declare the ██████ to

21   be a non-infringing alternative.  Whether that was properly

22   disclosed in discovery or not, an expert's opinion about that

23   is an affirmative burden of proof opinion and it has to go in

24   opening reports.

25           So, I mean, we disclosed our infringement contentions in

 1   fact discovery, but we also had to it put in an opening report

 2   on our infringement contentions.  It's the same thing.

 3        But Your Honor does anticipate the second point I have to

 4   make.  There are ███████████████████████ that are

 5   discussed by Doctor Feurstein.  One of them, one of those

 6   ████ was properly disclosed in fact discovery.  And Your

 7   Honor will recall we filed a motion to exclude, we thought it

 8   was disclosed too late, Your Honor disagreed and said that

 9   ████ was properly disclosed, so that one is in for purposes

10   of my argument.

11        The problem is the other ████  The other ███ were

12   products that were previously accused of infringement by

13   Fractus but which Fractus dropped the patents for which they

14   were accused of infringement so they are no longer accused

15   products.  Those were never mentioned whatsoever by ADT in any

16   fact discovery.  They were never mentioned in an opening

17   report because there was no opening report on non-infringing

18   alternatives.  The first time those first ███ non-infringing

19   alternatives were ever mentioned was in the rebuttal report of

20   Doctor Feurstein, and there are myriad cases from this

21   district excluding an expert from talking about non-infringing

22   alternatives that were never disclosed in fact discovery.

23        Now, I suspect ADT may argue, Well, these were

24   non- --these were products that you dropped your infringement

25   allegations on -- actually we indicated that they were dropped

1    before opening reports came in, but in any event, they will

2    say, You dropped your infringement allegations on those so it

3    was fair game for us to turn them into non-infringing

4    alternatives.  The problem with that argument is we never

5    accused those ██ products of infringing the three patents

6    that are left in this case.  That is why those products

7    dropped out of the case when we dropped those patents.

8        So ADT during some point in fact discovery should have

9    answered an interrogatory and said, Hey, Fractus, you accused

10   these ██ products of infringing the '092, the '200, and the

11   '246 Patents, but you don't accuse them of infringing the

12   '887, the '365, and the '103 Patents; therefore, those ██

13   patents are non-infringing alternatives to the three patents

14   that are left in this case.  They could have done that at any

15   point during fact discovery because we were a always not

16   accusing them of infringing the three patents in this case,

17   but they never did that.  And so those ██ products were

18   never accused -- were never identified as non-infringing

19   alternatives; therefore, their expert should not be able to

20   talk about them.

21       So to wrap both of these points together, Judge Payne

22   held in the *Correct Transmission* case that it is too late for

23   an expert to analyze non-infringing alternatives in a rebuttal

24   report.  Not only that, but it should be doubly too late for

25   an expert not only to analyze non-infringing alternatives in a

1    rebuttal report, but also to not even bother to identify those

2    non-infringing alternatives until the expert rebuttal report.

3         And so that's our argument with respect to Doctor

4    Feurstein.  I think all of those same arguments also apply to

5    the motion with respect to Mr. Andrien, so I won't further or

6    separately address that particular motion.

7         And that's all I've got, Your Honor.

8              THE COURT:  All right.  I'll hear from the

9    Defendants in response.

10             MS. ACHARYA:  Thank you, Your Honor.  Ranjini

11   Acharya for the Defendant ADT.

12        I will address the three motions that are issue here in

13   the same order that Fractus' counsel did.

14        A few things that I want to point out in relation to each

15   motion.  With respect to Doctor Tentzeris, I think a little

16   bit of context here is important.  During fact discovery,

17   Fractus' witnesses told us that they value all the patents in

18   their portfolio equally.  When we saw Mr. Mills' opening

19   expert report on damages, he said that ██████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████   So

22   when we saw the opening damages report, that was really the

23   first indication that we had that Fractus views its patent

24   portfolio with different weights ascribed to different

25   patents.  And so our damages expert Mr. Andrien went back to

1   the technical experts and talked to them about what value they

2   would ascribe to these patents given their technical

3   expertise.  He then sat out those conversations in his report.

4       Now, as Your Honor mentioned, this Court does allow

5   experts to rely on pure hearsay, and so we believe that for

6   Mr. Andrien to have formulated the opinions that he did by

7   relying on these out-of-court discussions that he had with

8   Doctor Tentzeris is not improper and does not render his

9   opinions subject to exclusion.

10       THE COURT:  Counsel, the Court has in the past

11  allowed an expert to rely on hearsay, but the Court, to its

12  knowledge, has never allowed an expert to rely on something --

13  some input to their opinion that wasn't fairly testable by the

14  other side prior to trial.  So I don't want to confuse hearsay

15  with the Plaintiff's argument here that the way this is

16  structured and the way it is now before the parties and the

17  Court precludes them from having a fair opportunity to test

18  those opinions.  What's your response to that?

19       MS. ACHARYA:  My response, Your Honor, is that they

20  had that fair opportunity and they chose to forego it.  We

21  offered Doctor Tentzeris for deposition.  It was not just

22  outlined in the docket control order from the Court, but we

23  actually specifically -- once we saw this motion come in, we

24  offered that deposition.  They declined.  So they had the

25  opportunity to test these opinions, as they call them, and the

1    substance of those conversations; they declined to take it.

2         And that I think also distinguishes some of the decisions

3    of this Court that they cited in their briefing where the

4    party that was seeking to challenge the opinions took

5    depositions of both the damages expert and the technical

6    expert that the damages expert was relying on.  Both of those

7    experts sat for depositions.  Here I heard counsel refer to

8    strategic reasons.  They made that choice not to take Doctor

9    Tentzeris's deposition.

10         THE COURT:  So when an expert like Doctor -- or

11   Mr. Andrien--I guess it's Mr. Andrien--when an expert like him

12   says, You've got to ask Doctor Tentzeris, you've got to ask

13   Doctor Tentzeris, you've got to ask Dr. Tentzeris, and gives

14   that same unenlightening response multiple times, then a party

15   in Plaintiff's position either has to educate the technical

16   expert by deposition as to how they're going to oppose him at

17   trial or they have to suffer the other consequence of not

18   knowing what he's going to say in response to Mr. Andrien's

19   prior statements, You'll have to ask him.  I mean, doesn't

20   that put them in somewhat of a Hobson's choice?

21         MS. ACHARYA:  Well, I think every deposition of an

22   expert is subject to that Hobson's choice, Your Honor.  Every

23   time you take the deposition of an expert you're sharing some

24   of the trial strategy with them in the questions that you ask

25   of that expert.  I don't think it's unfair to expect them to

1    take Doctor Tentzeris' deposition and ask him -- the same

2    questions that they put to Mr. Andrien they could have put to

3    Dr. Tentzeris.

4              THE COURT:  But isn't it the case that if

5    Mr. Andrien had answered those questions and not just punted

6    on each one of them to Dr. Tentzeris that Plaintiff might not

7    have needed to take the deposition of Dr. Tentzeris if they'd

8    gotten substantive answers from Mr. Andrien about the matters

9    they cared about?

10             MS. ACHARYA:  If they were satisfied with his

11   responses, certainly, but Mr. Andrien didn't feel like he was

12   in a position to explain Dr. Tentzeris' reasoning beyond

13   sharing the conclusions that Dr. Tentzeris offered.

14             THE COURT:  And if they even had deposed

15   Dr. Tentzeris based on the way this is all coming together,

16   wouldn't they have been in a position of trying to depose an

17   expert about something that's not even in his report?

18             MS. ACHARYA:  Yes, Your Honor, because of the way

19   that the --

20             THE COURT:  I mean, if the expert is limited to the

21   four corners of their report, why would you depose an expert

22   about something that's not in the expert's report?

23             MS. ACHARYA:  Well, I think that Dr. Tentzeris would

24   certainly be precluded at trial from offering opinions beyond

25   his expert report, but given that the conversation was

1    detailed in Mr. Andrien's damages rebuttal, we would have

2    certainly allowed Dr. Tentzeris to be deposed and questioned

3    on that during his deposition.  I don't think that's improper

4    for counsel to have asked Dr. Tentzeris those questions.

5              THE COURT:  They might could have asked him the

6    questions at deposition, but what good does it do them to get

7    the information from him when they know he can't testify about

8    it because it's not in his report?  I mean, how are they going

9    to hold anybody else responsible for his answers and those are

10   answers to questions he can't testify about?

11             MS. ACHARYA:  I don't want to tell them how to try

12   their case, Your Honor, but it certainly goes to the

13   credibility of Mr. Andrien in front of the jury when he is

14   asked about those opinions and what he based them on.  And so

15   I think it would go to the weight of Mr. Andrien's testimony

16   certainly, but it's not -- I don't support a basis to exclude

17   those opinions altogether.

18             THE COURT:  All right.  What other argument do you

19   have for me?

20             MS. ACHARYA:  With respect to Doctor Feurstein's

21   opinions, so I think we covered many of the same issues with

22   respect to the conversations about the patents themselves.  I

23   do want to address Dr. Feurstein's opinions as they related to

24   the non-infringing alternatives.

25        And again, I think here a little bit of context is

1    important just for the benefit of the Court.  The expert

2    reports, the opening expert reports went in on March 5th.  The

3    Court's ruling on Fractus' options to the claim construction

4    order came down on March 15th.  The stipulation dropping those

5    two patents from the case came out on--excuse me--was filed by

6    the parties on March 22nd, so that's when the ████████

7    products were dropped from the case.  And Dr. Feurstein

8    submitted his report on March 26th.  At the time that the

9    opening expert reports went in, those products were still part

10   of the case.  In discovery ADT had provided an interrogatory

11   response explaining why it didn't believe any of those

12   products infringed the patents that were asserted at the time

13   and provided discovery on those products.

14       So what we have here is a rebuttal opinion that is really

15   a rebuttal opinion to the expert report that went in on March

16   5th.  The products fell out of the case in the intervening

17   period, and that based on that Defendant was able to say now

18   these are non-infringing alternatives.  And we believe that

19   this is akin to the Court's decision in *Netlist,* which was

20   handed down in January of 2024, where the Court found that

21   non-infringement opinions--sorry; excuse me--non-infringing

22   alternative opinions in a rebuttal report were truly in

23   response to the expert's opening report, and that the

24   plaintiff had been on notice of those products and the

25   series, and so that opinion was not considered untimely

1    and was not stricken.

2         With respect to the *Correct Transmission* case that

3    Plaintiff relies heavily upon, I will note that that decision

4    came out I believe the day after Mr.--excuse me--Dr. Feurstein

5    submitted his rebuttal report and certainly after the opening

6    expert report deadlines had passed.  If I read *Correct*

7    *Transmission* correctly, I believe that it may represent a

8    shift in the Court's thinking about when experts should submit

9    expert reports on non-infringing alternatives.

10        Certainly there has been a practice before this Court,

11   including in the *Personalized Media* case, that's 2021

12   WL662237; in the *SESL* case, that was 2012 WL1995514; and in

13   the *Netlist* case to treat non-infringing opinions as properly

14   part of a rebuttal report.

15        Now, if the Court's thinking on that has changed and

16   those opinions should be submitted in an opening report, the

17   *Correct Transmission* case that laid that expectation out for

18   the first time came after the expert deadlines had passed in

19   this case for opening reports.

20        Lastly, with respect to the specific set of ███

21   non-infringing alternatives--this was at slide 33 of Fractus'

22   presentation--I think we can set to one side the product that

23   was disclosed by ADT in its interrogatory response.

24        With respect to the remaining ███ products, these, again,

25   were actually accused of infringing the Fractus patents that

1    are listed there and they were in the opening expert report of

2    the Plaintiff, of Fractus.  And in several instances, for

3    example, ████████████████████████████████████████████████

4    those products are sold and are available to ADT's customers

5    and are being installed in the field.  So they had full

6    discovery into these products, they were on notice that ADT

7    believed they did not infringe, they included them in their

8    expert report, and then decided after that expert report was

9    issued to drop them from the case.

10            We don't think there's any surprise here.  We think that

11   there was adequate notice that these would be non-infringing

12   alternatives, and we believe that Dr. Feurstein properly

13   submitted his opinion on those non-infringing alternatives.

14            THE COURT:  What else, counsel?

15            MS. ACHARYA:  That's it from me, Your Honor.

16            THE COURT:  Is there any follow-up from Plaintiff?

17            MR. GRINSTEIN:  Very briefly, Your Honor.

18            THE COURT:  All right.

19            MR. GRINSTEIN:  I won't comment further on the issue

20   of not putting your opinion in the report.  I think we've

21   adequately aired that.  Just quick points on the

22   non-infringing alternatives.

23            I believe what the argument that counsel was making was,

24   Well, since you dropped those patents and those products late

25   in the case, therefore, we were justified in waiting until the

 1   rebuttal report, but actually as Exhibit 2 to our motion

 2   showed, on March the 1st we told Defendant that we were

 3   dropping those patents and those products subject to the

 4   appeal of the claim construction to Your Honor.  And so we

 5   would include discussion of the dropped patents in our expert

 6   reports out of an abundance of caution just in case Your Honor

 7   reversed Judge Payne's claim construction, but they were

 8   otherwise dropped.  And that was before the opening reports,

 9   so they were on notice before the opening report that we're

10   dropping those products.

11        But all that doesn't matter anyway because those products

12   we dropped we never accused of infringing the patents-in-suit.

13   So whether we dropped them or not, they should have been

14   non-infringing alternatives identified by ADT during fact

15   discovery for the three patents that are in suit.  Whether we

16   dropped them or not had absolutely no bearing on ADT's burden

17   and duty to identify them as non-infringing alternatives,

18   which they did not.

19        As for the *Correct Transmission* case, I think we've heard

20   a new argument today which is, Well, we couldn't have

21   anticipated the *Correct Transmission* rule because that rule

22   came in the middle of expert report briefing.  I guess my

23   response to that is the defendant in *Correct Transmission*,

24   Nokia, I guess could have argued it didn't anticipate the rule

25   in *Correct Transmission* either, but that didn't get Nokia out

1    of having to comply with the rule that was announced in

2    *Correct Transmission*, to the extent it even was a change, and

3    I'm not sure it really was.

4         You know, the Court looked at what non-infringing

5    alternatives were, Judge Payne did, concluded that they were

6    in the nature of affirmative defenses and they should go in

7    opening reports.  That rule applied to Nokia when it was first

8    litigated against Nokia in *Correct Transmission* and it should

9    apply here to ADT.

10        Thank you.

11            THE COURT:  All right.  Thank you, counsel.

12        Let's see if we can take these three related but

13   different motions and cover the entirety of them.

14        All right.  With regard to the motion by Plaintiff to

15   strike the opinions of Jeffrey Andrien, Document 142, I'm

16   persuaded that the Plaintiff is in a position--and I can't

17   ascribe direct fault to them for being in this position--that

18   without some relief they are unable to fairly test these

19   opinions in this case.

20        Therefore, I'm going to strike paragraph 46 and note 71,

21   paragraph 70, the following sentences:  ███████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████    ████████████████████████████████

24   ███████████████████████████████████████████████████

25   █████████████████████████████████████████

1          I'm going to strike paragraph 87 where it says, "I'm

2     unsure how we want to address this"  -- I'm sorry.  No, I'm

3     going to cut all of paragraph 87, and then paragraph 114

4     starting with the sentence, "As discussed above" through the

5     rest of the paragraph.

6          And then paragraph 117, I'm going to strike the last

7     sentence which says, ███████████████████████████████

8     ██████████████████████████████████████

9     ███████████████████████████████████████

10    █████████████████████████████████████████

11    █████████████████████████████████████████

12         And I'm going to strike paragraph 125 where it says,

13    █████████████████████████████████████████

14    ██████████████████████████████████████████

15    ██████████████████████████████████████████

16    █████████████████████   ███████████████████

17    ████████████████████████████████████

18    ██████████████████████████████████████████

19    ██████████████████████          That portion of paragraph

20    125 is struck.

21         And those are the provisions in Mr. Andrien's report that

22    I'm going to strike.

23         With regard to the motion on Dr. Tentzeris, I'm simply

24    going to deny the motion, but limit the expert to what's in

25    his report.  And if I've struck it from Mr. Andrien, Doctor

1    Tentzeris is not going to rely on it.

2         And then with regard to Dr. Feurstein's report, I've

3    considered the *Correct Transmission* case and its analysis,

4    and, quite honestly, counsel, in anticipation of today's

5    pretrial I've had a lengthy discussion with Judge Payne about

6    it so that I could fully understand the nuance of that ruling,

7    and having considered the briefing and the argument, I do find

8    that it is unfair to put forward an opinion regarding a

9    non-infringing alternative for the first time in a rebuttal

10   report that precludes the other side from having a chance to

11   fairly respond to it.

12        So I'm going to strike all ███████ of the proposed

13   non-infringing alternatives, and that includes the ████████

14   Even though it was disclosed during fact discovery, there was

15   no opinion as to whether or not it constituted a

16   non-infringing alternative until the rebuttal report.  And I

17   think -- the issue which is not disclosure or non-disclosure;

18   the issue is the presentation of the opinion for the first

19   time in the rebuttal report.  And I'm going to adopt the

20   reasoning and the rationale in the *Correct Transmission* case

21   to the extent it's not previously been adopted by me

22   heretofore.  I think it's -- at the end of the day, I think

23   that's what protects a party in this case, the Plaintiff, but

24   could be -- certainly the shoe could be on the other foot in

25   any other case.  It protects a party from being unable to test

1    an opinion for the first time when it is relegated to a

2    rebuttal report.  And there's no real compelling reason why it

3    should have been relegated to the rebuttal report and there

4    was an opportunity to present it earlier.

5         So I think that should cover the Court's rulings on those

6    three motions.

7         Any questions from either side?

8              MR. GRINSTEIN:  No, Your Honor.

9              MS. ACHARYA:  No, Your Honor.

10             THE COURT:  Okay.  Let me ask you this, counsel.

11   Are there other substantive disputed motions between the

12   parties prior to the disputes regarding the motions in limine?

13   I'm trying to make sure we don't miss anything.

14             MR. TRIBBLE:  I don't believe so, Your Honor.

15             MR. ZELIGER:  Agreed.

16             THE COURT:  Then let's turn to the disputed motions

17   in limine.

18             MR. TRIBBLE:  Thank you, Your Honor.  Max Tribble

19   for the Plaintiff.

20             THE COURT:  Just a minute, Mr. Tribble.  Let me

21   catch up with you.

22             MR. TRIBBLE:  Yes, sir.

23             THE COURT:  Okay.  Let's take up the Defendant's

24   motions in limine first.  And let me hear from Plaintiff as to

25   why it opposes Defendant's motion or proposed Motion in Limine

```
 1    No. 1 dealing with characterizing ADT's overall financial

 2    strength market value, revenues, or profits relative to other

 3    home security monitoring companies such as Vivint or

 4    SimpliSafe.

 5              MR. TRIBBLE:  Yes, Your Honor.

 6        I think, as spelled out in our briefing, I mean, it's

 7    very simply this:  We're not going to argue or offer that ADT

 8    -- the concerns that they express in their motion in limine,

 9    it's not what we're going for.  But the simple fact of the

10    matter is that I believe both damages experts are going to

11    compare the sales -- ██████████████████████████████████████

12    ██████████████████████  draw conclusions for it.  And so, for

13    example, if ADT's infringing sales are X times those of

14    Vivint, that would be a factor that's fair to point out and

15    to draw conclusions from with regard to how it affects the

16    appropriate damages, and it's as simple as that.

17              THE COURT:  All right.  Let me hear a response from

18    the Defendant.

19              MS. ACHARYA:  Thank you, Your Honor.  Ranjini

20    Acharya again for ADT.

21        Our concern here is that there is a line that's being

22    crossed from talking about a comparison of the damages models

23    and a comparison of the two companies overall.

24        In Fractus' opposition they mention that the data bears

25    out that Vivint sales were ████████████  units, whereas, ████
```

1          █████████████████████████ but that's not what was in their

2     damages expert report.

3          If Your Honor turns to Exhibit 8 of the MIL's report

4     which was in Exhibit 1 to their opposition --

5               THE COURT:  I don't have that in front of me,

6     counsel, but you're welcome to use the overhead, the document

7     camera if you want to show me something.

8               MS. ACHARYA:  Sure.  I'll just summarize it for the

9     Court, and if you'd like to see it I can do that.

10         But essentially Mr. Mills rendered an opinion that he

11    found that the total royalty base for his calculations ████

12    ████████████████████  So what we would look to do is hold

13    Mr. Mills and Fractus to the correct comparisons here.  If

14    we're going to compare the royalty base, then it should be the

15    royalty base as Mr. Mills calculated where he found the Vivint

16    royalty base was ███████████████ and he found a roughly

17    similar number for ADT.  What we don't want to have happen is

18    for a comparison to be drawn on ADT's overall size relative to

19    Vivint's overall size, and we don't think that that's

20    controversial.

21              THE COURT:  Anything further?

22              MS. ACHARYA:  That's it, Your Honor.

23              THE COURT:  All right.  Well, with regard to

24    Defendant's proposed MIL No. 1, I think the comparison between

25    the Defendant and Vivint have enough overlap in this case to

1    where it's a fair comparison.

2        I don't -- I'm going to deny this motion in limine, but

3    in denying it I want Plaintiff to understand I'm not obviating

4    Standard MIL No. 3 in any way, and I'm not giving Mr. Mills

5    leave to go outside the scope of his report.  He's still bound

6    by those realities.  But as long as he stays within the scope

7    of his report and as long as you don't otherwise violate

8    Standard MIL No. 3, then I don't see -- I think there's enough

9    probative value to allow a fair comparison here, and I'm going

10   to deny the motion in limine.

11       All right.  Next is Defendant's proposed Motion in Limine

12   No. 2 that seeks to exclude hypothetical or real scenarios

13   involving criminals cutting physical phone and cable lines to

14   residences.

15       Let me hear the basis of Plaintiff's objection to this.

16           MR. TRIBBLE:  Your Honor, to be clear, we don't

17   intend to go into specific stories of incidents, criminal

18   incidents involving ADT customers unless there is some kind of

19   denial by ADT on the stand and there are documents that could

20   come in for impeachment purposes.  And so we're not going to

21   try and, I don't know, scare the jury or taint the jury or

22   something that ADT customers have had crimes committed against

23   them.  But the fact of the matter is, in emphasizing the

24   importance of cellular communications to its products, ADT

25   describes the cellular capability as life-saving and so forth.

1        They use this in their own marketing, and so just kind of in

2     this general way we think it's fair for us to describe how

3     they market their own products.

4              THE COURT:  All right.  Let me hear from the

5     Defendant.

6              MS. ACHARYA:  Your Honor, Ranjini Acharya for ADT.

7        I think what the Court heard just now is a conflation

8     that we expect to come in and be heavily made at trial, and

9     that is equating the patents-in-suit which deal with very

10    specific geometry of antennas sitting inside these devices

11    with the provision of cellular services more generally.

12       Adt has provided cellular backup in its panels for a long

13    time.  It's used cellular services as part of its monitoring

14    even before the priority date of the patents-in-suit.  The

15    issue in this case is not about the value of that service to

16    ADT or its customers; it's about these very specific antennas

17    that sit inside the panels -- some of the panels, I should

18    say, that ADT uses, because not all of ADT's panels, not all

19    of ADT's cellular-based services are accused in this case.

20       And so the risk you have whether this evidence comes in

21    as an exhibit, whether it comes in through Mr. Mills'

22    testimony or if it's introduced as cross examination or

23    impeachment evidence is highly prejudicial.  This is an

24    emotive line of questioning designed to elicit that kind of

25    emotive response from the jury and, in our view, has very

1    little relevance to the actual technical issues that are at

2    issue in this case.  And so on that basis we filed the motion

3    in limine.

4              THE COURT:  All right.  Thank you, counsel.

5         With regard to Defendant's proposed Motion in Limine 2,

6    I'm going to grant the motion because I think the Court needs

7    to put itself in the posture of being an active gatekeeper

8    here.  I want to make it clear to the parties, I think there

9    is relevance to the difference between -- at least to the

10   extent of background information regarding the patents-in-suit

11   there is relevance to the difference between a landline system

12   whose landline could be cut and a cellular system whose signal

13   is not subject to that kind of outward disruption.  However,

14   we are not going to have gory pictures or scenes of terrible

15   things that happen to people by criminals who took advantage

16   of the ability to disable a non-cellular system and then

17   proceed to pillage, murder, rape, et cetera.  That's not going

18   to happen and I'm -- that's why I am granting this motion.

19        Now, to the extent there is relevance and probative value

20   to the background and the development of the technology that

21   led from the landline basis to a cellular basis, I certainly

22   think that is appropriate background information to get us to

23   the asserted claims of the patents-in-suit.

24        I don't think -- to address Defendant's fear, I don't

25   think this has anything to do with obviating the Plaintiff's

1    obligation and burden of proof to show each and every element

2    of the asserted claims are covered by the asserted and the

3    accused products.  It is not a situation where showing that we

4    now have a cellular capability is game over for the Plaintiff;

5    it's anything but that.  And Plaintiff is still going to have

6    to put on evidence by a preponderance of the evidence that

7    persuades the jury on the infringement issue that each and

8    every element of the asserted claims is met and covered by the

9    accused products.  That's not going to change, and the ruling

10   on this MIL is not going to affect that.  But I do think the

11   transition and the development of the technology leading to

12   where we are today and leading up to the specificity of the

13   claims is fair and should come in.

14       But I'm going to be a gatekeeper in a way that avoids

15   anything sensational.  I don't see any reason why the

16   Plaintiff should elicit anything more than with the old

17   technology based on the landline it was subject to being cut

18   or interrupted by someone before entering a structure and now

19   with cellular technology that possibility is no longer

20   available.  I don't think you need to go any further than

21   that.  But to protect against the possibility that some

22   lawyer's exuberance might leave lead them further, I am going

23   to grant this MIL so I can be a gatekeeper here.

24       All right?

25           MR. TRIBBLE:  Your Honor, may I ask a clarification?

1          THE COURT:  You may.  It's better to ask it now than

2     in the middle of the trial.

3          MR. TRIBBLE:  Yes, Your Honor.

4       And so, for example, on our exhibit list is PX 17, which

5     is a marketing document of ADT.  I'd like to show it, but it's

6     been marked 'attorneys' eyes only' by ADT.

7       Take that down.

8       And so I guess we would have to briefly seal the

9     courtroom, or I could hand it up and just --

10         THE COURT:  Let me say this, counsel.  I am a very

11    firm believer in we do this in a compartmentalized basis and

12    I'm going to rule on the disputed MILs now.  Having given you

13    that guidance on this and the other disputed MILs, I'm then

14    going to turn you loose to meet and confer with the other side

15    about the opposed and disputed exhibits.  And if this is one

16    that survives that process and you're still unable to agree on

17    whether it should come in or come out, I'll deal with it

18    later, but I'm not going to take it up right now.

19         MR. TRIBBLE:  Yes, Your Honor.

20         THE COURT:  Okay.

21      All right.  Let's go to Defendant's proposed MIL No. 3.

22    This is regarding the ███████████████ .

23      Does anybody have any doubt that ███████ is out of the

24    case for both sides 100 percent?

25         MR. TRIBBLE:  No, Your Honor.

```
 1            MR. ZELIGER:  Your Honor, I do have just a question

 2   of clarification.

 3            THE COURT:  What's that?

 4            MR. ZELIGER:  There are a number of other offers

 5   that were made in reference to the report that are not just

 6   ██████████  and are not implicated at all by the motions or

 7   briefing on that point, and I just want a clarification from

 8   the Court that its ruling doesn't reach the other offers that

 9   were not accepted and not otherwise discussed today.

10            THE COURT:  Does anybody have a lack of

11   understanding as to where the ████████████████ starts and

12   ends?  Because that's what I'm ruling on.

13            MR. ZELIGER:  No.

14            MR. NELSON:  No, Your Honor.

15            THE COURT:  Then ████████████ is out, but I'm not

16   addressing anything that's not ██████████.

17            MR. ZELIGER:  Very well.  Thank you, Your Honor.

18            THE COURT:  I'm going to grant Defendant's MIL

19   No. 3, just to be consistent with what's previously been

20   said--no presentation or evidence regarding the ██████████

21   ██████████.

22       That brings us to disputed Plaintiff's MIL No. 1.  This

23   has to do with patents or claims no longer asserted against

24   ADT except in the context of arguments regarding comparability

25   of licenses.
```

1        What's the basis of Defendant's objection to this?  Let

2   me hear from Defendants first.

3            MS. ACHARYA:  Thank you, Your Honor.  Ranjini

4   Acharya again for ADT.

5        And I think with respect to the carve-out there may be

6   room for agreement here, but we just need a little bit of

7   clarification.

8        The reason that the '092 and the '200 Patents, which were

9   originally asserted but dropped from the case against ADT,

10  we've included that in our exhibit list because ADT's experts

11  address those patents in their rebuttal expert reports.  And

12  in -- specifically, examples are ADT's damages expert relied

13  on the conversations with Doctor Tentzeris to allocate

14  different values to the six patents that Fractus had asserted.

15  Now, I understand the Court has made some rulings on that, but

16  we oppose this motion because our understanding, based on some

17  of the other guidance from this Court in other cases, is that

18  if there are dropped patents that still are relevant to other

19  issues in the case, including damages, then they should be

20  allowed and they're not subject to the Court's standing order.

21  So we would like to be able to have these and address them

22  with the exhibit list later, but we would at least like to be

23  able to reference these two patents even if we're precluded

24  from referring to the fact that they were initially asserted

25  and then dropped.  But we need to at least be able to make

1    reference to them as part of the damages rebuttal.

2         THE COURT:  I can't imagine any basis on when I

3    would let a party say these were originally asserted but have

4    now been dropped.

5        Let me hear a response from the Plaintiff.

6         MR. TRIBBLE:  Your Honor, our position is that to

7    the extent they want to say in comparing the Vivint license to

8    the number we -- Mr. Mills opines on or numbers relating to

9    damages from ADT, if they want to say, Well, the Vivint

10   license ███████████████████████████████████████████

11   ████████████████████████████████████, we have no

12   objection to that.  What we object to is, first of all, any

13   mention that we dropped any patents, that we dropped the

14   assertion of any patents against ADT; and then, you know,

15   other than that, we note that the '246 Patent is on their

16   exhibit list but it wasn't in -- it was never asserted against

17   Vivint.  We just can't imagine why that could possibly be

18   relevant since it's not being asserted against ADT either.

19   And so those are our concerns.

20         THE COURT:  All right.  Well, let me say this.  To

21   the extent there's been anything raised, asserted, and now has

22   been dropped, surrendered, abandoned, and is no longer an

23   active matter on which issue is joined going into this trial,

24   that past history is excluded and is not going to be

25   mentioned.  And I think that's already covered by the Court's

1    standard MILs.

2        To the extent there's any room for doubt, I'm going to

3    grant this MIL to the extent it excludes anything that's been

4    previously asserted but has now been dropped.  That doesn't

5    mean that I am somehow through this limine motion

6    circumscribing an expert's report or their opinions or what

7    they may be talking about.  I'm not doing that, I'm not going

8    to do that, and limine practice is not an opportunity to

9    *Daubert* a report or an expert's opinions.  So -- and those

10   things are not inconsistent.

11       And there may be patents from the █████ agreement that

12   are relevant to the damages analysis, but to the extent those

13   are patents that were previously asserted and dropped, that

14   information is precluded.  But that doesn't necessarily

15   preclude any probative relevance to the issues before the

16   jury.

17       And I think everybody can understand this, but let me

18   just ask for my own peace of mind, does anybody doubt what I'm

19   saying here or have any questions about that?

20           MR. TRIBBLE:  No, Your Honor; we understand.

21           MS. ACHARYA:  No, Your Honor.

22           THE COURT:  Okay.  So this is granted with the

23   understanding that it doesn't preclude the relevance or

24   probative value of matters that may have been previously

25   asserted but dropped, except it expressly excludes any

```
1    reference to the fact that they were previously asserted and
2    now have been dropped.
3        Okay.  That brings us to Plaintiff's proposed MIL
4    No. 2 --
5            MR. TRIBBLE:  We dropped that one, Your Honor.
6            THE COURT:  That's out.  It's withdrawn.  It's moot
7    anyway in light of the Court's ruling.
8        Is MIL No. 3 still in active dispute here?
9            MR. TRIBBLE:  Well, what my outline says, this rises
10   or falls with the Court's prior rulings, and we believe it
11   does, and so we believe this should be granted for those same
12   reasons--there's no supporting expert testimony.
13           THE COURT:  Does Defendant dispute that this rises
14   or falls with the earlier ruling?
15           MS. ACHARYA:  Not as it relates to expert testimony,
16   Your Honor, but we do believe that the testimony from ADT's
17   fact witnesses --
18           THE COURT:  Counsel, please go to the podium.
19           MS. ACHARYA:  I'm sorry.  I apologize, Your Honor.
20           THE COURT:  That's all right.
21           MS. ACHARYA:  We are understanding the Court's
22   ruling as it relates to expert testimony on non-infringing
23   alternatives.  We understand that's out as a result of the
24   Court's rulings today.  We do want to make sure that the
25   factual testimony that ADT's witnesses provided in discovery
```

1    on the non-infringing alternatives that were identified

2    through the course of discovery, that we're not precluded from

3    presenting that evidence at trial.

4         THE COURT:  What probative purpose would you be

5    presenting that if there's not an ultimate opinion that this

6    is or is not a non-infringing alternative?  What other

7    probative purpose would it serve?

8         MS. ACHARYA:  We think it's important for the jury

9    to understand that not every aspect of ADT's business is being

10   accused of infringement here; that in the hypothetical

11   negotiation ADT would have had -- has and would have had these

12   alternatives available to it, and ADT's witnesses have

13   testified to that effect.

14        THE COURT:  Well, I'm trying to understand where

15   you're coming from.  We're not somehow going to get through

16   the back door that this is a non-infringing alternative but

17   we're not going to call it a non-infringing alternative, we're

18   not -- this is not a situation where as long as you don't call

19   it a duck it's okay even though it walks like a duck, it

20   quacks like a duck.  It's not going to come in for any purpose

21   related to non-infringing alternatives.  If there is another

22   probative purpose unrelated to that for which it might be

23   offered to the jury, then I'm open to that, but I'm asking you

24   to clarify for me what that might be.

25        MS. ACHARYA:  Sure.  And the response to that, Your

1    Honor, is, as I mentioned earlier, the accused technology in

2    this case is not the provision of cellular services.  ADT has

3    done that for a long time, even before the patents-in-suit.

4    And so the example that was given during deposition is an

5    example of a device that allowed ADT to offer cellular

6    connectivity to its customers via a product that's not accused

7    of infringement in this case, and it's important to place that

8    into context because it places the scope of the inventions

9    here in context.

10           THE COURT:  Let me just say this, counsel.  I'm

11   going to grant Plaintiff's MIL No. 3, and to the extent you

12   believe that that testimony can be presented in a way that

13   doesn't either directly or indirectly by statement or

14   implication raise the issue of a non-infringing alternative,

15   then I'm not going to preclude you from presenting it, but I

16   am going to require that you approach and get leave before you

17   do it.

18           MS. ACHARYA:  Understood.

19           THE COURT:  We need -- you know, it's much better

20   for me to determine that there is or isn't a basis not related

21   to the concept of non-infringing alternatives for which this

22   could come in or should stay out.  It's much better for me to

23   do that at the bench than for, you know, it to come in in the

24   middle of the trial and then I hear speeches about a bell that

25   can't be unrung or a skunk that can't be taken out of the jury

1    box and still not smelled.

2        I'm going to grant the motion in limine.  I'm not going

3    to preclude outright -- out of hand today that there is some

4    basis that doesn't relate to the concept of a non-infringing

5    alternative for which this might be probative, but you're

6    going to have to show me before you present it.

7            MS. ACHARYA:  Understood.  Thank you, Your Honor.

8            THE COURT:  Okay.  All right.  That brings us to --

9    Plaintiff's MIL No. 3 is granted.

10       Plaintiff's MIL No. 4 seeks to preclude evidence or

11   testimony that invokes or relates to claim construction,

12   including tech tutorials.

13       What's the basis of Defendant's objection to this?

14           MS. ACHARYA:  I shouldn't have left the podium, Your

15   Honor.  I apologize.  Ranjini Acharya again for ADT.

16       The relief stated here is fairly broad, but in the course

17   of briefing I think the concern that Fractus had is fairly

18   narrow and that concerns the testimony of one of its witnesses

19   in a deposition when she was asked about non-accused ADT

20   hardware, products that don't infringe or weren't asserted to

21   infringe the Fractus patents.  She was asked, "Do you have any

22   personal knowledge of products that were analyzed but not

23   accused?"

24       And she said, "Well, for example, in the tutorial for

25   Fractus we point to some ADT antennas that have external

 1    antennas."  And then later in that same -- in that same

 2    deposition, same day, she returned to the topic unprompted

 3    without a question pending while the questioning attorney was

 4    marking another exhibit came back and said, "I would like to

 5    clarify my previous response.  I'm referring to the antennas

 6    that appear in the tutorial shown by Fractus."

 7         So what we have here is a party admission that external

 8    antennas that were shown in the tech tutorial are not covered

 9    by the patents-in-suit.  This is not a claim construction

10    argument.  Everybody agrees in this case, including the

11    technical expert, that products with external antennas don't

12    infringe the patents-in-suit.  We're not trying to reargue any

13    claim construction position, but we do want to be able to

14    fairly put that evidence in front of the jury.  And so the

15    reason we've opposed this motion is we don't want an end-run

16    around that ability just because it was made in reference to a

17    tech tutorial.

18              THE COURT:  All right.  What's Plaintiff's response?

19              MR. TRIBBLE:  And so, Your Honor, in part this is

20    covered by the prior motion in limine regarding non-infringing

21    alternatives, but, in addition, it does relate to claim

22    construction.  I mean, clearly the tech tutorial was submitted

23    to the Court as part of the claim construction process, and we

24    believe it would be unfair to play testimony referring to the

25    tech tutorial.

1        And again, at the end of the day, you know, there's no

2    sponsoring or supporting expert who's going to talk about

3    non-infringing alternatives, and so this defense fails as a

4    matter of law.  So it's just going to be confusing and

5    distracting to the jury and highly prejudicial to Fractus on

6    this point that at the end of the day must fail as a matter of

7    law.

8        And, you know, in addition, even though it was a Fractus

9    witness, it is still a way to back door in testimony from a

10   fact witness to, you know --

11            THE COURT:  This is coming from the deposition of

12   Carmen Borja.  Is that right?

13            MR. TRIBBLE:  Borja.

14            THE COURT:  Borja.  So we're talking about

15   deposition designations, not a live witness.

16            MR. TRIBBLE:  That's true, Your Honor.

17            THE COURT:  Is that the only anticipated avenue from

18   which this would present itself?

19            MR. TRIBBLE:  I believe so.

20            THE COURT:  Why is that not something that the

21   Court can wait until I see the specific designation and

22   counterdesignation that's disputed and I can look at the

23   actual question and answer and give you a more accurate

24   response at that time?

25            MR. TRIBBLE:  I believe that the Court could.

```
1              THE COURT:  Is Defense counsel anticipating any of

2    this coming from anything other than this one deposition

3    witness?

4              MS. ACHARYA:  No, Your Honor.

5              THE COURT:  Okay.  Well, I'm going to deny the

6    motion in limine, but I'm going to serve as a gatekeeper when

7    I take up disputed designations or counterdesignations for

8    this particular deposition witness.

9              MR. TRIBBLE:  Yes, Your Honor.

10             THE COURT:  All right.  That brings us to

11   Plaintiff's asserted MIL No. 5, which is disputed.  This has

12   to do with failure to mark and whether or not the threshold

13   required by Arctic Cat has been met.

14       I don't know why this is coming to me as a motion in

15   limine.  I don't know why this wasn't presented as a

16   substantive motion for summary judgment, because it seems to

17   either open or close the issue of the marking defense and

18   that's really not what limine practice is about.

19             MR. TRIBBLE:  I understand, Your Honor.  In this

20   particular case this testimony shouldn't come in because they

21   should be bound to what they put forth in discovery, and

22   specifically in this particular case.  We asked them in an

23   interrogatory to state in detail the factual basis --

24             THE COURT:  I understand your argument.  I

25   understand why you say that the threshold required by Arctic
```

1    *Cat* hasn't been met; I just don't understand why this is a

2    disputed limine; why Plaintiff didn't move for a summary

3    judgment order that the initial burden placed on the Plaintiff

4    under *Arctic Cat* has not been met, and, therefore, the marking

5    defense is not available to the Defendant.

6         I don't know why -- because this is truly a substantive

7    issue.  This is not some procedural matter or it's not a

8    matter of how to present evidence or -- you know, it's not a

9    402, 403 argument, which is what most disputed limines are

10   about; this is a substantive argument that, if granted, would

11   effectively preclude a defense otherwise available to

12   Defendant.  I just don't know why it's before me as a MIL.

13             MR. TRIBBLE:  Well, Your Honor, if they had

14   identified any basis, any -- under *Arctic Cat* Defendant has

15   an initial burden that it must satisfy first before --

16             THE COURT:  I understand that.

17             MR. TRIBBLE:  And their burden is to identify,

18   quote, particular products, end quote, that --

19             THE COURT:  And your argument is they haven't

20   identified any particular products; therefore, they haven't

21   met the burden, and, therefore, there should be no addressing

22   the marking issue.  But why is that an appropriate limine

23   motion?  Why isn't that a substantive summary judgment issue

24   that as a matter of law there is no material dispute of fact

25   that there was no identification of affected products;

1    therefore, the burden imposed by *Arctic Cat* hasn't been met

2    and I should grant summary judgment to exclude the marking

3    defense?  That's how this should have been brought to the

4    Court.

5        I just don't know why it's like it is.  And every time I

6    ask you why is it coming to me this way, you're telling me the

7    substance of your argument.  I understand the substance of the

8    argument; I just don't understand the appropriateness of the

9    delivery mechanism.

10            MR. TRIBBLE:  So the other reason, Your Honor, is

11   that if they had met their burden and identified any

12   particular product, then during discovery we would have been

13   allowed to analyze that product and say no.  That product is

14   not covered by the patents and, therefore, there was no

15   marking requirement.  But we didn't get that opportunity

16   because they never identified any particular products during

17   discovery.

18            THE COURT:  What else?

19            MR. TRIBBLE:  Nothing, Your Honor.

20            THE COURT:  Let me hear from the Defendant.

21            MS. ACHARYA:  Your Honor, Ranjini Acharya again for

22   ADT.

23       For this MIL I think we'll rest on the briefs.  We agree

24   with Your Honor about the mechanism by which this motion in

25   limine could have been brought.

1        THE COURT:  Well, let's forego the mechanism issue.

2   Let's talk about the substantive issue.  Do you dispute that

3   there's been no identification of particular products that

4   would meet the burden imposed by *Arctic Cat*?

5        MS. ACHARYA:  We do, Your Honor.  We think there is

6   a dispute that if it had been brought as a summary judgment

7   motion, we would have opposed on the basis of factual

8   disputes.  We believe that Fractus' witnesses have testified

9   that their license agreements don't impose a marking

10  requirement on their licensees.

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████      But we believe that

13  the products that the licensees then produce with a

14  portfolio-wide license in some instances bear no indicia of

15  marking and are not subject to a marking requirement, so we

16  believe that there are products.  The ██████accused products

17  would be one example.  There is also a license agreement --

18        THE COURT:  I'm not interested in products that

19  don't have a marking requirement; I'm interested in products

20  that do have a requirement to mark and then there's a failure

21  to mark.  Have you identified products that are subject to the

22  marking requirement?

23        MS. ACHARYA:  No, Your Honor, because the license

24  agreements don't impose a marking requirement.

25        THE COURT:  So you're not asserting a separate

1    defense under § 287 beyond the license agreements.

2              MS. ACHARYA:  That's correct.

3              THE COURT:  So there is no formal marking defense by

4    Defendants in this case--is that right?--based on § 287.

5              MS. ACHARYA:  Our position has been that because the

6    license agreements don't impose a marking requirement, § 287

7    hasn't been met because Fractus doesn't require its licensees

8    to mark products that are licensed under the license

9    agreements.  So, for example, Fractus has asserted that █████

10   ████████████████████████████████████████      █████████████████

11   █████████   ██████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████

15             THE COURT:  Let me see if I can ask this the way I

16   want to.

17         The provisions of § 287 of the Patent Act, commonly known

18   as the marking requirement, the marking statute, impose a

19   limitation on the damages period that a plaintiff can recover

20   where it fails to mark a product that is otherwise required to

21   be marked, and *Arctic Cat* requires that the defendant, to take

22   advantage of that statutory defense, must first identify

23   particular products which are subject to the marking

24   requirement, and then having met that burden, the burden

25   shifts to show that they either were marked or some other

1   defense.

2       All I'm hearing about is there's no marking requirement,

3   so is there or is there not a § 287 defense that would curtail

4   the damages period asserted by the Plaintiffs in this case, in

5   your view?

6           MS. ACHARYA:  Let me answer that question directly.

7   We have not identified a product that is not marked in this

8   case.

9           THE COURT:  Then why would it be appropriate to

10  preclude this limine that would stop mentioning of -- would

11  preclude introducing evidence about a failure to mark a

12  product?

13          MS. ACHARYA:  And our position has been--and maybe

14  I'm hearing from Your Honor that this is not a persuasive

15  one--but our position has been that Fractus requires its

16  licensees to enter into a license agreement based on

17  allegations that those licensees--for example, ██████████

18  ██████--are practicing its patents, they then get a license,

19  they continue to market and sell those products that were

20  previously accused of infringement, those products are then

21  not marked, and they're not required to be marked.

22          THE COURT:  Okay.  Well, let me say this.  To the

23  extent, notwithstanding the fact that it's somewhat irregular

24  that this issue is brought to the Court through a disputed

25  motion in limine, notwithstanding that, the guidance from the

1    Federal Circuit in *Arctic Cat versus Bombardier Recreational*

2    *Products* is pretty clear that without some notice of what

3    market products the Defendant believes required marking, that

4    the Plaintiff's universal products for which it would have to

5    establish compliance would be unbounded, and reference to a

6    license agreement does not, in the Court's view, meet the

7    requirement of providing the kind of particular notice

8    targeted to specific products that *Arctic Cat* requires.

9         Therefore, I'm going to grant this motion in limine based

10   on Defendant's failure to identify specific products that

11   would then shift the burden back to Plaintiff.

12        MS. ACHARYA:  Thank you, Your Honor.

13        THE COURT:  All right.  Mr. Tribble, I would suggest

14   in the future this come to the Court as a summary judgment

15   motion.

16        MR. TRIBBLE:  Absolutely, Your Honor.

17        THE COURT:  All right.  That should dispose of all

18   the disputed limine issues.

19     Mr. Ward, you're at the podium.

20        MR. WARD:  I'm at the podium.

21        THE COURT:  Tell me why.

22        MR. WARD:  So good morning, Your Honor.

23     It's a MIL issue, Standing MIL 13, the Court's standing

24   MIL regarding other litigation.  I just wanted to clarify with

25   the Court, we don't want to go into litigation of ADT.  We

1    would certainly approach the bench before we did that.  But

2    during voir dire I would like to inform the jury about the

3    fact that Fractus has sued other companies, and they're going

4    to learn about that with respect to license agreements that

5    will be introduced into evidence--the Vivint license, and I

6    know the Defendants have some license agreements that they

7    want to refer to that are a result of the litigation.  And I

8    just wanted to clear that with the Court that I'd like to voir

9    dire the jury panel about that.

10        And also you'll see in the exhibits that come up, I don't

11   really think there's a dispute about what the experts have

12   relied upon.  So we'd ask for an exception to that MIL that we

13   could refer to that during voir dire and during the course of

14   the case with respect to the litigations that are relevant to

15   damages, and I guess some background of Fractus as well.

16            THE COURT:  Can you be more specific about what

17   particular prior litigations you are going to want to refer

18   to?

19            MR. WARD:  I believe that the litigation with

20   Samsung -- I think the Samsung license will be in evidence, or

21   those negotiations, what happened with respect to Fractus.

22   That was the first litigation that they were involved in, and

23   I think that forms to the basis of some of the discounts that

24   Mr. Mills will talk about with respect to license agreements.

25            THE COURT:  And you believe those licenses or other

1    exhibits are going to disclose on their face that they're a

2    result of existing litigation between the parties?

3              MR. WARD:  Yes, Your Honor.

4              THE COURT:  What's Defendant's position on this?

5              MR. ZELIGER:  Your Honor, Michael Zeliger for ADT.

6         I don't think we have any objection to that as

7    characterized with respect to the Vivint litigation.

8         The Samsung, though, was an entirely different set of

9    patents, and I'm not sure referencing the litigation itself

10   during voir dire is appropriate.  If the license itself, the

11   Samsung license comes in and it has a reference to it, that's

12   okay, but we don't see the value in previewing that during

13   voir dire.

14             THE COURT:  All right.  Let me say this.  Based on

15   this exchange with counsel for both sides, I'm going to grant

16   leave to Plaintiff's counsel during the jury selection process

17   to reference other litigation that is called out and evidenced

18   by pre-admitted exhibits that the Court will have pre-admitted

19   in advance of trial.  If it is not supported by and referenced

20   within a pre-admitted exhibit, then I'm not granting leave

21   unless I grant leave at the time.  But in advance of that, if

22   it relates to prior litigation, that's clearly borne out and

23   supported by documentary evidence that the Court's

24   pre-admitted and is expected to be shown to the jury during

25   the trial, then I'll grant an exception to Standard MIL

1    No. 13.

2              MR. WARD:  Understood, Your Honor.  Thank you.

3              THE COURT:  All right.  Is there anything else save

4    and except for disputes regarding the pre-admission of

5    exhibits that needs to be taken up?

6              MR. TRIBBLE:  No, Your Honor.

7              MR. ZELIGER:  Nothing from the Defendant, Your

8    Honor.

9              THE COURT:  All right.  Well, it's 10 minutes until

10   12:00 noon, counsel.  We're going to recess for lunch.  I want

11   you to spend -- I don't mind if you have something nourishing,

12   but I want you to work on these exhibits.  You've gotten the

13   Court's guidance by way of my rulings on the substantive

14   motions; you've gotten my guidance by way of the rulings on

15   the disputed motions in limine; you should have what you need

16   to fairly and clearly delineate what ought to be pre-admitted

17   as an exhibit in this case following the constraints and

18   structure of the Court's standing order on the pre-admission

19   of exhibits in a case like this.

20        I don't mind if you leave the building, but I want you

21   back here not later than 1:00, and I want you actively meeting

22   and conferring about these disputes and applying the Court's

23   guidance with regard to the pre-admission of exhibits.  You're

24   welcome to use the courtroom.  I don't have anything scheduled

25   in here.  You're welcome to meet in the jury room or the

1    attorney conference room.  But I want you working after lunch

2    diligently on these exhibits, and hopefully you can resolve

3    any prior disputes in light of the guidance I've given you.

4    If not, I want them substantially narrowed and targeted so

5    that I can give you direct guidance if that's necessary.

6         And I will have my staff check with you some place in the

7    courthouse.  I assume you'll be one of those three places.

8    We'll find you.  I'll have my staff check with you on any

9    progress that you're making beginning after the lunch break.

10        Questions?

11             MR. TRIBBLE:  No, Your Honor.

12             MR. ZELIGER:  Nothing, Your Honor.

13             THE COURT:  All right.  We stand in recess for

14   lunch.

15                       (Lunch recess.)

16             THE COURT:  Be seated, please.

17        Counsel, where are we on disputed exhibits to be

18   pre-admitted?

19             MS. ACHARYA:  May it please the Court.  Ranjini

20   Acharya for ADT.

21        And we were able to meet and confer and reach agreements

22   on all but one of the categories of exhibits.  I'm happy to

23   read those into the record, if that's helpful, or send a joint

24   email to the Court with the --

25             THE COURT:  Why don't we do it both ways.  Why don't

1    you read into the record what your understanding is, I'll

2    confirm it with Plaintiff, and then we'll follow it up with

3    documentation.

4            MS. ACHARYA:  Sounds good.

5        With respect to category 1, these are Fractus exhibits

6    PX 06, PX 03, and PX 11.  ADT's agreed to drop its objections

7    to PX 6, and Fractus has agreed to withdraw PX 3 and PX 11.

8        With respect to the second category of exhibits, ADT is

9    dropping its objections to PX 1 and PX 4.  We will be arguing

10   the remainder today.  And we also would like to add PX 29 to

11   this category.  It was overlooked while the parties were

12   preparing their joint submission.

13       For category 3, ADT drops its objections to PX 24 and 25.

14   PX 26 is withdrawn by Fractus with respect to that exhibit.

15       Turning to the ADT exhibits, category 4 in our list, the

16   ADT exhibits listed there DPX 1, DPX 2, DPX 3, DX 1, 2, 3, 4,

17   5, 6, 7, 8, 9, 10, 11, 17, 22, 23, 24, 25, and 26, ADT is

18   withdrawing all of those exhibits.

19           THE COURT:  Withdrawing the exhibit; not the

20   objections.  Right?

21           MS. ACHARYA:  Correct.

22           THE COURT:  Okay.

23           MS. ACHARYA:  With respect to ADT exhibits 12, 13,

24   14, 20, and 21, ADT is withdrawing those exhibits.  In that

25   category remaining is DX 18, and Fractus has agreed to

1    withdraw its objections to that exhibit.

2         With respect to the last category on the list, these are

3    ADT exhibits DX 15 and 16.  ADT has agreed to withdraw these

4    exhibits.

5              THE COURT:  All right.  Does Plaintiff have any

6    objection or correction with regard to the rendition offered

7    by Defense counsel?

8              MR. SMYSER:  In general, no, Your Honor.  I would

9    just note for Plaintiff's Exhibit 26, which is simulations of

10   some antennas, the parties agreed that TO the extent it was

11   referenced in an expert report, that can be shown to the jury

12   as part of a demonstrative during trial.  And I believe the

13   same agreement was reached with respect to Defendant's

14   Exhibits 12, 13, 14, 20, and 21.

15             THE COURT:  But not otherwise admitted as a

16   pre-admitted exhibit.

17             MR. SMYSER:  That is correct, Your Honor.

18             THE COURT:  Does that comport with your

19   understanding?

20             MS. ACHARYA:  Yes, that's right, Your Honor.

21             THE COURT:  All right.  So let's focus on what's

22   left.

23        This is PX 1 -- let's see.  PX 1 and 4 are no longer at

24   issue in this category.  Is that right?

25             MS. ACHARYA:  That's correct, Your Honor.

1            THE COURT:  So that leaves us PX 7 through the

2    remainder of this category.  And the basis of the objection is

3    primarily lack of authentication?

4            MS. ACHARYA:  That's correct, Your Honor.  We're

5    also adding PX 29 to this category.  The primary objection

6    here is lack of authentication, and attendant to that there is

7    some hearsay as well, but I can start with the authentication.

8            THE COURT:  All right.  Do we have a respective

9    exemplar for this group?

10           MS. ACHARYA:  Yes, Your Honor.

11        This is one example.  I identified two representative

12   examples from this category.  This is one.  It's an article

13   that was published online by CNET publication.  This is not

14   something that's been produced in this case by either party.

15   It's a third-party article that cannot be authenticated by any

16   witness.

17           THE COURT:  How is this identified?  This is PX  --

18   or proposed PX what?

19           MS. ACHARYA:  I'm sorry.  This is PX 13.

20           THE COURT:  Okay.

21           MS. ACHARYA:  And there are a number of third-party

22   articles like this listed in this category.  They come from

23   various public websites, but they're not ADT documents nor

24   Fractus documents nor produced by third-party subpoena in this

25   case.

```
 1              THE COURT:  And they're not referenced in any

 2    expert's report.  Is that correct?

 3              MS. ACHARYA:  I don't believe these are.  There was

 4    a separate batch of documents that we've now reached agreement

 5    on with respect to the expert reports.

 6              THE COURT:  All right.  Why don't you scroll through

 7    the balance of the document so I can look at it slowly.

 8         All right.  Is there more to it?

 9              MS. ACHARYA:  There is.  It goes in -- there is some

10    intervening advertising, and then it goes on with some Q&As.

11              THE COURT:  What's Plaintiff's response to this

12    objection?

13              MS. TUOHY:  Good afternoon, Kelsey Tuohy for the

14    Plaintiff.

15         This exhibit actually was cited in expert report.

16    Mr. Mills cites it in footnote 333 of his report.  But we

17    think that there is sufficient evidence that this document is

18    what it purports to be.  It's a periodical seen as a media

19    publication that reports on consumer electronics, and that it

20    should be authenticated as such.

21              THE COURT:  Are you referencing any particular

22    authority under the rules of evidence or procedure, or just

23    think it ought to be okay?

24              MS. TUOHY:  Under 902 -- Federal Rule of Evidence

25    902(7), periodicals are self-authenticating documents.
```

1        THE COURT:  You said 902(7)?

2        MS. TUOHY:  Yeah, I believe it's 902(7).  (6);

3   902(6).

4        THE COURT:  Okay.  And I gather you don't factually

5   dispute the fact that these were not produced -- affirmatively

6   produced by either side during discovery in the case.

7        MS. TUOHY:  No.

8        THE COURT:  Well, counsel, let me ask you this.

9   Under this definition, the National Enquirer is a publication.

10  So I'm checking out at the grocery store and I see an article

11  about aliens taking over the body of a Supreme Court justice.

12  And I supposed to accept that as probative and -- I mean,

13  there's a wide variety of publications out there; everything

14  from the *American Bar Journal* to the *National Enquirer.*  Why

15  does this fall in that spectrum that would be closer to

16  something recognized as reliable as opposed to the other end

17  of the spectrum?

18       MS. TUOHY:  If you look on the CNET website, it also

19  holds itself out to have editorial standards.  It's a

20  subsidiary of CBS.  But I also think that this is an issue for

21  authentication about whether this document is what it purports

22  to be and not necessarily to the extent they dispute the truth

23  of the statements made in the article.  That's an issue

24  separate from the authentication question.

25       THE COURT:  What's Defense counsel say as to that?

1          MS. ACHARYA:  Your Honor, as I mentioned, we do have

2     some concerns -- hearsay concerns about the subject of this

3     article as well, especially in light of what we talked about

4     earlier today with respect to the motions in limine where

5     there's statements being made about landline connections being

6     cut.  The witnesses are free to testify as they wish, but we

7     have some real concerns about these documents coming in as

8     pre-admitted exhibits and into evidence here.

9          THE COURT:  Why don't you do this.  Why don't you go

10    to your next exemplar and let me look at it.

11         MS. ACHARYA:  Sure.  The other example is a form

12    10-K that was submitted by Vivint to the Securities and

13    Exchange Commission.  Again, this is not an ADT document, it

14    wasn't produced in the case, it doesn't bear any Bates label.

15    We don't think that this is appropriate to bring in.  We think

16    there's an authentication issue.  We also worry that it's

17    going to be accepted by the jury as true on its face for the

18    contents of the document, and so this is part and parcel of

19    our concerns with this category of objections.

20        If Your Honor would like to see more of this document, I

21    can scroll through, but this gives you an indication of what

22    it is.

23         THE COURT:  So are we really fighting about the

24    authenticity or are we fighting about the reliability, or is

25    it both?

1          MS. ACHARYA:  It's both, Your Honor.  We categorized

2     it primarily as a lack of authentication issue because none of

3     these documents came in through a party in this case, but

4     there are also attendant concerns if they do come in about the

5     reliability of the statements and the risk that the jury will

6     accept these statements as true.

7          THE COURT:  I haven't looked at the criminal statute

8     in a long time, but, as I recall, there are very severe

9     penalties for making a factual misrepresentation to the

10    Securities and Exchange Commission in form 10-K.  It seems to

11    me inherently more reliable than something like a periodical

12    that anybody can publish on the internet, whether they have an

13    established description base or whether they're just a

14    one-person operation.

15         Why is this in the same category as the earlier exemplar?

16         MS. ACHARYA:  Well, one of the reasons why we

17    categorized this for the Court's benefit under authentication

18    was precisely that.  The primary concern is none of these

19    documents can be authenticated.  Certainly if this is

20    something Vivint submitted to the SEC, we would have to assume

21    that they were truthful in making that submission, but there

22    is no witness in this case that can confirm that this is, in

23    fact, a Vivint 10-K filing.

24         THE COURT:  Let me ask you this.  Is there anything

25    about the version of it that is being offered at this point in

1    this case that shows it actually was submitted to the SEC?  Is

2    this a -- is there a file marked copy?  Is there a -- anything

3    indicating that it's factually a true representative of what

4    was submitted to and filed with the agency?

5              MS. ACHARYA:  Not to my knowledge.  Fractus' counsel

6    will correct me if I'm wrong.  I don't believe this was a

7    deposition exhibit with any witness in the case.  I don't

8    think it's come in in any other way.

9              THE COURT:  Can Plaintiff's counsel represent that

10   this is a true and correct copy of what was actually filed

11   with the SEC, or is this a draft out of somebody's file and it

12   got substantively altered before an actual filing was made?

13   There could be a big difference there.

14             MS. TUOHY:  Kelsey Tuohy for the Plaintiff.

15     We obtained this file from the SEC's website EDGAR, and

16   if there is any doubt as to that, Defendant's counsel is also

17   free, or the Court, to check the EDGAR website themselves.

18             THE COURT:  Okay.  You didn't get this from Vivint;

19   you got it from the SEC's website?

20             MS. TUOHY:  Correct.

21             THE COURT:  Okay.  Let me ask this question.  The

22   SEC filing, this PX 19, am I correct that the remainder of the

23   identified exhibits in this category pretty clearly fall

24   either into the PX 13 area or the PX 19 area?  Or are there

25   other ones that are different and not fairly covered by these

1    two exemplars?

2         MS. TUOHY:  We've agreed that these two are

3    exemplars of the whole category.

4         THE COURT:  Well, the reason I ask this question is

5    my inclination is to exclude PX 13, the online, quote unquote,

6    news article, but my inclination is to pre-admit PX 19,

7    because, quite honestly, a filing from the SEC's website is a

8    much more reliable and acceptable document than something that

9    purports to be a news article just floating out there in the

10   ether.  To me there's a significant disparity between these

11   two regards their reliability.

12        So if it's akin to PX 19 and it's in this category, it

13   should come in.  If it's akin to PX 13, it should stay out.

14        Now, does that leave you-all with any that you don't know

15   which category it should fall in or not, or does that give you

16   the guidance that you need?

17        MS. TUOHY:  I think that can give us the guidance

18   that we need.

19        THE COURT:  All right.  Well, you have the benefit

20   of me here if there's something else you want me to look at,

21   but otherwise that's going to be the ruling that PX 13 and the

22   CNET news article is not pre-admitted, and PX 19, the filing

23   -- the 10-K filing with the Securities and Exchange Commission

24   for Vivint is pre-admitted.  And I'm happy to address any

25   other documents within this category, but if that gives you

1    the guidance you need, then that should resolve what's not

2    been resolved by the meet and confer efforts of the parties.

3              MS. TUOHY:  Thank you.

4              THE COURT:  So as they say at the wedding, speak now

5    or forever hold your peace.

6              MS. ACHARYA:  I think we've got it, Your Honor.

7    Thank you.

8              THE COURT:  Does that leave us, counsel, then where

9    we have a known and established universe of pre-admitted

10   exhibits that can be furnished to the Courtroom Deputy in

11   advance of trial and we start this case knowing where

12   everybody is?

13             MS. ACHARYA:  Yes, Your Honor.

14             MR. SMYSER:  Your Honor, could we just take two

15   minutes just to look at the other exhibits to make sure that

16   we --

17             THE COURT:  That's perfectly fine, Mr. Smyser.

18             MR. SMYSER:  Thank you, Your Honor.

19                  (Pause in proceedings.)

20             MR. SMYSER:  Thank you, Your Honor.

21        May I approach the podium?

22             THE COURT:  You may.

23             MR. SMYSER:  Greg Smyser for the Plaintiff Fractus

24   S.A.

25        Your Honor, I think your guidance covers almost all the

1    exhibits in this category.

2            THE COURT:  Almost?

3            MR. SMYSER:  In that they are 10-Ks or internet

4    articles.  The one exception I would make to that, I believe,

5    Your Honor, is what has been identified as proposed

6    Plaintiff's Exhibit 23.  That is a document which bears an ADT

7    Bates stamp ending in 8962 through 8963, and I believe it is

8    an internet archive printout of ADT's website regarding the

9    Cellguard or cellular backup solution.  I think in contrast to

10   either the 10-Ks on the one hand or the third-party articles,

11   this would qualify as an opposing party statement.

12           THE COURT:  Can you furnish a representation of it

13   that I can look at?

14           MR. SMYSER:  I believe so.  I think this is it.

15   Yes.

16           THE COURT:  This is from the Wayback Machine?

17           MR. SMYSER:  That's right.  It's an archive of the

18   website www.adt.com.  The '80' I think is an artifact of the

19   backup system, but 'resources/cellular backup', and it bears

20   an ADT Bates stamp, as it was produced by ADT.

21           THE COURT:  What's Defendant's position on PX 23?

22           MS. ACHARYA:  Your Honor, I apologize.  We had to

23   look at that.  We don't have any objections to that.

24           THE COURT:  All right.  If there's not objection,

25   the PX 23 is pre-admitted.

1           MR. SMYSER:  Thank you, Your Honor.

2       I think your guidance resolves the remaining disputes

3   that fall into this category.

4           THE COURT:  All right.  Is there anything else,

5   counsel, relating directly to the pretrial process that has

6   not been covered and needs to be addressed before I let

7   you-all go?

8           MR. TRIBBLE:  No, Your Honor.

9           THE COURT:  All right.  Anything from Defendant?

10          MR. ZELIGER:  Nothing from the Defendant, Your

11  Honor.

12          THE COURT:  All right.  This is not an absolute

13  statement, but my best guess at this point is you're going to

14  go to trial on July the 8th.

15      Let me ask you this.  Are there any ongoing high-level

16  settlement negotiations or mediation efforts that might mean

17  that I won't see you on July the 8th?  I don't want any

18  substance, but if there's something going on that I might need

19  to know about, tell me.  If there's not, that's fine, too.

20          MR. NELSON:  Your Honor, Justin Nelson from Susman

21  Godfrey.

22      The parties mediated in front of Judge Folsom

23  approximately in early May.  Judge Folsom I believe has

24  indicated--I can only speak from the perspective of Fractus,

25  obviously--that after today he would re-engage, so I would

1    expect --

2         THE COURT:  That would fit his usual practice.  He's

3    tenacious.

4         MR. NELSON:  So I would expect, Your Honor, that

5    there will be ongoing settlement discussions, but really since

6    that time and the immediate aftermath there have not been, but

7    I would expect them to pick up over the next few days.

8         THE COURT:  All right.  Well, I'm going to assume

9    that we are on go for Monday the 8th.  If anything changes

10   that I need to know immediately, I've got 40 or 50 good

11   citizens from six counties coming this way on Monday morning,

12   and if I have to turn them around as soon as they get here,

13   I'm going to be very unhappy.  So if something should break

14   that brings this dispute to an across-the-board resolution,

15   certainly contact me or contact my staff, even if it's over

16   the holiday, and let me know.

17        MR. NELSON:  Thank you, Your Honor; absolutely.

18        THE COURT:  Okay.  Anything further?

19        MR. TRIBBLE:  Nothing, Your Honor.

20        THE COURT:  All right.  Let's go off the record for

21   a second.

22        (Discussion held off the record.)

23        THE COURT:  Counsel, thank you for your attendance

24   and able argument today.  That completes the pretrial process.

25   I'll proceed to enter an order memorializing the rulings I've

1  given you on the record, and unless something changes I will

2  see you when this case goes to trial.

3       Have a good Independence Day holiday.

4       The Court stands in recess.

5       And you're excused.

6            (The proceedings were concluded at 2:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                I HEREBY CERTIFY THAT THE FOREGOING IS A

2                CORRECT TRANSCRIPT FROM THE RECORD OF

3                PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4                I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5                FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6                COURT AND THE JUDICIAL CONFERENCE OF THE

7                UNITED STATES.

8

9                S/Shawn McRoberts          07/17/2024

10            _____DATE_____
                  SHAWN McROBERTS, RMR, CRR

11            FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Concordance

**< Dates >**
**07/17/2024** 125:9 .
**February 1st** 42:1 .
**March 15th** 75:4 .
**MARCH 16, 2022** 1:12 .
**March 22nd** 75:6 .
**March 26th** 75:8 .
**March 5th** 75:2, 75:15 .
**May 1st** 43:19 .
**one may** 10:7 .
**'092** 69:10, 91:8 .
**'103** 13:11, 15:12, 19:7, 19:9,
    20:8, 20:10, 23:8, 24:13,
    30:24, 69:12 .
**'200** 69:10, 91:8 .
**'246** 69:11, 92:15 .
**'365** 13:9, 13:20, 20:9, 21:3,
    22:12, 22:22, 23:9, 24:23,
    25:12, 69:12 .
**'80'** 121:18 .
**'887** 13:9, 13:21, 20:9, 21:3,
    22:12, 22:22, 23:9, 24:23,
    25:12, 69:12 .
**--based** 104:4 .
**--these** 68:24 .
    .
    .
**< 0 >** .
**03** 111:6 .
**06** 111:6 .
    .
    .
**< 1 >** .
**1** 83:1, 84:4, 84:24, 90:22, 111:5,
    111:9, 111:16, 112:23 .
**1.5** 33:10 .
**10** 43:6, 43:14, 55:18, 80:13,
    109:9, 111:17 .
**10-K** 41:8, 116:12, 117:10,
    117:23, 119:23 .
**10-ks** 121:3, 121:10 .
**100** 1:44, 3:2, 89:24 .
**1000** 2:4 .
**10001** 2:13 .
**102** 2:44 .
**10:00** 5:21 .
**11** 5:9, 55:17, 111:6, 111:7,
    111:17 .
**114** 2:30, 80:3 .
**117** 80:6 .

**12** 10:22, 13:23, 37:23, 111:23,
    112:14 .
**125** 80:12, 80:20 .
**12:00** 109:10 .
**13** 13:23, 106:23, 109:1, 111:23,
    112:14, 113:19, 118:24, 119:5,
    119:13, 119:21 .
**137** 12:19, 27:15, 36:3, 38:5 .
**138** 30:2 .
**14** 37:24, 111:24, 112:14 .
**140** 58:17 .
**141** 57:6, 59:21 .
**142** 79:15 .
**15** 32:10, 55:14, 60:16, 62:6,
    64:22, 112:3 .
**1507** 2:24 .
**16** 112:3 .
**160** 57:6 .
**17** 89:4, 111:17 .
**176** 38:25, 40:3 .
**177** 39:1, 40:4 .
**18** 111:25 .
**180** 39:1, 40:4 .
**19** 118:22, 118:24, 119:6, 119:12,
    119:22 .
**19th** 45:9, 46:24, 48:3, 48:6,
    49:22, 50:20, 50:21, 51:10,
    51:18 .
**1:00** 109:21 .
**1st** 78:2 .
    .
    .
**< 2 >** .
**2** 1:5, 4:4, 20:2, 78:1, 85:12,
    87:5, 94:4, 111:16 .
**2.2** 83:25 .
**20** 111:24, 112:14 .
**200** 31:3 .
**2012** 76:12 .
**2021** 76:11 .
**2024** 75:20 .
**206** 2:20 .
**21** 111:24, 112:14 .
**212** 2:14, 27:16, 39:17, 40:5 .
**219** 27:16, 29:8, 29:9, 29:24,
    39:21, 39:25, 40:4, 51:22,
    52:5, 56:12 .
**22** 111:17 .
**22-CV-412** 4:4 .
**22-CV-412-JRG** 1:5 .

**220** 57:9 .
**221** 39:1, 39:20, 40:1 .
**23** 62:23, 63:1, 63:17, 65:8,
    65:13, 111:17, 121:6, 121:21,
    121:25 .
**233-4500** 2:39 .
**24** 111:13, 111:17 .
**240-volt** 22:21 .
**25** 111:13, 111:17 .
**2550** 2:37 .
**26** 60:4, 61:12, 61:14, 63:5,
    63:10, 63:15, 64:15, 111:14,
    111:17, 112:9 .
**287** 104:1, 104:4, 104:6, 104:17,
    105:3 .
**29** 111:10, 113:5 .
**2:10** 124:6 .
**2nd** 45:10 .
    .
    .
**< 3 >** .
**3** 36:7, 43:19, 85:4, 85:8, 89:21,
    90:19, 94:8, 96:11, 97:9,
    111:7, 111:13, 111:16 .
**3.5** 21:25 .
**30** 4:24, 5:11 .
**30(b)(6** 43:14, 44:12, 44:18,
    46:5, 47:21 .
**3000** 2:18 .
**33** 76:21 .
**333** 114:16 .
**336-8330** 2:14 .
**3G4000** 67:14, 67:18, 67:20,
    68:9, 81:13 .
    .
    .
**< 4 >** .
**4** 43:23, 49:10, 84:1, 97:10,
    111:9, 111:15, 111:16,
    112:23 .
**4.2** 33:16 .
**4.4** 84:16 .
**4.467** 84:12 .
**40** 5:12, 123:10 .
**401** 2:18 .
**402** 101:9 .
**403** 101:9 .
**45** 55:18 .
**46** 60:12, 60:17, 61:17, 79:20 .
**4:00** 10:22, 12:6 .

**Concordance**

**4th** 50:12 .

.

.

**< 5 >** .

**5** 44:2, 100:11, 111:17 .

**5.6** 49:10 .

**50** 123:10 .

**50(a** 6:18, 6:23 .

**50TH** 2:12 .

**5100** 2:4 .

**516-3880** 2:20 .

**56** 27:4 .

.

.

**< 6 >** .

**6** 111:7, 111:17, 115:2 .

**60** 29:20, 36:17, 56:15, 58:7 .

**600** 21:25 .

**65** 62:6 .

**650** 2:39 .

**651-9366** 2:6 .

.

.

**< 7 >** .

**7** 19:19, 43:10, 52:20, 111:17,
   113:1 .

**70** 79:21 .

**71** 79:20 .

**713** 2:6 .

**75604** 2:25 .

**75647** 2:31 .

**75670** 1:45, 3:3 .

**757-6400** 2:26 .

**75702** 2:45 .

**77002-5096** 2:5 .

**7:00** 5:24, 6:1 .

.

.

**< 8 >** .

**8** 84:3, 111:17 .

**800** 2:44 .

**845-5770** 2:32 .

**87** 80:1, 80:3 .

**8962** 121:7 .

**8963** 121:7 .

**8th** 4:21, 45:11, 50:10, 50:13,
   122:14, 122:17, 123:9 .

.

.

**< 9 >** .

**9** 111:17 .

**90** 41:15 .

**902** 114:24 .

**902(6)** 115:3 .

**902(7)** 114:25, 115:1, 115:2 .

**903** 1:46, 2:26, 2:32, 2:46, 3:4 .

**923-8546** 1:46, 3:4 .

**934-8450** 2:46 .

**94304** 2:38 .

**98101** 2:19 .

**9:00** 1:13 .

———————————————

    DATE_____ 125:10 .

.

**< A >** .

**A.M.** 1:13, 5:24, 6:1 .

**abandoned** 92:22 .

**ability** 65:11, 87:16, 98:16 .

**able** 20:7, 37:5, 49:17, 69:19,
   75:17, 80:10, 91:21, 91:23,
   91:25, 98:13, 110:21, 123:24 .

**above** 80:4 .

**ABOVE-ENTITLED** 125:3 .

**absolute** 122:12 .

**Absolutely** 45:24, 57:3, 78:16,
   106:16, 123:17 .

**abundance** 78:6 .

**abundantly** 52:13, 52:21 .

**accept** 55:7, 56:3, 115:12,
   117:6 .

**acceptable** 119:8 .

**accepted** 17:14, 17:17, 29:19,
   32:12, 90:9, 116:17 .

**accepts** 27:11, 38:21 .

**access** 8:9, 8:18, 48:22 .

**accompanying** 8:23, 8:24 .

**according** 41:14 .

**account** 7:5, 41:16, 41:17 .

**accuracy** 34:21 .

**accurate** 42:3, 43:12, 43:22,
   43:25, 44:4, 44:10, 45:3,
   99:23 .

**accurately** 43:8 .

**accuse** 69:11 .

**accusing** 69:16 .

**acknowledge** 33:17 .

**acknowledgement** 33:25 .

**acquire** 32:4 .

**acquired** 42:18 .

**acquisition** 31:12, 32:1 .

**across** 22:10, 37:9 .

**across-the-board** 123:14 .

**Act** 104:17 .

**action** 34:7 .

**active** 87:7, 92:23, 94:8 .

**actively** 109:21 .

**actual** 12:2, 23:20, 57:13, 87:1,
   99:23, 118:12 .

**actually** 15:18, 18:14, 18:22,
   19:21, 26:5, 30:22, 34:25,
   44:14, 45:4, 57:8, 59:3, 68:25,
   71:23, 76:25, 78:1, 114:15,
   118:1, 118:10 .

**add** 55:9, 55:12, 111:10 .

**added** 15:18 .

**addendum** 64:15 .

**adding** 113:5 .

**addition** 6:2, 32:10, 98:21, 99:8 .

**additional** 11:23, 25:4, 39:6,
   43:14, 44:12, 46:21, 47:21,
   51:2, 65:18 .

**address** 35:18, 35:21, 35:22,
   36:16, 36:22, 36:24, 37:3,
   52:16, 64:8, 70:6, 70:12,
   74:23, 80:2, 87:24, 91:11,
   91:21, 119:24 .

**addressed** 18:4, 34:15, 35:15,
   36:19, 57:4, 122:6 .

**addressing** 90:16, 101:21 .

**adequate** 49:3, 77:11 .

**adequately** 30:17, 31:2, 77:21 .

**adjudge** 17:2 .

**adjudging** 17:6 .

**adjusted** 35:13 .

**adjustment** 31:7 .

**admissibility.** 34:9, 34:22 .

**admission** 65:7, 98:7 .

**admit** 9:10, 9:16 .

**admitted** 112:15 .

**admitting** 35:3 .

**adopt** 81:19 .

**adopted** 11:5, 11:7, 21:23,
   81:21 .

**adopts** 21:21 .

**Adt--"did** 42:14 .

**ADT.** 79:25 .

**ADT2X16** 20:15 .

**ADT_FACTUS_8960** 43:21 .

**ADT_FRACTUS_8960** 43:9,

**Concordance**

43:24, 44:4, 44:6, 45:2 .
**advance** 108:19, 108:21, 120:11 .
**advantage** 87:15, 104:22 .
**advantages** 80:18 .
**advertising** 114:10 .
**advise** 5:21 .
**AEO** 41:5 .
**affect** 37:16, 88:10 .
**affected** 101:25 .
**affects** 83:15 .
**affirmative** 66:25, 67:23, 79:6 .
**affirmatively** 115:5 .
**afford** 4:24, 5:1 .
**afforded** 5:11 .
**after-the-fact** 14:2 .
**aftermath** 123:6 .
**afternoon** 114:13 .
**agency** 118:4 .
**ago** 45:18, 53:3, 66:22, 67:13 .
**agree** 20:24, 28:19, 32:3, 32:8, 33:17, 36:25, 44:11, 50:13, 89:16, 102:23 .
**agreeable** 50:8 .
**Agreed** 18:22, 36:20, 37:15, 82:15, 111:6, 111:7, 111:25, 112:3, 112:10, 119:2 .
**agreeing** 37:10 .
**agreement** 7:2, 36:14, 91:6, 93:11, 103:17, 105:16, 106:6, 112:13, 114:4 .
**agreements** 34:15, 38:21, 103:9, 103:24, 104:1, 104:6, 104:9, 107:4, 107:6, 107:24, 110:21 .
**agrees** 43:8, 43:13, 43:14, 98:10 .
**ahead** 19:15, 23:24, 32:23, 35:22, 37:12, 40:24 .
**aid** 10:4, 16:19 .
**AIO** 19:19, 20:15 .
**AIO7** 19:19 .
**aired** 77:21 .
**akin** 66:24, 75:19, 119:12, 119:13 .
**alarm** 33:9 .
**alarm.com** 48:25 .
**aliens** 115:11 .
**all-in-one** 19:19 .
**allegations** 68:25, 69:2, 105:17 .
**allegedly** 19:1 .

**allocate** 91:13 .
**allow** 51:11, 58:10, 71:4, 85:9 .
**allowed** 61:24, 61:25, 62:9, 62:23, 65:4, 65:6, 71:11, 71:12, 74:2, 91:20, 96:5, 102:13 .
**allowing** 63:1 .
**Almost** 26:22, 120:25, 121:2 .
**alone** 48:8 .
**already** 8:6, 17:24, 20:19, 23:25, 31:9, 43:12, 54:21, 59:6, 59:9, 92:25 .
**alteration** 18:21 .
**altered** 118:12 .
**alternate** 14:18 .
**alternative** 66:11, 66:24, 67:21, 75:22, 81:9, 81:16, 95:6, 95:16, 95:17, 96:14, 97:5 .
**alternatives--this** 76:21 .
**although** 18:3, 23:6, 28:12, 66:22, 70:19 .
**ALTO** 2:36, 2:38 .
**altogether** 74:17 .
**ambit** 60:9 .
**amended** 13:25 .
**American** 115:14 .
**among** 13:20, 65:13 .
**Amphenol** 80:15 .
**analogous** 34:8 .
**analogy** 31:14 .
**analysis** 21:1, 38:5, 57:8, 57:10, 57:18, 81:3, 93:12 .
**analyze** 69:23, 69:25, 102:13 .
**analyzed** 97:22 .
**and--excuse** 30:3 .
**Andrien** 59:7, 59:22, 60:5, 60:10, 62:1, 62:19, 64:24, 64:25, 65:18, 70:5, 70:25, 71:6, 72:18, 73:2, 73:5, 73:8, 73:11, 74:1, 74:13, 74:15, 79:15, 80:21, 80:25 .
**Andrien--i** 72:11 .
**Andrien--when** 72:11 .
**announced** 79:1 .
**announcement** 4:13 .
**announcements** 4:5 .
**Answer** 29:4, 30:5, 32:25, 42:13, 42:16, 44:16, 44:21, 45:23, 63:18, 99:23, 105:6 .
**answered** 44:7, 62:7, 69:9,

73:5 .
**answers** 73:8, 74:9, 74:10 .
**antenna** 48:18, 80:14 .
**antennas** 32:4, 86:10, 86:16, 97:25, 98:5, 98:8, 98:11, 112:10 .
**antennas.** 98:1 .
**anticipate** 68:3, 78:24 .
**anticipated** 78:21, 99:17 .
**anticipating** 100:1 .
**anticipation** 81:4 .
**Anybody** 8:13, 10:5, 40:12, 74:9, 89:23, 90:10, 93:18, 117:12 .
**anyway** 62:10, 78:11, 94:7 .
**apologies** 19:16 .
**apologize** 54:5, 94:19, 97:15, 121:22 .
**apologizing** 52:10 .
**apparatus-only** 17:3, 17:11, 18:19 .
**apparent** 38:21 .
**apparently** 50:21, 60:13 .
**appeal** 18:1, 20:22, 78:4 .
**appear** 14:8, 42:17, 44:11, 61:13, 65:21, 66:12, 66:15, 66:19, 98:6 .
**appears** 14:10, 56:16, 56:21, 60:17 .
**applicability** 79:22, 80:9, 80:18 .
**applied** 55:2, 79:7 .
**applies** 38:7 .
**apply** 14:6, 14:12, 17:5, 17:10, 18:19, 26:12, 31:22, 70:4, 79:9 .
**applying** 17:2, 109:22 .
**apportionment** 38:15 .
**appreciate** 55:6 .
**approach** 16:12, 17:5, 32:19, 58:22, 96:16, 107:1, 120:21 .
**approached** 28:24 .
**appropriate** 7:7, 7:22, 12:4, 32:7, 54:1, 54:4, 56:14, 83:16, 87:22, 101:22, 105:9, 108:10, 116:15 .
**appropriate.** 44:13 .
**appropriateness** 102:8 .
**approximately** 41:15, 122:23 .
**archive** 121:8, 121:17 .
**Arctic** 100:13, 100:25, 101:4, 101:14, 102:1, 103:4, 104:21,

**Concordance**

106:1, 106:8 .
**area** 118:24 .
**areas** 7:1 .
**argue** 68:23, 83:7 .
**argued** 17:13, 17:16, 20:23, 64:5, 78:24 .
**argues** 44:2 .
**arguing** 17:25, 18:12, 56:24, 111:9 .
**arguments** 5:11, 5:13, 34:12, 66:16, 70:4, 90:24 .
**arise** 6:14 .
**around** 15:2, 16:1, 19:23, 48:5, 61:13, 63:15, 63:16, 98:16, 123:12 .
**art** 14:10 .
**article** 113:12, 113:15, 115:10, 115:23, 116:3, 119:6, 119:9, 119:22 .
**articles** 113:22, 121:4, 121:10 .
**artifact** 121:18 .
**ascribe** 71:2, 79:17 .
**ascribed** 13:18, 70:24 .
**aside** 37:14 .
**asks** 37:25 .
**aspect** 95:9 .
**assert** 16:5 .
**asserting** 80:13, 103:25 .
**assertion** 92:14 .
**assertions** 35:12 .
**assess** 23:18 .
**assigning** 45:7 .
**assistant** 21:16 .
**assume** 26:25, 38:15, 51:23, 56:17, 110:7, 117:20, 123:8 .
**assuming** 28:15 .
**AT&T** 80:15 .
**attacked** 61:8 .
**attendance** 123:23 .
**attendant** 113:6, 117:4 .
**attending** 4:10 .
**attention** 9:19, 65:19 .
**attorney** 98:3, 110:1 .
**attorneys** 89:6 .
**attributable** 35:14 .
**audio** 8:23 .
**authenticated** 113:15, 114:20, 117:19 .
**authentication** 113:3, 113:6, 113:7, 115:21, 115:24, 116:16,

117:2, 117:17 .
**authenticity** 116:24 .
**authority** 67:12, 114:22 .
**authorized** 41:12, 42:15, 44:20 .
**automatic** 6:15 .
**available** 8:25, 50:7, 50:18, 77:4, 88:20, 95:12, 101:5, 101:11 .
**AVENUE** 2:30, 99:17 .
**avoid** 7:12, 7:22, 8:4, 11:1, 52:14 .
**avoidance** 34:2 .
**avoids** 88:14 .
**aware** 10:5, 41:25, 46:19, 47:7 .
.
.
**< B >**
**back** 8:5, 41:6, 45:6, 46:2, 57:11, 70:25, 95:16, 98:4, 99:9, 106:11, 109:21 .
**back-up** 15:1, 15:3, 15:4, 15:7 .
**background** 60:3, 60:6, 63:6, 87:10, 87:20, 87:22, 107:15 .
**Backup** 77:3, 86:12, 121:9, 121:19 .
**bad** 45:18 .
**balance** 114:7 .
**bands** 21:7, 25:15 .
**Bar** 54:8, 115:14 .
**base** 48:15, 80:14, 84:11, 84:14, 84:15, 84:16, 117:13 .
**Based** 12:16, 18:13, 25:23, 28:22, 33:18, 34:19, 35:9, 39:22, 40:20, 73:15, 74:14, 75:17, 88:17, 91:16, 105:16, 106:9, 108:14 .
**bases** 30:16 .
**Basic** 63:6 .
**basically** 29:14 .
**basis** 6:11, 29:3, 30:6, 34:24, 35:3, 52:11, 53:4, 56:10, 59:17, 61:6, 74:16, 85:15, 87:2, 87:21, 89:11, 91:1, 92:2, 96:20, 97:4, 97:13, 100:23, 101:14, 103:7, 107:23, 113:2 .
**batch** 114:4 .
**Bates** 116:14, 121:7, 121:20 .
**batteries** 20:14, 20:16, 22:24, 23:6, 24:24 .
**battery** 15:1, 15:2, 15:4, 15:6 .
**bear** 22:21, 103:14, 116:14 .

**bearing** 78:16 .
**bears** 83:24, 121:6, 121:19 .
**becomes** 14:13 .
**been--and** 105:13 .
**begin** 5:17, 46:17, 49:9, 52:10 .
**beginning** 5:2, 110:9 .
**behalf** 4:15 .
**behind** 11:21 .
**belied** 32:9 .
**believability** 27:10 .
**believed** 55:1, 77:7 .
**believer** 89:11 .
**believes** 17:7, 39:5, 106:3 .
**believing** 43:17 .
**bell** 96:24 .
**belongs** 61:18 .
**bench** 96:23, 107:1 .
**benchmark** 34:21 .
**benefit** 75:1, 117:17, 119:19 .
**benefits** 35:15 .
**besides** 56:25 .
**best** 12:16, 34:15, 122:13 .
**better** 89:1, 96:19, 96:22 .
**beyond** 51:1, 73:12, 73:24, 104:1 .
**big** 118:13 .
**BILL** 2:24 .
**binder** 6:1, 6:5 .
**binders** 12:4 .
**bit** 16:21, 70:16, 74:25, 91:6 .
**blame** 45:7, 48:9, 50:17 .
**blank** 9:23 .
**Blitzsafe** 65:19 .
**Blue** 42:14, 77:3 .
**board** 37:9, 64:23 .
**body** 115:11 .
**Bolles** 16:25 .
**bolted** 14:15, 14:21, 15:25, 22:17 .
**Bombardier** 106:1 .
**Borja** 99:12, 99:13, 99:14 .
**borne** 108:22 .
**bother** 70:1 .
**bottom** 20:1, 35:5 .
**bound** 85:5, 100:21 .
**boundaries** 22:10 .
**box** 9:21, 64:4, 97:1 .
**brake** 52:24 .
**break** 110:9, 123:13 .
**Bridge** 77:3 .

**Concordance**

**brief** 17:17, 18:5, 18:23, 19:4, 24:7, 44:2, 47:17 .
**briefing** 38:18, 46:9, 72:3, 78:22, 81:7, 83:6, 90:7, 97:17 .
**briefing--i'll** 57:13 .
**briefly** 37:21, 77:17, 89:8 .
**briefs** 102:23 .
**bring** 9:19, 116:15 .
**bringing** 28:24 .
**brings** 90:22, 94:3, 97:8, 100:10, 123:14 .
**broad** 97:16 .
**broader** 21:18 .
**brought** 102:3, 102:25, 103:6, 105:24 .
**building** 109:20 .
**built** 33:16, 33:23, 35:1, 35:20 .
**bunch** 9:23 .
**burden** 67:23, 78:16, 88:1, 101:3, 101:15, 101:17, 101:21, 102:1, 102:11, 103:4, 104:24, 106:11 .
**business** 48:15, 48:17, 95:9 .
.
.
**< C >** .
**cable** 85:13 .
**calculated** 84:15 .
**calculations** 84:11 .
**CALIFORNIA** 2:38 .
**call** 10:8, 10:9, 12:2, 19:8, 71:25, 95:17, 95:18 .
**called** 11:20, 41:12, 108:17 .
**Caltech** 31:14, 31:16, 31:22, 31:25, 33:2, 38:7 .
**camera** 84:7 .
**candid** 8:14 .
**capabilities** 18:14, 23:20 .
**capability** 85:25, 88:4 .
**capable** 18:20, 23:4, 23:11, 24:24, 26:1, 26:2 .
**capacity** 18:10, 22:24 .
**CAPSHAW** 2:29 .
**care** 48:5 .
**cared** 73:9 .
**careful** 41:1 .
**Carmen** 99:12 .
**carve-out** 91:5 .
**case--"allegedly** 34:6 .
**case--is** 104:4 .

**case--the** 13:9 .
**cases** 53:11, 62:13, 68:20, 91:17 .
**Cat** 100:13, 101:1, 101:4, 101:14, 102:1, 103:4, 104:21, 106:1, 106:8 .
**catch** 82:21 .
**categories** 110:22 .
**categorized** 117:1, 117:17 .
**category** 111:5, 111:8, 111:11, 111:13, 111:15, 111:25, 112:2, 112:24, 113:2, 113:5, 113:12, 113:22, 116:19, 117:15, 118:23, 119:3, 119:12, 119:15, 119:25, 121:1, 122:3 .
**CAUSE** 1:5, 53:24 .
**causes** 54:19 .
**caution** 78:6 .
**CBS** 115:20 .
**cell** 13:22, 21:10, 21:14, 21:15, 21:18, 22:10 .
**Cellguard** 121:9 .
**Cellular** 20:13, 20:16, 21:6, 22:25, 77:3, 85:24, 85:25, 86:11, 86:12, 86:13, 87:12, 87:21, 88:4, 88:19, 96:2, 96:5, 121:9 .
**cellular-based** 86:19 .
**cent** 36:17, 58:7 .
**center** 35:5, 35:7 .
**cents** 29:20, 56:15 .
**certain** 26:18, 33:18, 33:19 .
**Certainly** 37:3, 73:11, 73:24, 74:2, 74:12, 74:16, 76:5, 76:10, 81:24, 87:21, 107:1, 117:19, 123:15 .
**certification** 23:15, 23:16 .
**certified** 22:20 .
**certifies** 23:19 .
**CERTIFY** 125:1, 125:4 .
**cetera** 87:17 .
**chain** 47:11 .
**challenge** 17:25, 32:15, 51:21, 72:4 .
**challenged** 21:23 .
**challenges** 5:8, 30:15, 34:20 .
**chambers** 5:17, 6:1, 6:24, 10:22 .
**chance** 7:8, 8:18, 81:10 .
**change** 14:3, 14:20, 79:2, 88:9 .

**changed** 76:15 .
**changes** 123:9, 124:1 .
**channel** 41:9, 41:10, 41:11 .
**channels** 41:7 .
**character** 25:17 .
**characterize** 11:14 .
**characterized** 17:19, 24:10, 108:7 .
**characterizing** 83:1 .
**charge** 6:23, 7:2, 7:6, 7:9 .
**charged** 53:5 .
**chart** 11:3, 59:1 .
**check** 39:24, 110:6, 110:8, 118:17 .
**checking** 115:10 .
**CHIEF** 1:25, 6:20 .
**choice** 72:8, 72:20, 72:22 .
**choose** 5:1 .
**chose** 26:10, 71:20 .
**Circuit** 106:1 .
**circumscribing** 93:6 .
**circumstances** 51:16 .
**cite** 29:9 .
**cited** 24:8, 72:3, 114:15 .
**cites** 114:16 .
**citizens** 123:11 .
**Civil** 4:3, 6:18 .
**claim** 11:4, 11:6, 11:7, 11:8, 16:4, 17:11, 17:14, 17:18, 18:1, 18:4, 18:5, 18:13, 18:19, 20:21, 21:13, 22:9, 26:8, 26:18, 75:3, 78:4, 78:7, 97:11, 98:9, 98:13, 98:21, 98:23 .
**claimed** 14:1, 18:21 .
**claims** 13:10, 13:12, 13:25, 15:13, 17:3, 17:6, 18:24, 19:9, 21:12, 22:11, 25:22, 26:12, 87:23, 88:2, 88:8, 88:13, 90:23 .
**clarification** 88:25, 90:2, 90:7, 91:7 .
**clarify** 39:22, 43:7, 95:24, 98:5, 106:24 .
**clarity** 40:3 .
**clause** 33:7 .
**clear** 9:13, 14:13, 21:10, 24:4, 27:25, 35:25, 37:6, 52:13, 52:21, 58:15, 85:16, 87:8, 106:2, 107:8 .
**clearly** 38:12, 98:22, 108:22,

**Concordance**

109:16, 118:23 .
**Clendening** 8:8 .
**Clerk** 8:20 .
**click** 11:24 .
**clients** 7:11 .
**clips** 8:24 .
**close** 6:19, 6:20, 30:19, 100:17 .
**closer** 115:15 .
**closing** 5:11, 5:13 .
**CNET** 113:13, 115:18, 119:22 .
**cognizant** 41:5 .
**collaboratively** 48:20 .
**collar** 22:18 .
**colleague** 17:4 .
**collectively** 27:17 .
**COLLEGE** 2:44 .
**column** 11:5 .
**com** 121:18 .
**combination** 33:19 .
**combined** 33:4 .
**comes** 9:24, 41:19, 56:15, 61:10, 86:20, 86:21, 108:11 .
**coming** 35:9, 61:25, 65:3, 73:15, 95:15, 99:11, 100:2, 100:14, 102:6, 116:7, 123:11 .
**command** 19:19 .
**comment** 77:19 .
**comments** 39:22 .
**COMMERCE** 2:30 .
**commercial** 79:23, 80:8, 80:17 .
**commercially** 32:14, 80:11 .
**Commission** 116:13, 117:10, 119:23 .
**committed** 85:22 .
**common** 46:20, 46:21 .
**commonly** 104:17 .
**communicate** 22:25, 35:4, 35:6 .
**communication** 12:25, 13:10, 13:17, 13:22, 14:1, 15:9, 17:16, 17:21, 21:6, 21:13, 21:14, 21:15, 21:18, 21:24, 22:3, 23:2, 25:13 .
**communications** 20:13, 20:16, 20:18, 21:5, 50:22, 85:24 .
**comp** 30:19 .
**companies** 32:11, 80:14, 80:16, 83:3, 83:23, 107:3 .
**companion** 39:11 .
**comparability** 34:14, 90:24 .
**comparable** 30:17, 30:20, 34:6,

34:11, 34:18, 34:19, 38:10, 38:14 .
**compare** 44:22, 83:11, 84:14 .
**comparing** 18:25, 92:7 .
**comparison** 11:6, 83:22, 83:23, 84:18, 84:24, 85:1, 85:9 .
**comparisons** 84:13 .
**compartmentalized** 89:11 .
**compel** 43:4, 43:5, 43:21, 48:24 .
**compelled** 55:23 .
**compelling** 38:18, 82:2 .
**competing** 27:9 .
**competitor** 30:19 .
**complaint** 33:4 .
**complete** 11:2, 28:3, 36:6, 44:10, 45:3 .
**completely** 36:1 .
**completes** 123:24 .
**compliance** 106:5 .
**complicated** 48:16 .
**COMPLY** 79:1, 125:5 .
**component** 33:15, 33:23, 34:23 .
**comport** 112:18 .
**conceive** 21:11 .
**concept** 32:13, 96:21, 97:4 .
**concern** 31:11, 83:21, 97:17, 117:18 .
**concerned** 8:12, 63:25 .
**concerning** 14:4, 64:5 .
**concerns** 83:8, 92:19, 97:18, 116:2, 116:7, 116:19, 117:4 .
**conclude** 36:17, 58:1 .
**concluded** 79:5, 124:6 .
**conclusion** 9:13, 36:10, 39:21, 43:10 .
**conclusions** 31:8, 73:13, 83:12, 83:15 .
**conduct** 6:23, 7:9, 53:5 .
**conducted** 9:5, 50:8 .
**conducting** 54:21 .
**confer** 5:19, 46:7, 47:18, 89:14, 110:21, 120:2 .
**CONFERENCE** 1:21, 6:24, 7:6, 7:9, 110:1, 125:6 .
**conferring** 5:16, 109:22 .
**confidential** 7:20, 8:1, 40:21 .
**configuration** 17:8, 17:9 .
**confirm** 111:2, 117:22 .

**conflation** 86:7 .
**confuse** 71:14 .
**confusing** 7:14, 23:16, 99:4 .
**confusion** 43:3, 44:24 .
**connected** 20:6 .
**connection** 15:6 .
**connections** 116:5 .
**connectivity** 96:6 .
**conscious** 53:18 .
**consequence** 56:3, 72:17 .
**consider** 29:12, 30:21, 31:2, 31:17 .
**considered** 24:15, 75:25, 81:3, 81:7 .
**consistent** 13:19, 13:24, 15:7, 15:15, 15:17, 15:22, 21:22, 90:19 .
**consistently** 42:8 .
**constituted** 81:15 .
**constraints** 109:17 .
**construction** 11:5, 11:7, 11:8, 13:19, 13:24, 14:4, 15:18, 15:20, 16:4, 17:14, 17:18, 18:1, 18:4, 18:5, 18:7, 18:9, 18:13, 20:21, 20:24, 21:21, 26:8, 26:10, 75:3, 78:4, 78:7, 97:11, 98:9, 98:13, 98:22, 98:23 .
**construe** 39:7 .
**construed** 11:4, 13:17, 15:14, 18:24, 25:23, 26:12, 26:18 .
**consultants** 8:12 .
**consumer** 114:19 .
**contact** 123:15 .
**contain** 11:1, 11:3, 13:10, 44:19 .
**contained** 44:10 .
**containing** 6:1 .
**contains** 43:21, 43:25 .
**contemplates** 33:22 .
**contemplating** 21:17 .
**contentions** 67:25, 68:2 .
**contents** 116:18 .
**context** 48:12, 70:16, 74:25, 90:24, 96:8, 96:9 .
**Continue** 5:23, 15:11, 18:17, 105:19 .
**continuing** 23:6 .
**contrast** 79:21, 80:16, 121:9 .
**control** 71:22 .
**controversial** 84:20 .

**Concordance**

conundrum 62:25 .
conversation 29:6, 29:10, 29:17, 60:24, 73:25 .
conversations 48:23, 71:3, 72:1, 74:22, 91:13 .
copy 8:15, 8:18, 8:19, 11:2, 12:3, 16:14, 118:2, 118:10 .
corners 73:21 .
corporate 35:3, 43:8, 43:15, 44:18 .
correction 112:6 .
corrective 44:8 .
correctly 76:7 .
corresponding 11:5 .
cost 34:2 .
Counsel. 42:24 .
count 49:9 .
counterdesignation 6:10, 99:22 .
counterdesignations 100:7 .
counties 123:11 .
couple 46:2 .
course 10:19, 19:16, 33:25, 35:1, 44:15, 63:7, 63:9, 95:2, 97:16, 107:13 .
courthouse 22:17, 110:7 .
Courtroom 7:21, 7:25, 8:2, 40:9, 40:12, 40:15, 40:18, 40:19, 51:24, 51:25, 52:3, 52:6, 89:9, 109:24, 120:10 .
courtroom--but 57:14 .
cover 34:6, 79:13, 82:5 .
covered 39:9, 59:6, 74:21, 88:2, 88:8, 92:25, 98:8, 98:20, 102:14, 118:25, 122:6 .
covers 120:25 .
Craig 4:9, 16:17 .
create 59:14, 62:16 .
credibility 27:10, 74:13 .
credible 58:11 .
credit 7:17 .
crimes 85:22 .
criminal 85:17, 117:7 .
criminals 85:13, 87:15 .
criteria 60:14, 62:4 .
cross 34:13, 34:15, 35:15, 61:19, 61:21, 64:11, 65:2, 65:5, 86:22 .
crossed 64:24, 83:22 .
CRR 1:43, 3:1, 125:11 .

currently 10:8, 41:5 .
curtail 39:3, 58:12, 105:3 .
customers 41:9, 42:11, 77:4, 85:18, 85:22, 86:16, 96:6 .
cut 80:3, 87:12, 88:17, 116:6 .
cutting 85:13 .
CV-7 52:20 .

.

.

< D >.
dart 64:23 .
data 42:4, 42:15, 43:7, 43:12, 43:25, 44:7, 44:20, 45:1, 46:4, 47:12, 47:13, 83:24 .
data. 43:16, 43:22, 44:4, 44:10 .
date 45:15, 86:14 .
Daubert 21:24, 27:24, 28:2, 30:3, 30:11, 36:8, 58:3, 58:5, 61:2, 61:9, 93:9 .
Day 6:13, 6:14, 19:15, 27:2, 44:14, 44:18, 45:3, 45:4, 45:12, 49:15, 76:4, 81:22, 98:2, 99:1, 99:6, 124:3 .
days 41:15, 53:3, 58:3, 123:7 .
dead 49:23 .
deadlines 76:6, 76:18 .
deal 59:3, 86:9, 89:17 .
dealer 41:12, 41:16, 42:12, 42:18, 42:19, 42:20 .
dealers 41:13, 41:17, 42:15, 44:20 .
dealing 83:1 .
dealt 9:2, 17:23, 57:21 .
decide 27:8 .
decided 77:8 .
decides 16:3 .
decision 31:14, 31:16, 48:10, 53:18, 54:4, 54:24, 55:6, 56:3, 56:11, 75:19, 76:3 .
decisions 72:2 .
declare 63:12, 67:20 .
declined 71:24, 72:1 .
decorum 7:15 .
deemed 41:5 .
Defendants 2:35, 55:14, 70:9, 91:2, 104:4, 107:6 .
defending 54:24, 62:16 .
Defense 56:24, 59:15, 66:25, 99:3, 100:1, 100:17, 101:5, 101:11, 102:3, 104:1, 104:3,

104:22, 105:1, 105:3, 112:7, 115:25 .
defenses 79:6 .
defer 54:4 .
defies 48:15 .
defined 33:11 .
definitely 6:24 .
definition 15:21, 21:23, 115:9 .
degree 11:16, 34:14 .
delay 6:15 .
delineate 109:16 .
deliver 10:21 .
delivery 102:9 .
demonstrate 30:20, 80:10 .
demonstrated 24:19 .
demonstrates 19:23, 24:15 .
demonstrative 112:12 .
demonstratives 5:15 .
denial 85:19 .
denies 34:25, 65:11 .
deny 27:7, 38:7, 38:13, 38:18, 58:6, 80:24, 85:2, 85:10, 100:5 .
denying 85:3 .
dependent 21:12, 21:13 .
depends 10:19 .
depo 64:17 .
depose 45:21, 48:3, 49:17, 51:1, 64:7, 64:9, 73:16, 73:21 .
deposed 49:19, 64:19, 73:14, 74:2 .
deposing 49:2, 51:7 .
depositions 8:21, 72:5, 72:7 .
Deputy 120:10 .
Deputy-in-charge 8:8 .
Derieux 2:29, 2:33, 4:10 .
describe 86:2 .
described 17:22, 21:4 .
describes 24:9, 85:25 .
description 117:13 .
design-arounds 66:6 .
designated 41:3, 41:4, 55:15 .
designation 6:9, 27:1, 99:21 .
designations 99:15, 100:7 .
designed 14:16, 14:24, 16:1, 20:12, 86:24 .
desk 17:8, 19:22, 19:25, 20:3, 20:15, 23:9, 24:20 .
desktop 24:12 .
detail 100:23 .

**Concordance**

**detailed** 17:17, 59:23, 61:1, 74:1 .
**determine** 27:11, 96:20 .
**determined** 9:8, 60:15 .
**development** 87:20, 88:11 .
**devices** 13:22, 14:13, 15:17, 15:23, 19:6, 19:7, 19:8, 19:9, 19:10, 19:12, 19:21, 20:9, 20:10, 20:11, 21:10, 23:8, 23:9, 24:5, 24:10, 24:11, 24:18, 24:21, 24:23, 25:17, 25:23, 25:25, 26:5, 33:11, 33:19, 86:10 .
**difference** 61:12, 87:9, 87:11, 118:13 .
**different** 15:16, 15:21, 26:11, 26:20, 26:22, 30:22, 31:15, 34:5, 57:16, 63:10, 66:11, 70:24, 79:13, 80:14, 91:14, 108:8, 118:25 .
**differently** 28:20 .
**digital** 21:16 .
**diligent** 47:11 .
**diligently** 110:2 .
**dire** 107:2, 107:9, 107:13, 108:10, 108:13 .
**direct** 5:14, 10:21, 32:25, 40:16, 41:9, 42:22, 65:19, 67:12, 79:17, 110:5 .
**directed** 38:8 .
**directing** 12:1 .
**directly** 42:11, 96:13, 105:6, 122:5 .
**disable** 87:16 .
**disagree** 35:1, 41:2 .
**disagreed** 68:8 .
**disclose** 108:1 .
**disclosed** 21:9, 67:14, 67:18, 67:22, 67:25, 68:6, 68:8, 68:9, 68:22, 76:23, 81:14 .
**disclosure** 36:5, 63:16, 81:17 .
**disconnected** 23:5 .
**discounts** 107:23 .
**discovery** 41:25, 67:15, 67:18, 67:22, 68:1, 68:6, 68:16, 68:22, 69:8, 69:15, 70:16, 75:10, 75:13, 77:6, 78:15, 81:14, 94:25, 95:2, 100:21, 102:12, 102:17, 115:6 .
**discuss** 7:1, 7:4, 59:4, 59:5 .

**discussed** 22:10, 22:13, 22:23, 24:1, 26:9, 31:9, 31:15, 66:13, 68:5, 80:4, 90:9 .
**discusses** 33:6, 33:16 .
**Discussion** 28:15, 55:9, 60:17, 60:24, 66:11, 78:5, 81:5, 123:22 .
**discussions** 48:21, 50:22, 71:7, 123:5 .
**disparity** 119:10 .
**display** 16:20 .
**dispose** 106:17 .
**dispute** 6:7, 94:8, 94:13, 101:24, 103:2, 103:6, 107:11, 115:5, 115:22, 123:14 .
**disputed** 4:19, 6:2, 9:2, 12:13, 28:14, 82:11, 82:16, 89:12, 89:13, 89:15, 90:22, 99:22, 100:7, 100:11, 101:2, 101:9, 105:24, 106:18, 109:15, 110:17 .
**disputes** 5:16, 5:21, 5:24, 5:25, 6:9, 6:12, 6:14, 9:2, 82:12, 103:8, 109:4, 109:22, 110:3, 122:2 .
**disqualified** 28:4 .
**disrupt** 55:5 .
**disruption** 87:13 .
**distinguishes** 72:2 .
**distracting** 99:5 .
**distribution** 43:11 .
**distributor** 42:12, 42:18 .
**District** 1:1, 1:2, 1:25, 7:15, 62:13, 68:21 .
**divided** 32:11 .
**DIVISION** 1:3, 8:8 .
**do.** 35:8 .
**Docket** 36:3, 45:9, 50:21, 59:20, 71:22 .
**Document** 12:19, 27:15, 29:24, 38:5, 39:17, 40:5, 43:1, 43:9, 51:22, 52:5, 58:17, 79:15, 84:6, 89:5, 114:7, 114:17, 115:21, 116:13, 116:18, 116:20, 119:8, 121:6 .
**documentary** 108:23 .
**documentation** 111:3 .
**Documents** 27:16, 42:6, 43:24, 85:19, 113:23, 113:24, 114:4, 114:25, 116:7, 117:3, 117:19,

119:25 .
**doing** 53:1, 93:7 .
**don't.** 43:2 .
**done** 42:22, 45:18, 64:20, 69:14, 96:3 .
**door** 51:7, 95:16, 99:9 .
**doubly** 69:24 .
**doubt** 11:1, 37:22, 89:23, 93:2, 93:18, 118:16 .
**down** 16:21, 19:14, 75:4, 75:20, 89:7 .
**downward** 31:7 .
**DPX** 111:16 .
**draft** 118:11 .
**draw** 62:12, 62:14, 63:5, 83:12, 83:15 .
**drawn** 62:13, 84:18 .
**drop** 53:1, 77:9, 111:6 .
**dropped** 18:6, 18:9, 68:13, 68:24, 68:25, 69:2, 69:7, 75:7, 77:24, 78:5, 78:8, 78:12, 78:13, 78:16, 91:9, 91:18, 91:25, 92:4, 92:13, 92:22, 93:4, 93:13, 93:25, 94:2, 94:5 .
**dropping** 18:8, 75:4, 78:3, 78:10, 111:9 .
**drops** 111:13 .
**duck** 95:19, 95:20 .
**due** 22:24 .
**During** 10:23, 11:12, 13:25, 15:5, 15:19, 17:14, 41:18, 41:23, 41:25, 57:15, 67:14, 69:8, 69:15, 70:16, 74:3, 78:14, 81:14, 96:4, 102:12, 102:16, 107:2, 107:13, 108:10, 108:12, 108:16, 108:24, 112:12, 115:6 .
**duty** 8:11, 78:17 .
**DX** 111:16, 111:25, 112:3 .
.

< E > .
**E.** 1:44, 2:30, 3:2 .
**earlier** 82:4, 94:14, 96:1, 116:4, 117:15 .
**early** 46:3, 46:5, 47:13, 47:14, 47:20, 122:23 .
**earned** 11:15 .
**easily** 11:19 .

**Concordance**

**EASTERN** 1:2 .
**easy** 30:18 .
**EDGAR** 118:15, 118:17 .
**editorial** 115:19 .
**educate** 72:15 .
**effect** 95:13 .
**effectively** 41:15, 51:5, 58:1, 101:11 .
**efficient** 59:3 .
**efforts** 5:23, 120:2, 122:16 .
**eight** 5:7 .
**either** 6:17, 6:22, 11:11, 17:8, 21:15, 22:5, 22:11, 22:16, 32:7, 37:6, 38:17, 65:11, 72:15, 78:25, 82:7, 92:18, 96:13, 100:17, 104:25, 113:14, 115:6, 118:24, 121:17 .
**electric** 22:15 .
**electrical** 14:16 .
**electrician** 22:20 .
**electromagnetic** 25:15, 25:16 .
**electronic** 12:5 .
**electronic--excuse** 14:4 .
**electronically** 12:4 .
**electronics** 114:19 .
**element** 88:1, 88:8 .
**elicit** 86:24, 88:16 .
**Elizabeth** 2:33, 4:10 .
**elsewhere** 14:10 .
**email** 5:20, 12:14, 42:1, 110:24 .
**embarrass** 5:5 .
**embarrassing** 64:21 .
**embodied** 19:12 .
**embodiments** 21:9 .
**emergency** 30:2, 46:10, 46:14, 51:21, 51:24, 52:11, 52:14, 52:21, 52:24, 53:16, 53:19, 54:10, 57:22, 57:24, 58:4 .
**emotive** 86:24, 86:25 .
**emphasizing** 85:23 .
**employee** 29:14 .
**enable** 20:12 .
**encountered** 22:16 .
**end** 27:2, 29:2, 29:11, 29:15, 30:7, 36:18, 36:23, 37:16, 49:15, 56:10, 64:3, 81:22, 99:1, 99:6, 101:18, 115:16 .
**end-run** 63:15, 63:16, 98:15 .
**ended** 9:6 .

**ending** 121:7 .
**ends** 90:12 .
**enough** 84:25, 85:8 .
**Enquirer** 115:9, 115:14 .
**enter** 105:16, 123:25 .
**entered** 40:13, 70:19 .
**entering** 88:18 .
**entire** 28:21, 36:17, 54:8, 60:16 .
**entirely** 14:8, 21:22, 25:20, 26:7, 108:8 .
**entirety** 28:2, 28:4, 32:16, 38:1, 48:15, 79:13 .
**entry** 27:3 .
**Eon** 16:6, 22:5, 22:8, 22:15 .
**Eon--or** 22:14 .
**equally** 70:18 .
**equating** 86:9 .
**Ericsson** 34:6 .
**erroneous** 38:6 .
**error** 53:22 .
**especially** 116:3 .
**essentially** 19:8, 23:10, 24:9, 24:12, 24:16, 84:10 .
**establish** 106:5 .
**established** 117:13, 120:9 .
**et** 87:17 .
**ether** 119:10 .
**event** 69:1 .
**events** 64:1 .
**Everybody** 38:24, 54:10, 55:23, 93:17, 98:10, 120:12 .
**everything** 52:25, 54:8, 115:13 .
**evidence--the** 107:5 .
**evidenced** 108:17 .
**evidentiary** 34:21 .
**Evidently** 44:24 .
**exact** 67:13 .
**exactly** 22:3, 36:7 .
**examination** 5:2, 34:13, 34:16, 35:16, 61:19, 64:11, 86:22 .
**examine** 4:25, 61:21 .
**example** 17:25, 18:16, 35:11, 42:9, 60:4, 60:11, 65:19, 77:3, 83:13, 89:4, 96:4, 96:5, 97:24, 103:11, 103:17, 104:9, 105:17, 113:11, 116:11 .
**examples** 13:21, 19:7, 21:9, 91:12, 113:12 .
**exceeds** 49:6 .
**except** 47:10, 90:24, 93:25,

109:4 .
**exception** 107:12, 108:25, 121:4 .
**exception--the** 30:24 .
**excerpts** 21:2, 24:7 .
**Exchange** 5:15, 6:25, 108:15, 116:13, 117:10, 119:23 .
**exclude** 27:14, 27:19, 27:24, 36:2, 36:4, 36:6, 36:8, 38:4, 59:20, 60:8, 65:16, 65:17, 67:3, 68:7, 74:16, 85:12, 102:2, 119:5 .
**excluded** 38:13, 65:22, 92:24 .
**excludes** 93:3, 93:25 .
**excludible** 61:9, 63:9 .
**excluding** 68:21 .
**exclusion** 34:16, 67:8, 71:9 .
**excuse** 29:18, 40:17, 62:15, 75:21 .
**excused** 124:5 .
**exemplar** 113:9, 116:10, 117:15 .
**exemplars** 119:1, 119:3 .
**exhaustion** 31:20 .
**Exhibit** 9:10, 78:1, 84:3, 84:4, 86:21, 89:4, 91:10, 91:22, 92:16, 98:4, 108:20, 109:17, 111:14, 111:19, 112:1, 112:9, 112:16, 114:15, 118:7, 121:6 .
**Exhibits** 9:1, 9:4, 9:17, 89:15, 107:10, 108:1, 108:18, 109:5, 109:12, 109:19, 109:23, 110:2, 110:17, 110:22, 111:5, 111:8, 111:15, 111:16, 111:18, 111:23, 111:24, 112:3, 112:4, 112:14, 116:8, 118:23, 120:10, 120:15, 121:1 .
**existing** 5:22, 108:2 .
**expect** 10:8, 12:2, 72:25, 86:8, 123:1, 123:4, 123:7 .
**expectation** 76:17 .
**expected** 108:24 .
**expecting** 10:10, 46:6, 46:7 .
**expedite** 10:18 .
**expedited** 46:9 .
**expense** 34:2 .
**experience** 11:25 .
**expertise** 71:3 .
**experts** 12:2, 27:9, 60:1, 60:2, 60:3, 64:10, 65:21, 71:1, 71:5, 72:7, 76:8, 80:8, 83:10, 91:10,

Concordance

107:11 .
**explain** 14:25, 73:12 .
**explained** 20:19 .
**explaining** 75:11 .
**explanation** 11:14, 49:21,
   49:22 .
**exposed** 64:20 .
**express** 83:8 .
**expressly** 93:25 .
**extent** 7:25, 8:4, 8:22, 16:3, 16:5,
   38:11, 40:10, 42:4, 50:25,
   51:2, 58:8, 59:8, 79:2, 81:21,
   87:10, 87:19, 92:7, 92:21,
   93:2, 93:3, 93:12, 96:11,
   105:23, 112:10, 115:22 .
**external** 97:25, 98:7, 98:11 .
**extrinsic** 14:3 .
**exuberance** 88:22 .
**eyes** 89:6 .
   .
   .

< F > .
**face** 108:1, 116:17 .
**fact-finding** 27:5 .
**factor** 83:14 .
**factors** 56:13, 57:7 .
**facts** 16:7 .
**factual** 34:15, 34:20, 63:6, 94:25,
   100:23, 103:7, 117:9 .
**factually** 115:4, 118:3 .
**fail** 99:6 .
**failing** 65:10 .
**fails** 99:3, 104:20 .
**failure** 51:6, 100:12, 103:20,
   105:11, 106:10 .
**fair** 45:21, 53:6, 69:3, 71:17,
   71:20, 83:14, 85:1, 85:9, 86:2,
   88:13 .
**fairly** 38:11, 71:13, 79:18, 81:11,
   97:16, 97:17, 98:14, 109:16,
   118:25 .
**fairness** 31:15 .
**fall** 28:18, 115:15, 118:23,
   119:15, 122:3 .
**falls** 36:23, 50:19, 94:10, 94:14 .
**familiar** 10:25 .
**far** 64:5 .
**fault** 53:10, 79:17 .
**fear** 87:24 .
**feasible** 50:17 .

**feature** 23:17, 35:10 .
**features** 19:1, 34:19, 34:20 .
**FEDERAL** 6:18, 10:24, 106:1,
   114:24, 125:12 .
**feel** 55:20, 55:23, 73:11 .
**FEES** 125:4 .
**fell** 75:16 .
**Feuerstein** 58:16, 58:18, 59:5,
   66:18 .
**Feurstein** 60:6, 65:15, 65:16,
   66:1, 66:3, 66:7, 66:10, 66:19,
   67:1, 67:11, 68:5, 68:20, 70:4,
   74:20, 74:23, 75:7, 76:4,
   77:12, 81:2 .
**few** 16:19, 20:10, 33:6, 53:3,
   66:22, 67:13, 70:14, 80:18,
   123:7 .
**field** 49:6, 77:5 .
**fighting** 116:23, 116:24 .
**figures** 13:23, 21:8 .
**file** 12:4, 13:24, 15:17, 47:15,
   47:20, 54:9, 58:4, 118:2,
   118:11, 118:15 .
**filed** 33:3, 33:4, 43:20, 45:8,
   46:18, 46:24, 47:17, 48:2,
   50:21, 53:2, 60:23, 68:7, 75:5,
   87:2, 118:4, 118:10 .
**filing** 29:5, 29:7, 43:20, 52:10,
   117:23, 118:12, 118:22, 119:7,
   119:22, 119:23 .
**final** 7:7, 23:13 .
**Finally** 23:1 .
**financial** 83:1 .
**find** 27:1, 38:5, 38:10, 38:16,
   51:4, 53:4, 81:7, 110:8 .
**finds** 26:23 .
**fine** 10:1, 16:15, 55:9, 55:10,
   59:16, 60:3, 60:7, 120:17,
   122:19 .
**firm** 53:15, 89:11 .
**fit** 123:2 .
**five** 30:25 .
**fixed** 14:14, 15:5, 19:24, 25:19 .
**flaws** 64:21 .
**flippant** 54:14, 54:17 .
**flippantly** 54:9 .
**floating** 119:9 .
**FLOOR** 2:12 .
**fly** 9:11 .
**focus** 18:7, 39:1, 63:4, 112:21 .

**focusing** 51:13, 59:6 .
**follow** 5:14, 9:3, 12:15, 47:11,
   111:2 .
**follow-up** 37:20, 77:16 .
**Following** 43:23, 79:21, 109:17 .
**follows** 28:5 .
**Folsom** 122:22, 122:23 .
**foot** 81:24 .
**footnote** 114:16 .
**forbidden** 61:22 .
**forces** 52:25 .
**forcing** 67:6 .
**forego** 71:20, 103:1 .
**FOREGOING** 125:1 .
**forever** 120:5 .
**forfeited** 51:5 .
**forget** 9:20 .
**forgive** 54:17 .
**form** 7:2, 7:8, 37:25, 116:11,
   117:10 .
**formal** 7:9, 104:3 .
**formality** 13:2 .
**FORMAT** 125:5 .
**forms** 107:23 .
**formulated** 71:6 .
**forth** 8:5, 85:25, 100:21 .
**forward** 49:16, 50:23, 81:8 .
**found** 13:23, 75:20, 84:11,
   84:15, 84:16 .
**four** 5:8, 9:17, 39:8, 73:21 .
**fourth** 79:24 .
**Fractus--excuse** 30:23, 30:25 .
**Fractus.** 98:6 .
**Fractus/simplisafe** 36:14 .
**FRACTUS_8960** 44:19, 45:2 .
**frame** 15:25 .
**frankly** 40:25, 62:17 .
**free** 19:23, 19:24, 116:6, 118:17 .
**free-flowing** 6:25 .
**freestyle** 63:1 .
**frequencies** 21:4, 21:6, 21:25,
   22:2, 22:25, 25:13 .
**frequency** 21:7 .
**Friday** 9:6, 10:24, 45:11, 50:11 .
**front** 9:11, 11:16, 11:23, 74:13,
   84:5, 98:14, 122:22 .
**full** 34:3, 54:3, 77:5 .
**fully** 81:6 .
**function** 18:21 .
**functionalities** 19:11, 19:12 .

**Concordance**

**fundamental** 59:21 .
**furnish** 5:25, 7:8, 121:12 .
**furnished** 12:5, 120:10 .
**futile** 48:8 .
**future** 33:12, 106:14 .

.
.

**< G >** .
**game** 69:3, 88:4 .
**gatekeeper** 87:7, 88:14, 88:23, 100:6 .
**gather** 115:4 .
**gave** 48:22, 60:6 .
**general** 31:11, 86:2, 112:8 .
**generally** 34:8, 86:11 .
**generate** 7:6 .
**generation** 79:25, 80:9 .
**gentleman** 29:7 .
**geometry** 86:10 .
**Georgia-pacific** 56:13, 57:7 .
**gets** 61:8 .
**getting** 62:16 .
**gigahertz** 22:1 .
**GILLAM** 2:43 .
**GILSTRAP** 1:24 .
**give** 5:3, 45:8, 48:11, 52:23, 60:2, 99:23, 110:5, 119:15, 119:17 .
**given** 8:18, 12:14, 20:21, 41:2, 45:15, 71:2, 73:25, 89:12, 96:4, 110:3, 124:1 .
**gives** 72:13, 116:21, 119:25 .
**giving** 6:7, 15:1, 41:21, 85:4 .
**GLADEWATER** 2:31 .
**gloss** 55:20 .
**Godfrey** 2:3, 2:11, 2:17, 32:22, 40:23, 122:21 .
**Gorham** 2:47, 4:14, 10:14, 12:12, 53:21, 53:25 .
**gory** 87:14 .
**gotten** 46:13, 73:8, 109:12, 109:14 .
**gradations** 63:20 .
**grant** 27:13, 50:4, 51:2, 51:15, 51:16, 87:6, 88:23, 90:18, 93:3, 96:11, 97:2, 102:2, 106:9, 108:15, 108:21, 108:25 .
**granted** 93:22, 94:11, 97:9, 101:10 .

**granting** 87:18, 108:20 .
**Greg** 120:23 .
**GRINSTEIN** 2:8, 4:9, 19:23, 20:4, 24:19, 58:19, 58:20, 58:22, 58:25, 59:13, 59:18, 59:19, 61:1, 61:11, 64:6, 65:25, 66:3, 67:16, 77:17, 77:19, 82:8 .
**grocery** 115:10 .
**grounds** 27:25 .
**group** 7:25, 113:9 .
**grouped** 17:19, 59:1 .
**guess** 57:2, 72:11, 78:22, 78:24, 89:8, 107:15, 122:13 .
**guidance** 89:13, 91:17, 105:25, 109:13, 109:14, 109:23, 110:3, 110:5, 119:16, 119:17, 120:1, 120:25, 122:2 .
**guided** 22:5 .

.
.

**< H >** .
**hand** 16:2, 24:17, 24:19, 24:20, 24:23, 26:1, 26:6, 89:9, 97:3, 121:10 .
**handed** 75:20 .
**handheld** 13:1, 13:12, 15:13, 15:16, 15:19, 15:23, 15:24, 17:8, 18:3, 18:6, 18:8, 18:13, 23:22, 23:25, 24:5, 24:10, 24:15, 24:25 .
**handle** 59:7 .
**HANOVER** 2:37 .
**happen** 54:6, 84:17, 87:15, 87:18 .
**happened** 48:5, 55:24, 107:21 .
**happening** 32:2 .
**happy** 25:2, 35:18, 35:21, 37:1, 110:22, 119:24 .
**hard** 8:18, 8:19, 12:3, 62:18 .
**hard-wired** 14:15, 14:23, 14:25, 15:6 .
**hardest** 17:23 .
**hardware** 31:13, 32:1, 97:20 .
**harm** 52:15, 52:17, 54:20 .
**head-and-shoulders** 11:12 .
**hear** 5:7, 6:17, 12:20, 14:17, 16:10, 27:9, 27:18, 30:9, 32:17, 39:14, 40:7, 47:23, 51:25, 52:7, 53:8, 56:23, 70:8, 82:24, 83:17, 85:15, 86:4,

91:2, 92:5, 96:24, 102:20 .
**heard** 6:22, 17:4, 17:13, 26:9, 72:7, 78:19, 86:7 .
**hearing** 17:19, 18:4, 33:5, 105:2, 105:14 .
**hearsay** 61:6, 61:10, 61:11, 63:8, 63:21, 71:5, 71:11, 71:14, 113:7, 116:2 .
**heavily** 76:3, 86:8 .
**held** 16:2, 24:17, 24:18, 26:1, 66:21, 67:5, 69:22, 123:22 .
**helpful** 7:3, 8:5, 8:24, 110:23 .
**helpfully** 19:23, 24:19 .
**helps** 8:14, 8:15 .
**HEREBY** 63:12, 67:20, 125:1 .
**heretofore** 81:22 .
**high** 29:11, 36:17, 36:23, 37:16, 57:12 .
**high-level** 5:3, 122:15 .
**higher** 29:15, 30:7 .
**highlighted** 25:14, 36:10 .
**highly** 86:23, 99:5 .
**HILL** 2:23 .
**history** 13:25, 15:17, 41:21, 92:24 .
**Hobson** 72:20, 72:22 .
**hold** 24:20, 74:9, 84:12, 120:5 .
**holds** 115:19 .
**holes** 11:22 .
**holiday** 123:16, 124:3 .
**holidays** 10:24, 45:12 .
**home** 15:2, 33:8, 33:9, 80:19, 83:3 .
**honestly** 50:17, 81:4, 119:7 .
**HONORABLE** 1:24 .
**hopefully** 110:2 .
**hour** 45:25, 50:25 .
**hours** 5:9, 43:20, 55:17, 55:18 .
**house** 14:16, 14:23 .
**housekeeping** 4:18 .
**housing** 14:18, 14:22, 14:23 .
**HOUSTON** 1:44, 2:5, 3:2 .
**hypothetical** 31:4, 31:17, 85:12, 95:10 .

.
.

**< I >** .
**idea** 6:5, 25:19 .
**identification** 101:25, 103:3 .
**identified** 66:5, 69:18, 78:14,

**Concordance**

95:1, 101:14, 101:20, 102:11, 102:16, 103:21, 105:7, 113:11, 113:17, 118:23, 121:5 .
**identify** 13:3, 44:9, 66:13, 70:1, 78:17, 101:17, 104:22, 106:10 .
**Ilario** 29:7, 29:10, 29:13, 29:18, 29:19 .
**illustration** 52:23 .
**imagine** 92:2, 92:17 .
**immediate** 123:6 .
**immediately** 9:20, 123:10 .
**imminent** 52:14, 52:17, 54:20, 54:23 .
**impeachment** 85:20, 86:23 .
**implemented** 9:25 .
**implicated** 90:6 .
**implication** 15:1, 96:14 .
**importance** 85:24 .
**important** 49:11, 70:16, 75:1, 95:8, 96:7 .
**impose** 55:24, 103:9, 103:24, 104:6, 104:18 .
**imposed** 11:12, 57:22, 102:1, 103:4 .
**improper** 58:4, 71:8, 74:3 .
**improper.** 36:10 .
**improperly** 57:23 .
**in.** 88:13, 116:15, 119:13 .
**in/out** 8:5 .
**inaccurate** 44:6 .
**inadequate** 52:16 .
**inadvertently** 9:9, 9:17, 9:19 .
**inappropriately** 39:7 .
**incidents** 85:17, 85:18 .
**inclination** 119:5, 119:6 .
**include** 5:10, 8:24, 8:25, 20:9, 20:10, 33:11, 33:12, 42:10, 42:15, 78:5, 103:12 .
**included** 11:9, 11:22, 42:19, 42:20, 45:1, 59:24, 77:7, 91:10, 92:10 .
**includes** 11:11, 21:25, 33:14, 34:4, 39:12, 81:13 .
**including** 33:7, 41:16, 57:4, 57:7, 76:11, 80:15, 91:19, 97:12, 98:10 .
**inconsistent** 93:10 .
**incorrect** 17:10, 21:1 .
**incremental** 35:12, 35:14, 57:8,

57:10, 57:18 .
**Independence** 45:12, 124:3 .
**indicated** 68:25 .
**indicated--i** 122:24 .
**indicates** 21:13, 24:3, 24:22 .
**indicating** 118:3 .
**indication** 14:10, 14:18, 70:23, 116:21 .
**indicia** 103:14 .
**indirect** 41:10, 41:11 .
**indirectly** 96:13 .
**individually** 23:7 .
**industry.** 80:19 .
**inform** 107:2 .
**informal** 6:23, 7:6, 48:21 .
**informally** 48:22 .
**information** 6:25, 7:20, 8:9, 8:13, 8:16, 40:21, 42:25, 48:17, 49:1, 60:3, 60:6, 60:21, 63:6, 63:7, 74:7, 87:10, 87:22, 93:14 .
**informed** 7:16, 29:19 .
**infringe** 38:16, 77:7, 97:20, 97:21, 98:12 .
**infringed** 34:19, 63:13, 75:12 .
**infringement** 17:2, 17:6, 17:9, 17:11, 18:24, 20:25, 23:18, 25:24, 63:12, 67:25, 68:2, 68:12, 68:14, 68:24, 69:2, 88:7, 95:10, 96:7, 104:12, 105:20 .
**infringing** 19:2, 69:5, 69:10, 69:11, 69:16, 76:25, 78:12, 83:11, 83:13 .
**inherent** 23:17 .
**inherently** 7:14, 117:11 .
**initial** 41:19, 41:23, 101:3, 101:15 .
**initially** 91:24 .
**initiate** 50:22 .
**initiated** 47:4, 80:13 .
**input** 7:5, 71:13 .
**inquiry** 22:4, 63:19, 64:13 .
**insert** 11:24 .
**inside** 86:10, 86:17 .
**install** 22:20, 42:3, 42:5, 43:7 .
**installation** 42:14, 42:15, 43:11, 43:16, 44:7 .
**installations** 42:7 .
**installed** 22:19, 77:5 .

**instance** 41:14 .
**instances** 9:6, 14:21, 77:2, 103:14 .
**instead** 14:6, 18:7, 23:20, 40:1, 46:10, 55:17 .
**instruction** 7:7, 7:17 .
**instructions** 12:8, 41:18 .
**instructive** 16:7 .
**Intellectual** 34:10 .
**intend** 37:2, 55:5, 85:17 .
**intended** 47:15, 47:20 .
**intent** 24:4, 55:5 .
**intentional** 64:1 .
**interact** 18:10, 18:11, 20:7 .
**interacted** 19:24 .
**interest** 48:4 .
**interested** 103:18, 103:19 .
**interests** 7:11 .
**internet** 117:12, 121:3, 121:8 .
**interpretation** 23:1, 23:12, 24:25 .
**interpreted** 20:25 .
**interpreter** 10:4, 10:6 .
**interpreters** 10:11 .
**Interrogatory** 42:3, 43:6, 43:13, 44:1, 44:3, 44:9, 69:9, 75:10, 76:23, 100:23 .
**interrupted** 88:18 .
**intervening** 75:16, 114:10 .
**interview** 60:5 .
**intrinsic** 14:8, 21:22, 24:14 .
**introduced** 86:22, 107:5 .
**introducing** 105:11 .
**invented** 14:11 .
**inventions** 96:8 .
**invokes** 97:11 .
**involve** 31:5 .
**involved** 34:11, 107:22 .
**involving** 17:20, 85:13, 85:18 .
**ipad-type** 19:9 .
**ipads** 23:10 .
**IQ** 20:2 .
**irregular** 105:23 .
**irreparable** 52:15, 52:17 .
**irrevocable** 54:20, 54:22 .
**issued** 43:17, 77:9 .
**issues** 4:19, 5:4, 6:16, 7:3, 14:20, 26:8, 27:2, 31:10, 36:16, 36:20, 47:15, 65:17, 66:4, 74:21, 87:1, 91:19,

**Concordance**

93:15, 106:18 .
**it--where** 65:21 .
**item** 12:17 .
**itself** 10:16, 14:23, 30:16, 32:3, 33:24, 61:9, 87:7, 99:18, 108:9, 108:10, 115:19 .

.

.

**< J >** .
**JAMES** 2:15 .
**January** 75:20 .
**Jeffrey** 79:15 .
**Joe** 4:9, 58:19 .
**Johnny** 2:27, 4:9 .
**join** 53:19 .
**joined** 56:21, 92:23 .
**joint** 110:23, 111:12 .
**jointly** 5:25 .
**JOSEPH** 2:8 .
**Journal** 115:14 .
**JR** 2:27 .
**Judge** 1:25, 17:13, 17:17, 17:19, 18:1, 26:9, 26:10, 26:13, 27:10, 65:20, 66:21, 67:2, 67:5, 67:13, 69:21, 78:7, 79:5, 81:5, 122:22, 122:23 .
**judging** 17:10 .
**judgment** 12:18, 12:24, 14:20, 26:17, 27:4, 27:5, 27:13, 100:16, 101:3, 101:23, 102:2, 103:6, 106:14 .
**JUDICIAL** 125:6 .
**July** 4:21, 45:10, 45:11, 50:12, 50:13, 122:14, 122:17 .
**jump** 15:10 .
**juncture** 39:14 .
**June** 45:9, 46:3, 46:5, 46:24, 47:13, 47:15, 48:3, 48:6, 49:22, 50:21, 51:10, 51:18 .
**juror** 8:6, 10:22, 12:6 .
**jurors** 5:7 .
**justice** 115:11 .
**justification** 51:4, 54:9, 57:24 .
**justified** 77:25 .
**justifies** 56:13 .
**justify** 53:7 .
**Justin** 2:9, 4:8, 32:22, 40:22, 122:20 .

.

.

**< K >** .
**keep** 48:17 .
**keeping** 7:14 .
**Kelsey** 2:21, 4:9, 114:13, 118:14 .
**kind** 17:5, 32:11, 53:5, 53:7, 55:24, 63:8, 85:18, 86:1, 86:24, 87:13, 106:7 .
**know.** 42:16 .
**knowing** 72:18, 120:11 .
**knowledge** 71:12, 97:22, 118:5 .
**known** 104:17, 120:9 .
**knows** 10:1, 10:16 .
**Kyocera** 105:17 .

.

.

**< L >** .
**label** 116:14 .
**Laboratory** 23:15 .
**lack** 46:13, 48:4, 90:10, 113:3, 113:6, 117:2 .
**laid** 24:6, 47:16, 57:3, 57:5, 57:12, 76:17 .
**landline** 87:11, 87:12, 87:21, 88:17, 116:5 .
**language** 11:4, 11:6, 11:7, 22:9, 22:11, 26:18 .
**lapse** 5:4 .
**larger** 36:16 .
**last** 9:5, 9:6, 31:11, 51:19, 59:7, 80:6, 112:2 .
**Lastly** 76:20 .
**late** 67:7, 67:10, 68:8, 69:22, 69:24, 77:24 .
**latent** 16:4 .
**later** 5:20, 10:22, 28:14, 35:21, 37:3, 38:20, 41:15, 89:18, 91:22, 98:1, 109:21 .
**launder** 62:15 .
**law** 16:7, 99:4, 99:7, 101:24 .
**lawsuit** 34:1 .
**lawsuits** 80:13 .
**lawyer** 88:22 .
**lawyers** 8:12 .
**laying** 57:18 .
**lead** 88:22 .
**leading** 88:11, 88:12 .
**leads** 58:1 .
**learn** 107:4 .
**least** 6:6, 9:14, 49:21, 87:9,

91:22, 91:25 .
**leave** 50:4, 50:20, 51:15, 51:16, 51:21, 85:5, 88:22, 96:16, 108:16, 108:20, 108:21, 109:20, 119:14, 120:8 .
**leaves** 113:1 .
**led** 87:21 .
**left** 19:6, 19:18, 44:16, 69:6, 69:14, 97:14, 112:22 .
**leg** 51:19 .
**legal** 11:22, 17:1 .
**lengthy** 81:5 .
**less** 29:19, 80:8 .
**licensed** 31:19, 33:10, 33:11, 33:19, 33:20, 34:3, 104:8 .
**licensee** 33:8 .
**licensees** 31:15, 33:13, 103:10, 103:13, 104:7, 105:16 .
**licensees--for** 105:17 .
**licenses** 32:3, 34:6, 34:19, 90:25, 107:25 .
**licensing** 29:13 .
**life-saving** 85:25 .
**light** 49:3, 51:15, 94:7, 110:3, 116:3 .
**Likewise** 14:23, 15:21, 34:14 .
**limines** 101:9 .
**limit** 80:24 .
**limitation** 18:25, 104:19 .
**limitation-by-limitation** 19:1 .
**limited** 14:21, 45:25, 55:25, 73:20, 79:22, 80:17 .
**limiting** 21:11 .
**line** 22:21, 37:3, 41:13, 47:14, 62:12, 62:14, 63:5, 63:23, 83:21, 86:24 .
**lines** 11:17, 63:19, 85:13 .
**list** 21:5, 25:14, 89:4, 91:10, 91:22, 92:16, 111:15, 112:2 .
**listed** 77:1, 111:16, 113:22 .
**literally** 36:3 .
**litigated** 79:8 .
**litigation** 25:20, 106:24, 106:25, 107:7, 107:19, 107:22, 108:2, 108:7, 108:9, 108:17, 108:22 .
**litigations** 107:14, 107:17 .
**little** 16:21, 48:11, 70:15, 74:25, 87:1, 91:6 .
**live** 11:11, 99:15 .
**LLC** 1:11 .

**Concordance**

**LLP** 2:3, 2:11, 2:17, 2:29, 2:36, 2:43 .
**Local** 52:13, 52:20, 52:23, 53:6, 53:7, 53:16, 53:18, 54:16, 55:2 .
**lodge** 7:10 .
**logic** 31:25, 49:8 .
**long** 19:15, 45:18, 67:4, 85:6, 85:7, 86:12, 95:18, 96:3, 117:8 .
**longer** 17:21, 30:8, 68:14, 88:19, 90:23, 92:22, 112:23 .
**LONGVIEW** 2:25 .
**Look** 8:18, 21:12, 23:18, 23:20, 36:2, 36:7, 37:23, 51:3, 61:17, 84:12, 99:22, 114:7, 115:18, 116:10, 119:20, 120:15, 121:13, 121:23 .
**looked** 67:20, 79:4, 117:7 .
**looking** 41:6 .
**looks** 4:22, 12:17, 28:1 .
**loose** 89:14 .
**lose** 53:11 .
**lost** 20:21, 59:11 .
**lot** 7:24, 59:2 .
**LOUISIANA** 2:4 .
**LTE/IA** 20:11 .
**lump** 33:14 .
**Lunch** 109:10, 110:1, 110:9, 110:14, 110:15 .

.

.

**< M >** .

**M.** 3:1 .
**Machine** 121:16 .
**made-up** 14:7 .
**Magistrate** 17:19 .
**magnetic** 14:5 .
**maintain** 28:16, 51:23 .
**malicious** 44:24 .
**MANHATTAN** 2:12 .
**manner** 22:3 .
**manufactured** 25:20 .
**March** 78:2 .
**mark** 100:12, 103:20, 103:21, 104:8, 104:14, 104:20, 105:11 .
**marked** 89:6, 104:21, 104:25, 105:7, 105:21, 118:2 .
**market** 83:2, 86:3, 105:19,

106:3 .
**marketing** 86:1, 89:5 .
**marketplace** 34:20 .
**marking** 98:4, 100:17, 101:4, 101:22, 102:2, 102:15, 103:9, 103:12, 103:15, 103:19, 103:22, 103:24, 104:3, 104:6, 104:11, 104:18, 104:23, 105:2, 106:3 .
**Markman** 33:5 .
**MARSHALL** 1:3, 1:11, 1:45, 3:3 .
**Martin** 58:18 .
**material** 40:10, 40:25, 48:16, 101:24 .
**MATTER** 9:9, 39:12, 49:20, 54:19, 54:20, 55:9, 58:11, 64:17, 78:11, 83:10, 85:23, 92:23, 99:4, 99:6, 101:7, 101:8, 101:24, 125:3 .
**matters** 4:2, 4:18, 73:8, 93:24 .
**Max** 2:7, 4:7, 82:18 .
**Mcroberts** 1:43, 3:1, 125:9, 125:11 .
**me--'mobile** 14:5 .
**me--137** 30:3 .
**me--against** 30:23, 30:25 .
**me--dr** 76:4 .
**me--non-infringing** 75:21 .
**me--the** 22:15 .
**me--was** 75:5 .
**me--with** 29:18 .
**mean** 26:19, 42:20, 45:17, 48:5, 49:21, 65:7, 67:25, 72:19, 73:20, 74:8, 83:6, 93:5, 98:22, 115:12, 122:16 .
**Meaning** 13:19, 14:3, 14:7, 14:12, 15:15, 15:23, 26:19, 26:20, 26:21, 26:23, 26:24, 26:25, 27:8, 42:21 .
**means** 7:20, 55:17 .
**measures** 44:8 .
**mechanism** 9:15, 102:9, 102:24, 103:1 .
**Media** 76:11, 114:18 .
**mediated** 122:22 .
**mediation** 122:16 .
**meet** 5:18, 30:21, 46:6, 47:18, 89:14, 103:4, 106:6, 109:25, 110:21, 120:2 .
**meeting** 5:16, 109:21 .

**megahertz** 21:25 .
**memorializing** 123:25 .
**memory** 19:11 .
**mention** 37:15, 39:20, 39:21, 61:24, 64:8, 83:24, 92:13 .
**mentioned** 66:4, 68:15, 68:16, 68:19, 71:4, 92:25, 96:1, 116:1 .
**mentioning** 105:10 .
**merit** 38:12, 46:14 .
**merits** 46:13 .
**met** 88:8, 100:13, 101:1, 101:4, 101:21, 102:1, 102:11, 104:7, 104:24 .
**meters** 22:15 .
**method** 14:18 .
**methodologies** 57:16 .
**methodology** 57:19 .
**Michael** 2:40, 4:15, 13:5, 25:9, 27:21, 47:25, 52:9, 108:5 .
**middle** 9:7, 9:11, 9:21, 50:24, 64:4, 78:22, 89:2, 96:24 .
**MIL** 39:12, 84:3, 84:24, 85:4, 85:8, 88:10, 88:23, 89:21, 90:18, 90:22, 93:3, 94:3, 94:8, 96:11, 97:9, 97:10, 100:11, 101:12, 102:23, 106:23, 106:24, 107:12, 108:25 .
**million** 49:10, 83:25, 84:1, 84:12, 84:16 .
**Mills--** 29:18 .
**Mills.** 36:5 .
**Mils** 28:14, 89:12, 89:13, 93:1 .
**mind** 20:4, 93:18, 109:11, 109:20 .
**minimize** 8:1 .
**minute** 82:20 .
**minutes** 4:25, 5:2, 5:11, 5:12, 55:18, 109:9, 120:15 .
**mirror** 51:3 .
**misguided** 54:15 .
**misrepresentation** 117:9 .
**missing** 26:6 .
**misspoke** 13:13 .
**mistake** 48:9, 53:23 .
**misunderstood** 54:16 .
**mobile** 12:25, 13:10, 13:17, 13:22, 14:1, 14:4, 15:9, 15:24, 17:15, 17:21, 20:18, 21:5, 21:13, 21:14, 21:15, 21:17,

**Concordance**

21:24, 22:2, 22:3, 23:1, 23:3, 23:11, 25:13, 25:16, 25:19, 25:20 .
**mobility** 22:8 .
**models** 83:22 .
**modules** 19:11 .
**Monday** 4:21, 45:11, 50:9, 56:19, 123:9, 123:11 .
**monitor** 34:24 .
**monitoring** 33:8, 35:5, 35:6, 80:19, 83:3, 86:13 .
**month** 32:5, 56:15 .
**monthly** 35:2, 58:8, 58:13 .
**months** 66:22, 67:13 .
**moot** 94:6 .
**morning** 4:7, 4:14, 5:17, 5:24, 12:21, 12:22, 16:17, 32:21, 32:23, 47:17, 58:19, 58:21, 106:22, 123:11 .
**motions** 6:17, 6:22, 9:2, 12:13, 39:11, 52:14, 52:21, 58:25, 59:1, 59:2, 59:4, 70:12, 79:13, 82:6, 82:11, 82:12, 82:16, 82:24, 90:6, 109:14, 109:15, 116:4 .
**mount** 14:19, 17:8, 19:22, 19:25, 20:3 .
**mounted** 14:15, 20:15 .
**mounting** 23:10 .
**Movant** 27:18 .
**move** 14:16, 14:24, 15:2, 16:1, 17:25, 19:23, 23:22, 49:16, 56:4, 58:4, 58:16, 65:14, 101:2 .
**moved** 12:23, 26:2, 60:8, 63:9 .
**moves** 27:23 .
**Moving** 12:20, 20:18, 22:10, 22:23, 25:7, 26:5, 66:1 .
**Mr.--excuse** 76:4 .
**multifunction** 13:1, 13:12, 15:13, 18:6, 18:8, 18:14, 24:5, 24:11 .
**multimedia** 19:11 .
**multiple** 27:25, 72:14 .
**murder** 87:17 .
**mutually** 50:8 .
**myriad** 68:20 .
.

**< N > .**

**N.** 2:44 .
**name** 11:13, 11:15, 11:19 .
**named** 29:7 .
**names** 7:13 .
**narrative** 6:3 .
**narrow** 36:20, 97:18 .
**narrowed** 110:4 .
**National** 115:9, 115:14 .
**nature** 43:7, 79:6 .
**necessarily** 39:3, 44:24, 93:14, 115:22 .
**necessary** 7:11, 52:14, 110:5 .
**need** 5:20, 6:12, 8:12, 10:23, 10:25, 11:1, 11:3, 12:5, 12:17, 13:2, 24:17, 46:25, 47:1, 51:3, 51:23, 52:2, 57:2, 66:25, 88:20, 91:6, 91:25, 96:19, 109:15, 119:16, 119:18, 120:1, 122:18, 123:10 .
**needed** 73:7 .
**needs** 87:6, 109:5, 122:6 .
**negotiation** 31:4, 31:17, 31:23, 95:11 .
**negotiations** 31:23, 107:21, 122:16 .
**Netlist** 75:19, 76:13 .
**NEW** 2:13, 11:21, 46:4, 59:6, 78:20 .
**news** 119:6, 119:9, 119:22 .
**Next** 5:24, 11:20, 16:25, 27:14, 44:18, 45:3, 45:11, 50:9, 51:19, 85:11, 116:10, 123:7 .
**night** 5:21 .
**No--i'm** 12:19 .
**No.** 1:5, 4:4, 28:21, 37:1, 37:13, 44:21, 83:1, 84:24, 85:4, 85:8, 85:12, 89:21, 90:19, 90:22, 94:4, 94:8, 96:11, 97:9, 97:10, 100:11, 102:13, 109:1, 115:7 .
**Nokia** 78:24, 78:25, 79:7, 79:8 .
**non-** 68:24 .
**non--argumentative** 5:3 .
**non-accused** 97:19 .
**non-cellular** 87:16 .
**non-disclosure** 81:17 .
**non-infringement** 12:18, 12:24, 26:17, 75:21 .
**non-patented** 35:15 .
**None** 10:14, 12:24, 32:12, 117:2, 117:18 .

**noon** 109:10 .
**nor** 113:23, 113:24 .
**note** 23:8, 66:23, 76:3, 79:20, 92:15, 112:9 .
**note-taking** 11:17, 11:23 .
**notebook** 11:22 .
**notebooks** 10:22, 12:6 .
**noted** 18:5, 18:8 .
**Nothing** 11:8, 26:14, 51:14, 55:12, 56:12, 64:12, 67:17, 102:19, 109:7, 110:12, 122:10, 123:19 .
**notice** 75:24, 77:6, 77:11, 78:9, 106:2, 106:7 .
**noticed** 53:15 .
**notwithstanding** 105:23, 105:25 .
**nourishing** 109:11 .
**nowhere** 56:16, 60:18 .
**nuance** 81:6 .
**Number** 4:22, 8:1, 9:4, 15:16, 21:6, 30:15, 48:21, 49:6, 56:15, 57:7, 64:14, 64:18, 84:17, 90:4, 92:8, 113:21 .
**numbers** 39:24, 42:10, 42:21, 47:14, 62:6, 92:8 .

.

**< O > .**

**oath** 45:17 .
**object** 92:12 .
**objection** 9:12, 85:15, 91:1, 92:12, 97:13, 108:6, 112:6, 113:2, 113:5, 114:12, 121:24 .
**objections** 111:6, 111:9, 111:13, 111:20, 112:1, 116:19, 121:23 .
**obligation** 27:5, 88:1 .
**obtained** 118:15 .
**obtaining** 47:12 .
**obviating** 85:3, 87:25 .
**Obviously** 8:3, 33:2, 46:19 .
**obviously--that** 122:25 .
**occurred** 44:14 .
**occurring** 35:10 .
**occurs** 35:2 .
**offer** 29:21, 46:11, 51:8, 56:16, 80:18, 83:7, 96:5 .
**offered** 71:21, 71:24, 73:13, 95:23, 112:6, 117:25 .

**Concordance**

**offering** 14:3, 29:2, 45:24, 73:24 .

**offers** 15:20, 90:4, 90:8 .

**OFFICIAL** 3:1, 125:12 .

**often** 64:9 .

**Okay** 10:15, 27:14, 30:14, 49:13, 50:3, 54:11, 63:22, 63:23, 66:2, 82:10, 82:23, 89:20, 93:22, 94:3, 95:19, 97:8, 100:5, 105:22, 108:12, 111:22, 113:20, 114:23, 115:4, 118:18, 118:21, 123:18 .

**old** 88:16 .

**omitted** 58:5 .

**on--excuse** 75:5 .

**on/off** 7:23, 8:5 .

**Once** 15:15, 48:1, 71:23 .

**one--but** 105:15 .

**one-hour** 50:7, 50:14, 51:12, 51:13, 56:18 .

**one-person** 117:14 .

**ones** 118:25 .

**ongoing** 32:12, 34:24, 35:2, 122:15, 123:5 .

**online** 113:13, 119:5 .

**open** 44:16, 57:2, 57:13, 95:23, 100:17 .

**opening** 5:10, 5:12, 16:8, 18:5, 18:23, 51:7, 66:20, 67:1, 67:11, 67:24, 68:1, 68:16, 68:17, 69:1, 70:18, 70:22, 75:2, 75:9, 75:23, 76:5, 76:16, 76:19, 77:1, 78:8, 78:9, 79:7 .

**operate** 22:19, 23:6 .

**operated** 22:23, 24:17, 24:18 .

**operating** 21:4, 22:2, 25:13, 41:17 .

**operation** 23:11, 24:25, 117:14 .

**opine** 63:12 .

**opined** 26:4 .

**opines** 92:8 .

**opinion--i** 65:20 .

**opinions--sorry** 75:21 .

**opportunity** 8:19, 45:14, 45:16, 45:21, 49:15, 49:18, 71:17, 71:20, 71:25, 82:4, 93:8, 102:15 .

**oppose** 47:19, 49:9, 72:16, 91:16 .

**opposed** 31:4, 46:17, 89:15,

98:15, 103:7, 115:16 .

**opposes** 82:25 .

**opposing** 121:11 .

**opposition** 37:23, 83:24, 84:4 .

**options** 75:3 .

**oral** 38:17 .

**ordinary** 13:18, 14:3, 14:7, 14:12, 15:14, 15:23, 26:19, 26:20, 26:21, 26:22, 26:24, 26:25, 27:8 .

**origin** 59:23 .

**original** 28:2, 29:9, 30:11, 35:25, 36:7, 57:4, 57:15, 58:3 .

**originally** 91:9, 92:3 .

**other--it** 38:24 .

**otherwise** 39:9, 78:8, 85:7, 90:9, 101:11, 104:20, 112:15, 119:21 .

**ought** 61:2, 109:16, 114:23 .

**out-of-court** 71:7 .

**outage** 15:5 .

**outcome** 54:5 .

**outline** 94:9 .

**outlined** 71:22 .

**outright** 97:3 .

**outside** 22:17, 48:24, 53:11, 61:23, 65:6, 85:5 .

**outward** 87:13 .

**over-speak** 41:4 .

**overall** 83:1, 83:23, 84:18, 84:19 .

**overhead** 84:6 .

**overlap** 59:2, 84:25 .

**overlapping** 60:15 .

**overlaps** 30:24 .

**overlooked** 9:9, 9:17, 9:19, 111:11 .

**overnight** 5:18, 5:25 .

**oversight** 53:20 .

**overture** 46:25 .

**overview** 5:4, 19:4 .

**OWENS** 2:24 .

**own** 26:21, 86:1, 86:3, 93:18 .

.

.

**< P >** .

**p.m.** 5:21, 124:6 .

**pad** 11:22 .

**page** 11:10, 11:13, 11:20, 43:10, 43:19, 43:23, 44:2 .

**pages** 11:17, 11:18, 11:21, 37:24, 45:17, 48:2, 50:6 .

**PALO** 2:36, 2:38 .

**panel** 4:25, 5:3, 14:21, 15:3, 20:2, 20:12, 107:9 .

**panels** 12:25, 14:14, 32:4, 86:12, 86:17, 86:18 .

**papers** 14:18 .

**paragraph** 6:3, 6:7, 29:8, 29:9, 41:11, 56:12, 57:9, 60:4, 60:12, 60:17, 61:17, 63:5, 63:10, 79:20, 79:21, 80:1, 80:3, 80:5, 80:6, 80:12, 80:19 .

**paragraphs** 38:25, 39:8, 39:19, 39:23, 57:6, 57:11 .

**parcel** 116:18 .

**pardon** 22:14 .

**PARKWAY** 2:24 .

**part** 10:19, 36:4, 36:7, 36:12, 36:21, 48:17, 53:20, 54:20, 56:19, 57:8, 58:2, 60:14, 62:10, 63:23, 66:8, 66:9, 75:9, 76:14, 86:13, 92:1, 98:19, 98:23, 112:12, 116:18 .

**particular** 21:7, 24:6, 25:15, 53:2, 57:19, 62:1, 70:6, 100:8, 100:20, 100:22, 101:18, 101:20, 102:12, 102:16, 103:3, 104:23, 106:7, 107:17, 114:21 .

**particularly** 80:18 .

**parties** 5:14, 5:22, 6:6, 9:7, 10:21, 18:5, 26:11, 27:16, 33:17, 42:5, 44:11, 50:9, 50:13, 71:16, 75:6, 82:12, 87:8, 108:2, 111:11, 112:10, 120:2, 122:22 .

**parties.** 80:11 .

**partner** 48:25 .

**party** 6:17, 6:22, 7:10, 9:8, 23:19, 32:8, 34:17, 72:4, 72:14, 81:23, 81:25, 92:3, 98:7, 113:14, 117:3, 121:11 .

**passed** 76:6, 76:18 .

**past** 33:12, 56:5, 71:10, 92:24 .

**Patent** 13:9, 13:10, 13:11, 15:12, 19:8, 21:8, 22:9, 24:3, 24:9, 24:14, 30:24, 60:15, 62:3, 70:23, 92:15, 104:17 .

**Concordance**

patentee 13:25, 15:18 .
patents-in-suit 11:3, 13:14, 34:5,
    78:12, 79:22, 80:8, 80:17,
    86:9, 86:14, 87:10, 87:23,
    96:3, 98:9, 98:12 .
patents-in-suit--this 34:5 .
Pause 15:8, 19:4, 120:19 .
pay 31:19, 32:3, 32:4, 32:5,
    32:8 .
paying 31:18 .
payment 33:18, 34:1 .
Payne 17:13, 17:17, 17:19, 18:1,
    26:9, 26:10, 26:13, 65:20,
    66:21, 67:2, 67:5, 67:13,
    69:21, 78:7, 79:5, 81:5 .
PDA 21:19 .
Pdas 13:22, 21:10 .
peace 93:18, 120:5 .
pen 11:24 .
penalize 55:14 .
penalties 117:9 .
penalty 55:24, 57:22 .
pending 98:3 .
people 7:24, 59:11, 87:15 .
per 4:25, 5:8, 5:9, 5:12, 29:20,
    56:15 .
percent 60:16, 62:6, 64:22,
    89:24 .
percentage 33:18, 33:20 .
peremptory 5:8 .
perfectly 10:1, 34:8, 120:17 .
performing 18:20, 20:25 .
Perhaps 44:25 .
period 52:16, 75:17, 104:19,
    105:4 .
periodical 114:18, 117:11 .
periodicals 114:25 .
permission 59:2 .
permitted 24:2 .
person 52:23 .
personal 21:16, 97:22 .
Personalized 76:11 .
personally 54:3 .
perspective 53:11, 122:24 .
persuade 58:10 .
persuaded 44:5, 48:25, 79:16 .
persuades 88:7 .
persuasive 105:14 .
phone 21:14, 21:16, 21:18,
    53:25, 85:13 .

phones 13:22, 21:10 .
photograph 11:12 .
phrase 13:10, 13:12, 18:6, 24:4 .
physical 23:17, 85:13 .
pick 24:20, 53:25, 123:7 .
picking 45:10 .
pictures 87:14 .
piece 31:11 .
pillage 87:17 .
PILLSBURY 2:35 .
PITTMAN 2:36 .
place 20:20, 22:17, 52:25, 62:18,
    65:4, 96:7, 110:6 .
placed 101:3 .
places 96:8, 110:7 .
plain 13:18, 14:3, 14:6, 14:12,
    15:14, 15:22, 26:18, 26:20,
    26:21, 26:22, 26:23, 26:24,
    27:8 .
Plaintiffs 105:4 .
play 98:24 .
Please 4:1, 11:23, 11:24, 15:11,
    16:15, 18:17, 19:14, 27:22,
    32:22, 36:17, 54:13, 58:21,
    94:18, 110:16, 110:19 .
PLLC 2:23 .
pocket 11:23 .
podium 94:18, 97:14, 106:19,
    106:20, 120:21 .
point 18:2, 22:5, 23:13, 25:21,
    25:22, 26:12, 45:17, 63:20,
    64:5, 64:18, 65:18, 67:9,
    67:16, 67:17, 67:18, 68:3,
    69:8, 69:15, 70:14, 83:14,
    90:7, 97:25, 99:6, 117:25,
    122:13 .
pointed 21:8, 22:1 .
points 25:10, 69:21, 77:21 .
Pope 43:25, 44:7, 44:25 .
Pope--"would 42:17 .
portability 22:8 .
portable 15:16, 17:20, 24:10 .
portfolio 34:11, 70:18, 70:24 .
portfolio-wide 31:3, 70:20,
    103:14 .
portion 7:21, 25:11, 38:7, 38:18,
    80:19 .
pose 45:14 .
position 6:8, 17:22, 18:13,
    30:10, 55:12, 56:25, 61:2,

    61:3, 72:15, 73:12, 73:16,
    92:6, 98:13, 104:5, 105:13,
    105:15, 108:4, 121:21 .
position--and 79:16 .
position--that 79:17 .
positions 6:4 .
possesses 20:3, 20:15 .
possibility 10:15, 51:8, 88:19,
    88:21 .
possible 8:14, 11:17, 47:20 .
possibly 92:17 .
posture 87:7 .
potential 5:16, 11:10, 51:4 .
potentially 9:16 .
power 14:15, 14:25, 15:5, 15:6,
    20:7, 23:5 .
Powerpoint 18:15 .
practical 45:6 .
Practically 45:19 .
practice 5:1, 5:15, 7:12, 7:14,
    32:13, 54:16, 76:10, 93:8,
    100:18, 104:10, 123:2 .
practicing 104:13, 105:18 .
pre-admission 9:1, 109:4,
    109:18, 109:23 .
pre-admit 119:6 .
pre-admitted 9:4, 9:10, 108:18,
    108:20, 108:24, 109:16,
    110:18, 112:16, 116:8, 119:22,
    119:24, 120:9, 121:25 .
precisely 117:18 .
preclude 27:3, 36:12, 58:7,
    93:15, 93:23, 96:15, 97:3,
    97:10, 101:11, 105:10,
    105:11 .
precluded 17:24, 18:12, 20:20,
    24:1, 73:24, 91:23, 93:14,
    95:2 .
precludes 71:17, 81:10 .
predicament 46:3 .
predicate 49:17 .
prejudice 67:6 .
prejudicial 86:23, 99:5 .
prepare 10:21 .
prepared 6:1, 43:1, 46:11,
    46:18 .
preparing 111:12 .
preponderance 88:6 .
PRESCRIBED 125:5 .
prescriber 29:20, 58:7 .

**Concordance**

**present** 8:4, 33:12, 40:16, 50:14, 59:23, 66:20, 82:4, 97:6, 99:18, 101:8 .
**presentation** 16:19, 81:18, 90:20 .
**presentation--i** 76:22 .
**presented** 6:13, 6:15, 12:3, 57:24, 96:12, 100:15 .
**presenting** 36:12, 95:3, 95:5, 96:15 .
**presents** 10:16 .
**PRETRIAL** 1:21, 4:2, 9:16, 38:20, 45:9, 50:24, 52:18, 54:21, 65:12, 81:5, 122:5, 123:24 .
**pretty** 106:2, 118:23 .
**preview** 38:20 .
**previewing** 108:12 .
**previous** 98:5 .
**previously** 68:12, 81:21, 90:19, 93:4, 93:13, 93:24, 94:1, 105:20 .
**price** 65:7 .
**primarily** 113:3, 117:2 .
**primary** 113:5, 117:18 .
**principles** 31:20 .
**printed** 11:2 .
**printout** 121:8 .
**prior** 9:23, 28:24, 45:22, 71:14, 72:19, 82:12, 94:10, 98:20, 107:17, 108:22, 110:3 .
**priority** 86:14 .
**privileged** 42:25 .
**probably** 4:22, 5:5, 8:17, 22:16 .
**probative** 85:9, 87:19, 93:15, 93:24, 95:4, 95:7, 95:22, 97:5, 115:12 .
**probe** 7:3 .
**problem** 12:15, 14:7, 45:24, 54:7, 59:14, 60:10, 66:9, 68:11, 69:4 .
**problems** 6:5 .
**procedural** 101:7 .
**procedurally** 57:22 .
**Procedure** 6:18, 114:22 .
**proceed** 16:16, 27:22, 58:21, 59:17, 87:17, 123:25 .
**PROCEEDINGS** 124:6, 125:3 .
**proceedings.** 120:19 .
**process** 5:19, 9:16, 10:18,

18:10, 59:12, 89:16, 98:23, 108:16, 122:5, 123:24 .
**processing** 18:15, 19:10 .
**produce** 42:6, 103:13 .
**produced** 43:8, 43:12, 44:9, 48:23, 113:14, 113:24, 115:5, 115:6, 116:14, 121:20 .
**product** 33:11, 33:15, 33:19, 33:20, 33:22, 41:13, 76:22, 96:6, 102:12, 102:13, 104:20, 105:7, 105:12 .
**proffered** 50:6 .
**profit** 57:12 .
**profits** 35:12, 35:14, 57:8, 57:10, 57:18, 83:2 .
**program** 41:12 .
**progress** 110:9 .
**project** 25:18 .
**proof** 67:23, 88:1 .
**proper** 7:7, 7:15, 22:4, 60:9 .
**properly** 56:22, 67:21, 68:6, 68:9, 76:13, 77:12 .
**proposal** 28:9, 28:16, 28:23, 29:1, 30:8, 32:10, 36:9, 36:19, 36:22, 38:22, 39:2, 57:1, 89:22, 90:11, 90:21 .
**proposal.** 36:14 .
**proposed** 15:21, 18:9, 20:24, 28:1, 37:25, 41:20, 45:8, 48:1, 81:12, 82:25, 84:24, 85:11, 87:5, 89:21, 94:3, 113:18, 121:5 .
**proposes** 48:14 .
**proposing** 26:11 .
**proprietary** 7:20 .
**prosecution** 15:19 .
**protect** 88:21 .
**protecting** 7:20 .
**protections** 62:25, 65:8 .
**protective** 40:13, 40:17 .
**protects** 81:23, 81:25 .
**proven** 30:17, 32:13 .
**proves** 21:16 .
**provide** 12:1, 19:4, 42:3, 43:14, 48:25 .
**provided** 14:9, 26:4, 33:13, 60:22, 75:10, 75:13, 86:12, 94:25 .
**provides** 33:8 .
**providing** 106:7 .

**provision** 9:25, 86:11, 96:2 .
**provisions** 80:21, 104:17 .
**public** 8:11, 113:23 .
**publication** 113:13, 114:19, 115:9 .
**publications** 115:13 .
**publish** 117:12 .
**published** 113:13 .
**punched** 11:22 .
**punted** 62:20, 73:5 .
**purchase** 42:4, 43:7, 43:16, 43:22, 43:25, 44:4, 44:7, 44:19, 45:1 .
**purchases** 41:15, 42:10, 48:18 .
**purchasing** 43:11 .
**pure** 61:6, 71:5 .
**purports** 114:18, 115:21, 119:9 .
**purpose** 15:3, 15:4, 95:4, 95:7, 95:20, 95:22 .
**purposes** 28:15, 68:9, 79:23, 85:20 .
**pursuant** 6:17, 6:23, 27:4 .
**put** 5:9, 8:17, 11:15, 11:16, 55:17, 58:10, 60:20, 62:24, 63:13, 64:15, 65:10, 67:4, 67:11, 68:1, 72:20, 73:2, 81:8, 87:7, 88:6, 98:14, 100:21 .
**puts** 62:17 .
**putting** 77:20 .
**PX** 89:4, 111:6, 111:7, 111:9, 111:10, 111:13, 111:14, 112:23, 113:1, 113:5, 113:17, 113:18, 113:19, 118:22, 118:24, 119:5, 119:6, 119:12, 119:13, 119:21, 119:22, 121:21, 121:25 .
. 
. 

**< Q >** .
**Q&as** 114:10 .
**quacks** 95:20 .
**qualify** 24:13, 121:11 .
**quantified** 31:7 .
**quantify** 35:14 .
**queried** 61:8 .
**query** 45:16, 47:1 .
**question** 20:18, 23:12, 23:21, 24:7, 28:6, 29:1, 30:5, 35:5, 44:16, 45:6, 60:19, 62:3, 62:21, 90:1, 98:3, 99:23,

**Concordance**

105:6, 115:24, 118:21, 119:4 .
**questioned** 74:2 .
**questioning** 32:25, 86:24, 98:3 .
**questionnaire** 8:7 .
**questionnaires** 8:10, 8:13,
  8:17 .
**Questions** 12:7, 12:9, 12:11,
  15:8, 15:11, 23:23, 25:3, 25:5,
  27:3, 62:7, 72:24, 73:2, 73:5,
  74:4, 74:6, 74:10, 82:7, 93:19,
  110:10 .
**quick** 39:24, 77:21 .
**quickly** 11:19 .
**quite** 50:17, 57:12, 81:4, 119:7 .
**quote** 17:22, 17:23, 21:4, 22:10,
  23:14, 101:18, 119:5 .
**quotes** 18:23 .

.

.

**< R >.**
**Rader--do** 42:9 .
**raise** 51:6, 96:14 .
**raised** 58:2, 92:21 .
**raises** 65:17, 66:3 .
**range** 24:6, 24:9, 24:11, 28:21,
  29:2, 29:11, 29:16, 30:7,
  36:18, 36:23, 37:16, 39:21,
  56:11 .
**Ranjini** 2:41, 4:16, 70:10, 83:19,
  86:6, 91:3, 97:15, 102:21,
  110:19 .
**rape** 87:17 .
**rapid** 7:23 .
**rarely-used** 52:22 .
**rate** 32:7, 34:18, 58:8, 58:13 .
**rather** 24:16 .
**rationale** 81:20 .
**re-engage** 122:25 .
**reach** 90:8, 110:21 .
**reached** 9:13, 64:22, 80:15,
  112:13, 114:4 .
**read** 76:6, 110:23, 111:1 .
**reading** 53:6, 53:7 .
**ready** 4:11, 4:16 .
**real** 39:24, 82:2, 85:12, 116:7 .
**real-world** 45:6 .
**realities** 85:6 .
**reality** 26:10 .
**realization** 9:14 .
**realize** 9:18 .

**really** 31:7, 31:14, 35:20, 64:20,
  70:22, 75:14, 79:3, 100:18,
  107:11, 116:23, 123:5 .
**reargue** 98:12 .
**reason** 28:16, 32:6, 48:16, 82:2,
  88:15, 91:8, 98:15, 102:10,
  119:4 .
**reasonably** 18:20, 23:11, 24:24,
  26:1, 26:2 .
**reasoning** 31:16, 73:12, 81:20 .
**reasons** 15:24, 28:4, 32:15,
  64:14, 72:8, 117:16 .
**reasons--there** 94:12 .
**rebuttal** 66:20, 67:2, 67:5, 67:12,
  68:19, 69:23, 70:1, 70:2, 74:1,
  75:14, 75:15, 75:22, 76:5,
  76:14, 78:1, 81:9, 81:16,
  81:19, 82:2, 82:3, 91:11,
  92:1 .
**recall** 68:7, 117:8 .
**receipt** 44:19 .
**receive** 25:18 .
**received** 53:21 .
**recent** 103:11 .
**recess** 109:10, 110:13, 124:4 .
**recess.** 110:15 .
**rechargeable** 20:14, 20:16,
  22:24, 23:5, 24:24 .
**recognized** 115:16 .
**recommending** 29:15 .
**RECORD** 4:5, 6:24, 7:9, 7:21,
  13:3, 14:9, 26:4, 32:9, 40:3,
  56:16, 110:23, 111:1, 123:20,
  124:1, 125:2 .
**record.** 123:22 .
**recover** 104:19 .
**Recreational** 106:1 .
**recurring** 35:2 .
**refer** 7:19, 8:7, 14:19, 16:6,
  31:13, 72:7, 107:7, 107:13,
  107:17 .
**reference** 29:8, 56:13, 90:5,
  91:23, 92:1, 94:1, 98:16,
  106:5, 108:11, 108:17 .
**referenced** 27:16, 57:9, 108:19,
  112:11, 114:1 .
**referencing** 57:11, 108:9,
  114:21 .
**referred** 18:14, 25:11 .
**referring** 24:16, 39:23, 91:24,

98:5, 98:24 .
**refers** 19:20, 22:2, 24:5, 25:17 .
**reflect** 34:3, 42:21, 42:22, 44:1,
  46:22 .
**reflected** 31:8 .
**reflecting** 42:6 .
**reflects** 34:1, 44:4, 44:6 .
**regard** 5:15, 5:16, 7:2, 9:3,
  26:16, 38:3, 50:3, 58:12,
  79:14, 80:23, 81:2, 83:15,
  84:23, 87:5, 109:23, 112:6 .
**regarding** 6:9, 6:12, 9:2, 23:14,
  36:13, 43:15, 50:20, 81:8,
  82:12, 87:10, 89:22, 90:20,
  90:24, 98:20, 106:24, 109:4,
  121:8 .
**regards** 8:9, 119:11 .
**rejected** 36:9 .
**rejection** 28:3 .
**relate** 39:12, 61:15, 97:4, 98:21 .
**related** 33:8, 38:9, 39:11, 60:17,
  74:23, 79:12, 95:21, 96:20 .
**relates** 60:12, 66:10, 94:15,
  94:22, 97:11, 108:22 .
**relating** 92:8, 122:5 .
**relation** 70:14 .
**relative** 83:2, 84:18 .
**relatively** 46:20, 46:21 .
**relegated** 82:1, 82:3 .
**relevance** 87:1, 87:9, 87:11,
  87:19, 93:15, 93:23 .
**relevant** 33:2, 42:3, 91:18,
  92:18, 93:12, 107:14 .
**reliability** 116:24, 117:5, 119:11 .
**reliable** 115:16, 117:11, 119:8 .
**reliance** 28:22, 28:25, 36:9 .
**relied** 30:8, 60:21, 91:12,
  107:12 .
**relief** 28:2, 51:2, 51:14, 58:7,
  79:18, 97:16 .
**relies** 42:5, 76:3 .
**rely** 28:17, 60:25, 61:6, 63:8,
  71:5, 71:11, 71:12, 81:1 .
**relying** 41:1, 71:7, 72:6 .
**remainder** 11:16, 111:10, 113:2,
  118:22 .
**remaining** 15:12, 76:24, 111:25,
  122:2 .
**remarks** 16:8 .
**remind** 7:12, 8:10, 9:24 .

**Concordance**

**render** 71:8 .
**rendered** 84:10 .
**rendition** 112:6 .
**reopened** 40:18, 52:1, 52:3 .
**repeat** 53:23, 63:14, 66:8 .
**replete** 27:2 .
**reply** 47:16 .
**REPORTER** 3:1, 125:12 .
**reports** 12:2, 12:3, 46:20, 60:5, 66:23, 67:24, 69:1, 75:2, 75:9, 76:9, 76:19, 78:6, 78:8, 79:7, 91:11, 114:5, 114:19 .
**represent** 76:7, 118:9 .
**representation** 40:21, 121:12 .
**representations** 43:18, 45:1 .
**representative** 35:3, 43:9, 43:15, 44:18, 113:11, 118:3 .
**represented** 43:24, 44:23 .
**represents** 8:11 .
**request** 7:22, 8:3, 50:19 .
**requests** 41:23 .
**require** 19:9, 50:6, 51:11, 96:16, 104:7, 104:14 .
**required** 15:6, 22:8, 22:20, 30:20, 48:23, 100:13, 100:25, 104:20, 105:21, 106:3 .
**requirement** 102:15, 103:10, 103:12, 103:15, 103:19, 103:20, 103:22, 103:24, 104:6, 104:12, 104:18, 104:24, 105:2, 106:7 .
**requires** 61:12, 104:21, 105:15, 106:8 .
**resemblance** 22:22 .
**reservation** 28:12 .
**reserved** 34:12 .
**residences** 85:14 .
**resolution** 123:14 .
**resolve** 5:23, 110:2, 120:1 .
**resolved** 17:24, 120:2 .
**resolves** 122:2 .
**resources/cellular** 121:19 .
**respective** 113:8 .
**respond** 54:12, 81:11 .
**responded** 43:5 .
**responses** 73:11 .
**responsibility** 54:3, 55:7 .
**responsible** 74:9 .
**responsive** 49:7 .
**rest** 30:9, 70:21, 80:5, 102:23 .

**result** 56:11, 94:23, 107:7, 108:2 .
**resulted** 64:2 .
**retain** 8:16 .
**retaining** 8:13 .
**return** 8:19 .
**returned** 98:2 .
**Returning** 18:18 .
**revenue** 33:20, 35:2, 35:9, 83:11 .
**revenues** 36:13, 38:6, 38:9, 83:2 .
**reversed** 78:7 .
**review** 7:8 .
**reviewed** 60:13 .
**rights** 28:13 .
**rises** 94:9, 94:13 .
**risk** 6:15, 86:20, 117:5 .
**RMR** 1:43, 3:1, 125:11 .
**Robert** 27:15, 36:5, 38:5, 51:20, 56:5 .
**rock** 62:17, 62:18 .
**RODNEY** 1:24 .
**rolling** 6:11 .
**room** 91:6, 93:2, 109:25, 110:1 .
**roughly** 84:16 .
**round** 67:7 .
**royalty** 32:7, 32:12, 34:18, 48:14, 58:8, 58:13, 84:11, 84:14, 84:15, 84:16 .
**Rule** 6:11, 6:18, 6:23, 27:4, 52:20, 54:16, 55:2, 61:12, 61:13, 63:15, 64:15, 78:21, 78:24, 79:1, 79:7, 89:12, 114:24 .
**ruled** 6:22, 11:17 .
**Rules** 6:18, 52:13, 52:23, 53:6, 53:7, 63:16, 114:22 .
**ruling** 39:3, 39:7, 39:10, 39:19, 75:3, 81:6, 88:9, 90:8, 90:12, 94:7, 94:14, 94:22, 119:21 .
**rulings** 82:5, 91:15, 94:10, 94:24, 109:13, 109:14, 123:25 .

.

.

**< S >** .
**S/shawn** 125:9 .
**said--no** 90:20 .
**sales** 38:6, 38:8, 41:7, 41:9,

83:11, 83:13, 83:25, 84:1 .
**Samsung** 79:24, 107:20, 108:8, 108:11 .
**sanctionable** 53:5 .
**sat** 71:3, 72:7 .
**satisfied** 73:10 .
**satisfy** 101:15 .
**save** 35:19, 109:3 .
**saw** 50:19, 70:18, 70:22, 71:23 .
**saying** 25:22, 29:14, 29:21, 32:3, 43:5, 44:23, 49:11, 93:19 .
**says** 4:6, 25:13, 29:5, 29:17, 36:8, 62:23, 64:15, 67:19, 72:12, 80:1, 80:7, 80:12, 94:9 .
**scan** 8:15 .
**scare** 85:21 .
**scenarios** 85:12 .
**scenes** 87:14 .
**schedule** 46:10 .
**scheduled** 52:18, 54:22, 109:24 .
**scope** 37:22, 61:23, 65:6, 85:5, 85:6, 96:8 .
**screen** 19:20, 20:3, 20:4, 21:2, 36:11, 41:7, 60:4 .
**screens** 19:10, 23:9, 24:22 .
**scroll** 114:6, 116:21 .
**scrutinized** 54:8 .
**seal** 8:2, 51:23, 89:8 .
**sealed** 40:10, 40:15 .
**sealed.** 40:19 .
**sealing** 7:21, 7:22 .
**seated** 4:1, 110:16 .
**SEATTLE** 2:19 .
**SEC** 117:20, 118:1, 118:11, 118:15, 118:19, 118:22, 119:7 .
**second** 31:13, 41:12, 66:9, 67:16, 68:3, 111:8, 123:21 .
**secondly** 61:21 .
**Section** 33:10, 33:16, 39:20, 39:21, 57:9 .
**sections** 57:11 .
**Securities** 116:12, 117:10, 119:23 .
**security** 14:14, 15:3, 33:9, 83:3 .
**seeking** 72:4 .
**seeks** 85:12, 97:10 .
**seemed** 28:12 .

**Concordance**

**seems** 28:17, 100:16, 117:10 .
**seen** 14:17, 114:18 .
**sees** 41:11 .
**segregate** 7:25 .
**select** 4:24, 5:7 .
**selecting** 5:10 .
**selection** 58:4, 108:16 .
**self-authenticating** 114:25 .
**sell** 41:13, 105:19 .
**sells** 17:23, 34:25 .
**send** 55:21, 55:22, 110:23 .
**sensational** 88:15 .
**sense** 31:21, 49:9, 53:24 .
**sent** 42:1 .
**sentence** 80:4, 80:7 .
**sentences** 79:21 .
**separate** 31:23, 65:17, 66:3, 103:25, 114:4, 115:24 .
**separately** 29:24, 31:19, 32:1, 32:5, 70:6 .
**series** 64:1, 75:25 .
**seriously** 54:19 .
**serve** 43:6, 95:7, 100:6 .
**service** 33:15, 35:9, 86:15 .
**services** 33:8, 33:12, 33:21, 33:23, 34:23, 38:8, 86:11, 86:13, 86:19, 96:2 .
**SESL** 76:12 .
**set** 4:2, 4:21, 17:19, 52:18, 76:20, 76:22, 108:8 .
**settled** 33:5 .
**settlement** 33:24, 60:14, 60:16, 122:16, 123:5 .
**settlements** 80:16 .
**settling** 34:1 .
**seven** 66:13, 66:18, 67:9, 68:4, 68:6, 75:6, 76:20, 81:12 .
**several** 61:4, 65:20, 77:2, 80:13 .
**severe** 117:8 .
**shared** 13:20, 25:12 .
**sharing** 72:23, 73:13 .
**SHAW** 2:35 .
**SHAWN** 1:43, 3:1, 125:11 .
**shawn_mcroberts@txed.uscourts.gov** 1:47 .
**shift** 76:8, 106:11 .
**shifts** 104:25 .
**shoe** 81:24 .
**short** 45:23 .

**shorten** 52:16 .
**shouldn't** 62:24, 65:7, 97:14, 100:20 .
**show** 16:25, 84:7, 88:1, 89:5, 97:6, 104:25 .
**showed** 78:2 .
**showing** 11:3, 23:3, 60:4, 61:20, 88:3 .
**shown** 43:25, 98:6, 98:8, 108:24, 112:11 .
**shows** 118:1 .
**side** 4:24, 4:25, 5:8, 5:9, 5:11, 5:12, 6:3, 9:12, 9:16, 9:20, 12:1, 64:3, 64:7, 64:9, 71:14, 76:22, 81:10, 82:7, 89:14, 115:6 .
**side-by-side** 11:6 .
**sides** 9:23, 10:25, 38:22, 38:23, 64:2, 89:24, 108:15 .
**sight** 53:11 .
**signal** 55:22, 87:12 .
**signals** 54:10 .
**signed** 53:15 .
**significance** 55:6 .
**significant** 18:21, 119:10 .
**significantly** 54:15 .
**silence** 49:23 .
**similar** 18:3, 22:11, 84:17 .
**Similarly** 15:13, 20:1, 20:2, 20:15, 80:13 .
**simple** 83:9, 83:16 .
**Simply** 8:10, 8:17, 9:18, 11:15, 17:10, 21:1, 26:12, 31:6, 33:21, 39:8, 55:20, 80:23, 83:7 .
**simulations** 112:9 .
**sincere** 54:15 .
**sincerely** 54:19, 55:1 .
**single** 6:3, 6:6, 11:3, 62:2, 62:7, 62:21 .
**single-sided** 11:2 .
**singularly** 27:17 .
**sir** 16:22, 56:8, 82:22 .
**sit** 86:17 .
**sits** 14:22, 15:25 .
**sitting** 86:10 .
**situation** 18:3, 62:17, 63:10, 88:3, 95:18 .
**six** 45:17, 48:2, 50:6, 58:3, 68:11, 68:18, 69:5, 69:10, 69:12,

69:17, 70:20, 75:6, 76:24, 80:14, 91:14, 123:11 .
**six-page** 45:8, 47:2, 48:14, 49:4, 51:13, 51:17 .
**sixth** 44:15 .
**size** 19:20, 24:6, 24:11, 24:16, 84:18, 84:19 .
**skip** 35:17 .
**skunk** 96:25 .
**slap** 55:21 .
**sleek-looking** 20:12 .
**slide** 6:2, 16:25, 19:6, 20:1, 20:11, 24:8, 44:22, 76:21 .
**slides** 6:5, 16:19, 17:18, 18:11, 18:15, 58:23 .
**slightly** 31:6 .
**slow** 16:21, 19:14 .
**slowly** 114:7 .
**smartphone** 19:11, 24:12 .
**smelled** 97:1 .
**SMITH** 2:23, 2:43 .
**SMYSER** 2:15, 4:9, 16:12, 16:14, 16:17, 16:22, 16:24, 17:12, 17:15, 18:18, 19:16, 19:18, 21:21, 23:25, 25:6, 25:11, 25:22, 42:1, 112:8, 112:17, 120:14, 120:17, 120:18, 120:20, 120:23, 121:3, 121:14, 121:17, 122:1 .
**sold** 77:4 .
**solution** 121:9 .
**somebody** 39:7, 118:11 .
**somehow** 93:5, 95:15 .
**someone** 14:21, 31:17, 88:18 .
**sometime** 50:12 .
**somewhat** 72:20, 105:23 .
**soon** 10:1, 46:3, 123:12 .
**sorry** 37:11, 39:15, 65:16, 65:18, 80:2, 94:19, 113:19 .
**sorry--138** 12:19 .
**sort** 61:18 .
**sought** 28:2 .
**sound** 31:16 .
**Sounds** 111:4 .
**source** 61:6, 61:10, 61:11 .
**speaking** 45:19 .
**specific** 76:20, 85:17, 86:10, 86:16, 99:21, 106:8, 106:10, 107:16 .
**specifically** 14:1, 16:1, 16:6,

**Concordance**

17:6, 26:23, 33:6, 33:10, 57:7, 57:10, 71:23, 91:12, 100:22 .
**specification** 13:20, 13:21, 15:15, 20:23, 21:3, 22:1, 22:9, 22:12, 24:3, 24:7, 25:12 .
**specifications** 15:7 .
**specificity** 88:12 .
**spectrum** 14:5, 21:25, 25:15, 25:16, 25:20, 115:15, 115:17 .
**speeches** 96:24 .
**speeding** 52:24 .
**spelled** 83:6 .
**spend** 7:24, 37:23, 109:11 .
**spoken** 29:13 .
**sponsor** 65:4 .
**sponsoring** 99:2 .
**spreadsheet** 42:10, 42:17, 44:19 .
**spreadsheets** 18:11, 44:10 .
**squandered** 51:9 .
**ST.** 2:4 .
**staff** 5:20, 110:6, 110:8, 123:15 .
**stage** 27:6 .
**stamp** 121:7, 121:20 .
**stand** 85:19, 110:13 .
**Standard** 17:1, 17:10, 18:18, 18:19, 18:22, 18:23, 85:4, 85:8, 93:1, 108:25 .
**standards** 30:21, 115:19 .
**standards--in** 21:6 .
**Standing** 7:19, 9:3, 9:15, 9:25, 91:20, 106:23, 109:18 .
**stands** 4:22, 19:19, 124:4 .
**stares** 9:24 .
**start** 16:24, 32:24, 59:19, 113:7, 120:11 .
**started** 9:14 .
**starting** 46:3, 80:4 .
**starts** 90:11 .
**state** 100:23 .
**stated** 43:19, 97:16 .
**statement** 5:12, 23:17, 96:13, 121:11, 122:13 .
**statements** 5:10, 72:19, 115:23, 116:5, 117:5, 117:6 .
**STATES** 1:1, 1:25, 7:15, 43:21, 125:7 .
**station** 80:14 .
**statute** 104:18, 117:7 .
**statutory** 104:22 .

**stay** 96:22, 119:13 .
**stays** 85:6 .
**STE** 2:4 .
**step** 47:18 .
**steps** 47:17 .
**sticking** 37:15 .
**stipulate** 36:25 .
**stipulation** 75:4 .
**stool** 51:20 .
**stop** 5:5, 28:6, 45:5, 49:2, 60:19, 105:10 .
**stops** 52:25 .
**store** 115:10 .
**stories** 85:17 .
**story** 27:11 .
**strategic** 64:10, 72:8 .
**strategy** 72:24 .
**stream** 35:2 .
**STREET** 1:44, 2:18, 2:37, 3:2 .
**strength** 83:2 .
**stricken** 28:23, 76:1 .
**strike** 21:24, 34:11, 38:1, 38:25, 56:11, 58:12, 58:17, 79:15, 79:20, 80:1, 80:6, 80:12, 80:22, 81:12 .
**striking** 39:8 .
**strong** 57:14 .
**struck** 80:20, 80:25 .
**structure** 88:18, 109:18 .
**structured** 71:16 .
**stuff** 48:23 .
**subject** 40:13, 40:17, 54:20, 61:2, 71:9, 72:22, 78:3, 87:13, 88:17, 91:20, 103:15, 103:21, 104:11, 104:13, 104:23, 116:2 .
**subjected** 61:8, 61:19 .
**submission** 111:12, 117:21 .
**submit** 22:21, 24:22, 76:8 .
**submitted** 23:2, 75:8, 76:5, 76:16, 77:13, 98:22, 116:12, 117:20, 118:1, 118:4 .
**subpart** 52:21 .
**subpoena** 113:24 .
**subscriber** 56:15, 58:13 .
**subscription** 36:13, 38:6 .
**subsidiary** 115:20 .
**substance** 57:25, 58:1, 72:1, 102:7, 122:18 .
**substantial** 33:6 .

**substantially** 110:4 .
**substantive** 73:8, 82:11, 100:16, 101:6, 101:10, 101:23, 103:2, 109:13 .
**substantively** 58:6, 118:12 .
**substitute** 27:5 .
**successful** 80:11 .
**succession** 7:23 .
**succinctly** 30:5 .
**such.** 44:1 .
**sued** 107:3 .
**suffer** 72:17 .
**sufficient** 48:8, 67:7, 114:17 .
**sufficiently** 34:18 .
**suggest** 49:3, 106:13 .
**suggested** 12:15, 22:4, 25:24 .
**suggestions** 7:10 .
**suggests** 30:18 .
**suit** 78:15 .
**SUITE** 2:18, 2:44 .
**sum** 33:6, 33:14 .
**summarize** 84:8 .
**summary** 12:18, 12:23, 14:20, 26:16, 27:3, 27:13, 100:16, 101:2, 101:23, 102:2, 103:6, 106:14 .
**summons** 8:11 .
**supplemental** 35:20, 43:6, 43:20, 44:3, 44:12, 44:15, 46:1, 46:12, 46:18, 46:20, 46:22, 46:23, 47:16, 48:1, 48:2, 49:7, 51:22, 56:20 .
**supplemented** 44:1, 58:9 .
**supplementing** 44:8 .
**supply** 14:16, 15:1 .
**support** 14:22, 29:11, 30:6, 57:1, 74:16 .
**supported** 39:9, 58:8, 108:19, 108:23 .
**supporting** 94:12, 99:2 .
**supports** 39:6 .
**supposed** 115:12 .
**Supreme** 115:11 .
**surprise** 77:10 .
**surprised** 6:4, 46:17 .
**surprises** 9:22 .
**surrendered** 92:22 .
**survived** 5:18 .
**survives** 89:16 .
**surviving** 5:25 .

**Concordance**

**Susman** 2:3, 2:11, 2:17, 32:22, 40:22, 122:20.

**suspect** 68:23.

**system** 41:16, 87:11, 87:12, 87:16, 121:19.

**systems** 20:13, 33:9.

.

.

**< T >**.

**tab** 11:19.

**tabbed** 11:18.

**table** 14:22, 16:1, 19:22, 19:25, 20:2.

**tabletop** 14:19.

**taint** 85:21.

**talked** 48:24, 57:16, 57:17, 71:1, 116:3.

**talks** 15:16, 57:10.

**tamper-proof** 22:18.

**tapping** 20:4.

**targeted** 49:19, 55:25, 106:8, 110:4.

**tax** 31:12, 32:1.

**teach** 7:18, 64:11.

**tech** 97:12, 98:8, 98:17, 98:22, 98:25.

**technical** 6:16, 59:23, 60:1, 60:2, 61:1, 63:8, 64:10, 71:1, 71:2, 72:5, 72:15, 80:7, 87:1, 98:11.

**technologies** 20:17.

**technology** 48:25, 60:7, 87:20, 88:11, 88:17, 88:19, 96:1.

**tenacious** 123:3.

**tendered** 51:18.

**term** 13:17, 13:18, 14:1, 14:5, 14:6, 14:7, 14:10, 15:18, 15:22, 20:25, 21:17, 23:12, 24:15, 25:1, 26:22.

**terminal** 11:15.

**terms** 15:22, 16:7, 16:8, 17:20, 17:22, 26:20, 27:8, 36:3, 37:4, 53:9.

**terrible** 87:14.

**test** 64:2, 64:3, 65:11, 71:17, 71:25, 79:18, 81:25.

**testable** 71:13.

**testified** 95:13, 103:8.

**testify** 10:4, 12:2, 43:9, 43:15, 65:7, 74:7, 74:10, 116:6.

**testimony** 6:10, 6:13, 7:13, 8:1, 27:15, 27:19, 27:24, 29:17, 36:5, 36:13, 38:4, 41:14, 44:25, 74:15, 86:22, 94:12, 94:15, 94:16, 94:22, 94:25, 96:12, 97:11, 97:18, 98:24, 99:9, 100:20.

**TEXAS** 1:2, 1:11, 1:45, 2:5, 2:25, 2:31, 2:45, 3:3.

**text** 8:23, 8:24.

**thanks** 23:5, 53:21.

**that--that** 48:9.

**that.** 42:13.

**themselves** 40:17, 74:22, 118:17.

**thereto** 38:9.

**they've** 9:17, 11:15.

**thinking** 28:25, 76:8, 76:15.

**thinks** 16:5.

**third** 13:11, 23:19, 33:7, 42:5, 80:9, 80:11.

**third-party** 23:16, 23:17, 42:7, 61:10, 61:11, 113:15, 113:21, 113:24, 121:10.

**though** 20:6, 60:10, 64:13, 66:16, 81:14, 95:19, 99:8, 108:8.

**thousands** 34:12.

**three** 5:2, 11:22, 13:8, 13:14, 31:5, 36:21, 58:25, 59:10, 69:5, 69:13, 69:16, 70:12, 78:15, 79:12, 82:6, 110:7.

**three-legged** 51:20.

**three-ring** 6:1.

**threshold** 100:12, 100:25.

**throughout** 48:21.

**throwing** 52:24.

**throws** 52:24.

**Thursday** 10:24, 45:11.

**Tim** 42:9.

**timeline** 47:16.

**timely** 41:22.

**timing** 67:6.

**title** 36:1, 36:2, 36:8.

**today** 4:8, 4:15, 16:20, 38:17, 38:21, 45:9, 45:10, 45:19, 48:6, 49:23, 50:23, 51:10, 52:19, 54:21, 78:20, 81:4, 88:12, 90:9, 94:24, 97:3, 111:10, 116:4, 122:25,

123:24.

**together** 59:1, 69:21, 73:15.

**Tom** 2:47, 4:14.

**tomorrow** 10:22, 10:23, 12:6.

**took** 44:8, 47:17, 72:4, 87:15, 104:10.

**tool** 52:22.

**top** 11:13.

**topic** 31:6, 56:5, 98:2.

**topics** 52:18.

**total** 84:11.

**totality** 51:16.

**totally** 60:8.

**touch** 19:10, 20:3, 23:9, 24:21.

**touched** 59:9.

**TOUHY** 2:21.

**track** 48:16, 48:18.

**tracking** 42:6.

**train** 52:24.

**transactions** 42:21, 42:22.

**TRANSCRIPT** 125:2, 125:4.

**transfer** 12:5.

**transition** 88:11.

**Transmission** 66:22, 67:3, 69:22, 76:2, 76:7, 76:17, 78:19, 78:21, 78:23, 78:25, 79:2, 79:8, 81:3, 81:20.

**treat** 76:13.

**tried** 14:2, 62:2, 63:4.

**true** 20:7, 25:18, 33:21, 99:16, 116:17, 117:6, 118:3, 118:10.

**truly** 9:17, 75:22, 101:6.

**trust** 50:12.

**truth** 115:22.

**truthful** 117:21.

**try** 7:22, 10:18, 14:25, 74:11, 85:21.

**trying** 12:15, 26:12, 41:1, 54:17, 54:25, 63:5, 73:16, 82:13, 95:14, 98:12.

**TUOHY** 4:9, 114:13, 114:24, 115:2, 115:7, 115:18, 118:14, 118:20, 119:2, 119:17, 120:3.

**turn** 12:13, 51:19, 52:5, 53:1, 57:25, 69:3, 82:16, 89:14, 123:12.

**turned** 45:3.

**Turning** 111:15.

**turns** 84:3.

**tutorial** 97:24, 98:6, 98:8, 98:17,

**Concordance**

98:22, 98:25 .
**tutorials** 97:12 .
**twice** 32:8 .
**twice--once** 31:12 .
**two** 9:6, 13:14, 13:20, 25:10,
26:20, 31:15, 31:23, 32:3,
41:7, 57:16, 64:18, 65:17,
66:3, 66:15, 75:5, 83:23,
91:23, 113:11, 119:1, 119:2,
119:11, 120:14 .
**two-fold** 64:14 .
**two-license** 33:1 .
**TYLER** 2:45 .
**type** 20:10 .
**typical** 5:1, 17:5, 23:14 .
**typically** 6:24, 14:14, 17:7, 19:2 .
.
.
**< U >** .
**UL** 15:7 .
**ultimate** 95:5 .
**ultimately** 80:15 .
**unable** 64:2, 79:18, 81:25,
89:16 .
**unbounded** 106:5 .
**underlying** 30:3 .
**underneath** 11:13 .
**understand** 28:10, 28:11, 31:3,
37:2, 37:13, 49:5, 49:8, 49:14,
49:24, 53:22, 55:2, 56:2,
79:22, 80:7, 80:16, 81:6, 85:3,
91:15, 93:17, 93:20, 94:23,
95:9, 95:14, 100:19, 100:24,
100:25, 101:1, 101:16, 102:7,
102:8 .
**understanding** 23:4, 24:4,
24:14, 39:5, 56:24, 90:11,
91:16, 93:23, 94:21, 111:1,
112:19 .
**Understood** 96:18, 97:7, 109:2 .
**Underwriters** 23:15 .
**undisputed** 23:2 .
**unenlightening** 72:14 .
**unequivocal** 22:18 .
**unfair** 72:25, 81:8, 98:24 .
**unhappy** 51:3, 123:13 .
**unintentional** 64:1 .
**UNION** 2:18 .
**unique** 52:22 .
**uniquely** 25:16 .

**UNITED** 1:1, 1:25, 7:15, 125:7 .
**units** 19:10, 49:6, 83:25, 84:1,
84:12, 84:16 .
**universal** 106:4 .
**universe** 120:9 .
**Unless** 23:22, 26:23, 85:18,
108:21, 124:1 .
**unprompted** 98:2 .
**unquote** 21:4, 23:14, 119:5 .
**unreasonable** 32:8, 32:13 .
**unrelated** 95:22 .
**unrung** 96:25 .
**unseal** 8:2 .
**unsealed** 40:18, 52:4 .
**unsealed.** 52:6 .
**unsealing** 7:23 .
**unsure** 80:2 .
**until** 21:9, 40:17, 46:24, 50:23,
70:2, 77:25, 81:16, 99:21,
109:9 .
**untimely** 75:25 .
**untrue** 45:4 .
**unviable** 32:14 .
**uphold** 67:7 .
**upper** 28:21, 29:2, 56:10 .
**urgency** 53:9 .
**urges** 17:5 .
**users** 49:10 .
**uses** 34:24, 41:13, 86:18 .
**using** 10:5, 35:6, 64:23, 64:24 .
**usual** 5:15, 123:2 .
**utility** 22:15 .
.
.
**< V >** .
**vague** 56:13, 57:13 .
**valuable** 62:4, 70:21, 79:24 .
**valuation** 64:22, 66:6 .
**value** 33:18, 34:3, 34:19, 60:16,
70:17, 71:1, 83:2, 85:9, 86:15,
87:19, 93:24, 108:12 .
**values** 91:14 .
**variances** 63:20 .
**variety** 115:13 .
**various** 62:4, 113:23 .
**venire** 4:25 .
**Ventures** 34:10 .
**verdict** 7:2, 7:8 .
**Verizon** 80:15 .
**version** 27:11, 117:25 .

**versus** 4:3, 106:1 .
**via** 21:23, 22:25, 66:21, 96:6 .
**video** 8:23 .
**view** 28:23, 31:12, 38:12, 50:19,
56:12, 86:25, 105:5, 106:6 .
**views** 70:23 .
**violate** 7:17, 85:7 .
**violates** 31:20 .
**Virnetx** 34:14 .
**virtually** 41:3 .
**virtue** 19:25 .
**Vivint--are** 105:18 .
**voir** 107:2, 107:8, 107:13,
108:10, 108:13 .
**voluntarily** 48:24 .
**vs** 1:9 .
.
.
**< W >** .
**wait** 99:21 .
**waited** 67:4 .
**waiting** 77:25 .
**waive** 65:8 .
**waived** 58:2 .
**waiving** 62:25 .
**walks** 95:19 .
**wall** 14:15, 15:25 .
**wanted** 9:10, 49:15, 106:24,
107:8 .
**wants** 29:16, 29:22, 59:22 .
**WARD** 2:23, 2:27, 4:10, 106:19,
106:20, 106:22, 107:19,
108:3, 109:2 .
**WASHINGTON** 2:19 .
**Wayback** 121:16 .
**ways** 25:17, 110:25 .
**weak** 38:11 .
**website** 115:18, 118:15, 118:17,
118:19, 119:7, 121:8, 121:18 .
**websites** 113:23 .
**wedding** 120:4 .
**week** 47:21, 50:9 .
**weekend** 45:25, 50:11 .
**weeks** 46:2 .
**weight** 34:9, 34:21, 38:12,
74:15 .
**weights** 70:24 .
**welcome** 84:6, 109:24, 109:25 .
**well-aware** 46:9 .
**WEST** 2:12 .

**Concordance**

**whatever** 53:1, 59:6 .

**whatsoever** 42:10, 68:15 .

**whereas** 33:7, 83:25 .

**Whether** 18:20, 25:18, 34:4, 38:13, 39:9, 42:11, 50:11, 56:10, 56:21, 58:10, 67:18, 67:21, 78:13, 78:15, 81:15, 86:20, 86:21, 89:17, 100:12, 115:21, 117:12, 117:13 .

**white** 20:12 .

**whole** 119:3 .

**wide** 115:13 .

**WINTHROP** 2:35 .

**wireless** 13:1, 13:12, 15:13, 17:20, 17:22, 18:7, 24:5, 24:11 .

**wish** 116:6 .

**withdraw** 111:7, 112:1, 112:3 .

**Withdrawing** 28:25, 111:18, 111:19, 111:24 .

**withdrawn** 94:6, 111:14 .

**within** 47:21, 60:8, 85:6, 108:20, 119:25 .

**Without** 18:21, 45:6, 54:9, 57:23, 79:18, 98:3, 106:2 .

**witness** 10:8, 11:10, 11:11, 11:12, 11:18, 11:20, 11:21, 48:22, 99:9, 99:10, 99:15, 100:3, 100:8, 113:16, 117:22, 118:7 .

**witnesses** 6:11, 7:16, 7:17, 10:3, 42:8, 61:5, 70:17, 94:17, 94:25, 95:12, 97:18, 103:8, 116:6 .

**WL1995514** 76:12 .

**WL662237** 76:12 .

**wondering** 53:4 .

**word** 18:10, 18:15 .

**work** 9:20, 109:12 .

**working** 48:20, 110:1 .

**works** 15:5 .

**world** 45:13, 45:20, 54:18, 54:22, 55:2 .

**worry** 116:16 .

**worth** 60:16 .

**wrap** 59:10, 69:21 .

**wrist** 55:21 .

**wrong--i** 47:7 .

**www** 121:18 .

.

.

**< Y >** .

**yesterday** 29:5, 29:7, 47:17, 57:5 .

**YORK** 2:13 .

**you-all** 119:14, 122:7 .

**yourself** 13:3 .

.

.

**< Z >** .

**zip** 12:4 .